ROBERT E. OPERA – State Bar No. 101182
ropera@winthropcouchot.com
JEANNIE KIM – State Bar No. 270713
jkim@winthropcouchot.com
**WINTHROP COUCHOT**
**PROFESSIONAL CORPORATION**
660 Newport Center Drive, Suite 400
Newport Beach, CA 92660
Telephone:    (949) 720-4100
Facsimile:    (949) 720-4111

General Insolvency Counsel
for Debtor and Debtor-in-Possession

# UNITED STATES BANKRUPTCY COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re:<br><br>IMAGENETIX, INC., a Nevada corporation,<br><br>          Debtor and<br>          Debtor-in-Possession. | Case No. 12-16423 MM11<br><br>Chapter 11 Proceeding<br><br>**DEBTOR'S THIRD AMENDED CHAPTER 11 PLAN OF REORGANIZATION**<br><br><u>Plan Confirmation Hearing</u>:<br>DATE:     September 10, 2014<br>TIME:     2:00 p.m.<br>PLACE:  Department 1<br>             325 West "F" Street<br>             San Diego, CA 92101 |

# **TABLE OF CONTENTS**

**PAGE**

I.      INTRODUCTION.................................................................................... 2

II.     DEFINITIONS AND RULES OF CONSTRUCTION............................. 3
        2.1     Defined Terms ................................................................ 3
        2.2     Rules of Interpretation ................................................... 19
        2.3     Exhibits .......................................................................... 20

III.    UNCLASSIFIED CLAIMS ..................................................................... 20
        3.1     Allowed Administrative Claims ..................................... 21
                3.1.1   Payment........................................................... 21
                3.1.2   Administrative Claims Bar Date ....................... 21
                3.1.3   Deadline for Objections .................................. 22
                3.1.4   United States Trustee Fees .............................. 22
                3.1.5   Pre-Effective Date Professional Fee Claims ..... 22
                        3.1.5.1   Allowance of Pre-Effective Date Professional
                                  Fee Claims ...................................... 22
                        3.1.5.2   Issuance of Common Stock in Exchange for
                                  Allowed Pre-Effective Date Professional Fee
                                  Claims............................................. 22
                        3.1.5.3   Objections ....................................... 23
        3.2     Allowed Priority Tax Claims .......................................... 23

IV.     CLASSIFICATION OF CLAIMS AND INTERESTS............................. 24
        4.1     Overview......................................................................... 24
        4.2     Designation of Classes ................................................... 24
                4.2.1   Allowed Claims ............................................... 24
                        4.2.1.1   Class 1............................................ 24
                        4.2.1.2   Class 2............................................ 25
                        4.2.1.3   Class 3............................................ 25
                        4.2.1.4   Class 4............................................ 25
                        4.2.1.5   Class 5............................................ 25
                4.2.2   Interests ........................................................... 25
                        4.2.2.1   Class 6............................................ 25
        4.3     Summary of Classification............................................. 25

V.      TREATMENT OF CLASSES UNDER THIS PLAN ............................. 26
        5.1     Class 1 -- Allowed Secured Claim of Pacific Rainbow ..... 26
                5.1.1   Amount of Allowed Class 1 Claim..................... 26
                5.1.2   Debtor Collateral for Allowed Class 1 Claim...... 26
                5.1.3   Interest on Allowed Class 1 Claim .................... 26
                5.1.4   Distributions on Account of Allowed Class 1 Claim........................ 27

---

1

## **TABLE OF CONTENTS**

2

### **(Continued)**

|  |  |  | **PAGE** |
|---|---|---|---|

3

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

|  |  |  |  |
|---|---|---|---|
| 5.1.5 | Maturity of Allowed Class 1 Claim | ................................... | 27 |
| 5.1.6 | Pacific Rainbow Loan Agreements | ................................... | 27 |
| 5.1.7 | Satisfaction of Class 1 Allowed Claim/Release of Liens | ................. | 27 |
| 5.1.8 | Prepayment of Allowed Class 1 Claim | ........................... | 27 |
| 5.2 | Class 2 -- Allowed Secured Claim of TriPharma | .......................... | 27 |
| 5.2.1 | Amount of Allowed Class 2 Claim | .................................. | 27 |
| 5.2.2 | TriPharma Collateral | ............................................. | 28 |
| 5.2.3 | Interest on Allowed Class 2 Claim | ................................ | 28 |
| 5.2.4 | Distributions on Account of Allowed Class 2 Claim | ..................... | 28 |
| 5.2.4.1 | Effective Date Payment | ...................................... | 28 |
| 5.2.4.2 | Months 3-24 After the Effective Date | ......................... | 29 |
| 5.2.4.3 | Months 27-36 After the Effective Date | ....................... | 29 |
| 5.2.4.4 | Month 39 After the Effective Date Through Each Remaining Quarter During the Term of this Plan | ............... | 29 |
| 5.2.5 | TriPharma Prepayment Discount Obligation | ....................... | 29 |
| 5.2.6 | Right to Prepay Allowed Class 2 Claim | ........................... | 30 |
| 5.2.7 | Manner of Payment | ............................................. | 30 |
| 5.2.8 | Application of Payments | .......................................... | 30 |
| 5.2.9 | Amendment of the TriPharma Bankruptcy Claims | .................... | 30 |
| 5.2.10 | Satisfaction of TriPharma's Allowed Claims | ...................... | 31 |
| 5.2.11 | Payment Default | ................................................ | 31 |
| 5.2.11.1 | Acceleration | ............................................... | 32 |
| 5.2.11.2 | Default Interest | ............................................ | 32 |
| 5.2.11.3 | Foreclosure | ............................................... | 32 |
| 5.2.12 | Resolution of Litigation | ...................................... | 32 |
| 5.2.12.1 | Cancellation of Notice of TriPharma Judgment Lien | .......... | 32 |
| 5.2.12.2 | Satisfaction of Judgment | ................................... | 32 |
| 5.2.12.3 | TriPharma Arbitration II | ................................... | 32 |
| 5.2.12.4 | GNC Action | ................................................ | 32 |
| 5.2.12.5 | Solstice Action | ............................................ | 33 |
| 5.2.12.6 | MAX Action | ................................................ | 33 |
| 5.2.12.7 | Fraudulent Transfer Action | ................................. | 33 |
| 5.2.13 | Mutual Release of Claims | ....................................... | 33 |
| 5.2.14 | TriPharma Settlement Agreement | ................................. | 33 |
| 5.2.15 | Release of TriPharma's Liens | ................................... | 33 |
| 5.3 | Class 3 -- Any Allowed Secured Claims, Other than Class 1 and Class 2 Allowed Secured Claims | ................................... | 34 |
| 5.3.1 | Class 3 Treatment Options | ...................................... | 34 |
| 5.3.1.1 | Treatment Option 1 | ......................................... | 34 |
| 5.3.1.2 | Treatment Option 2 | ......................................... | 34 |
| 5.3.1.3 | Treatment Option 3 | ......................................... | 35 |

28

-ii-

## **TABLE OF CONTENTS**

### **(Continued)**

| | | PAGE |
|---|---|---|
| | 5.3.1.4 Treatment Option 4 | 35 |
| 5.3.2 | Time for Making and Implementing Class 3 Treatment Options | 35 |
| 5.4 | Class 4 -- Any Allowed Priority Non-Tax Claims | 35 |
| 5.4.1 | Treatment of Allowed Priority Non-Tax Claims | 35 |
| 5.5 | Class 5 -- Allowed General Unsecured Claims | 36 |
| 5.5.1 | Distributions on Account of Allowed Class 5 Claims | 36 |
| 5.5.2 | Schedule of Distributions on Account of Allowed Class 5 Claims | 36 |
| 5.5.3 | No Post-Effective Date Interest | 36 |
| 5.5.4 | Termination of Reorganized Debtor's Obligations to Holders of Allowed Class 5 Claims | 36 |
| 5.5.5 | Allowed General Unsecured Claim of TriPharma | 36 |
| | 5.5.5.1 Classification of TriPharma's Allowed General Unsecured Claim | 36 |
| | 5.5.5.2 Application of Payments Made to TriPharma to Allowed Class 2 Claim | 37 |
| 5.5.6 | Prepayment of Allowed Class 5 Claims | 38 |
| 5.6 | Class 6 -- Interests | 38 |
| 5.6.1 | Treatment of Interests | 38 |
| 5.6.2 | Issuance of PerioDyne Stock | 38 |
| 5.6.3 | Issuance of PerioDyne Warrants | 38 |
| 5.6.4 | Issuance of Series A Preferred Stock | 38 |
| 5.6.5 | Equity Investor Warrants | 38 |
| 5.6.6 | Management Stock Options | 39 |
| VI. PLAN IMPLEMENTATION | | 39 |
| 6.1 | Overview | 39 |
| 6.2 | Conditions Precedent to Plan Confirmation | 39 |
| 6.3 | Conditions Precedent to the Effectiveness of the Plan | 39 |
| 6.4 | Implementation of Plan | 40 |
| 6.5 | Corporate Action | 40 |
| 6.6 | Plan Funding | 40 |
| 6.7 | Representative of the Estate | 41 |
| 6.8 | The Reorganized Debtor | 41 |
| 6.8.1 | Corporate Powers | 41 |
| 6.8.2 | Board of Directors | 41 |
| 6.8.3 | Officers of the Reorganized Debtor | 41 |
| 6.9 | Causes of Action | 42 |
| 6.9.1 | Reorganized Debtor's Right to Prosecute Causes of Action | 42 |
| 6.9.2 | Creditor's Right to Make Demand for Prosecution of Causes of Action | 42 |
| 6.10 | Post-Effective Date Professional Fees | 43 |

-iii-

# TABLE OF CONTENTS

## (Continued)

PAGE

| | | |
|---|---|---|
| 6.10.1 | Reorganized Debtor's Employment of Professionals | 43 |
| 6.10.2 | Ordinary Course Payments to Professionals | 43 |
| 6.11 | Disposition of Assets | 44 |
| 6.12 | Compromise of Claims Objections and Causes of Action | 44 |
| 6.13 | Bankruptcy Court Approval Relative to Post-Confirmation Matters | 44 |
| 6.14 | Plan Completion Certification | 44 |
| 6.15 | Final Decree | 44 |
| 6.16 | Resolution of Disputes | 44 |
| 6.17 | Disposition of Guarantees | 45 |

**VII. DISTRIBUTIONS** ............................................................................ 45

| | | |
|---|---|---|
| 7.1 | Designation and Role of the Disbursing Agent | 45 |
| 7.1.1 | Disbursing Agent | 45 |
| 7.1.2 | Payment of Fees and Expenses | 45 |
| 7.2 | Distribution of Property Under this Plan | 45 |
| 7.2.1 | Cash Distributions | 45 |
| 7.2.2 | Setoffs and Recoupment | 46 |
| 7.2.3 | No De Minimis Distributions | 46 |
| 7.2.4 | Timeliness of Distributions | 46 |
| 7.2.5 | Limitations on Liability | 46 |
| 7.2.6 | Delivery of Distributions | 47 |
| 7.2.6.1 | Distributions Only to Holders of an Allowed Claim | 47 |
| 7.2.6.2 | Addresses to Which Distributions Will Be Sent | 47 |
| 7.2.7 | Undeliverable Distributions | 47 |
| 7.2.8 | Disposition of Unclaimed Property | 48 |
| 7.2.9 | Approval for Schedule of Proposed Distributions | 48 |
| 7.2.10 | Compliance with Tax Requirements | 48 |
| 7.2.11 | Further Assurances Regarding Distributions | 49 |
| 7.2.12 | Creditor's Payment of Obligations or Turn Over of Property to the Reorganized Debtor | 49 |

**VIII. OBJECTIONS TO DISPUTED CLAIMS** ........................................... 49

| | | |
|---|---|---|
| 8.1 | Objection to Claims | 49 |
| 8.1.1 | Reorganized Debtor's Right to Object to Disputed Claims | 49 |
| 8.1.2 | Creditor's Right to Make Demand for Filing Objection To Disputed Claims | 49 |
| 8.2 | Claims Objection Deadline | 51 |
| 8.3 | Treatment of Disputed Claims | 51 |
| 8.3.1 | No Distribution Pending Allowance | 51 |
| 8.3.2 | Distribution After Allowance | 51 |
| 8.3.3 | Reserve for Disputed Claims | 51 |

-iv-

# TABLE OF CONTENTS

### (Continued)

| | | | PAGE |
|---|---|---|---|
| | 8.3.4 | No Distribution Until Allowance of Disputed Claim | 52 |
| | 8.4 | Bar Date for Filing Avoidance Action Payment Claims | 52 |
| IX. | LITIGATION | | 52 |
| | 9.1 | Authorization to Assert Causes of Action | 52 |
| | 9.2 | Evaluation of Causes of Action | 53 |
| | 9.3 | Retention of Professionals | 53 |
| | 9.4 | Preservation of Causes of Action | 53 |
| | 9.5 | Subordination of Claims | 54 |
| X. | EXECUTORY CONTRACTS AND UNEXPIRED LEASES | | 54 |
| | 10.1 | Executory Contracts and Unexpired Leases Being Assumed | 54 |
| | 10.2 | Executory Contracts and Unexpired Leases Being Rejected | 55 |
| | 10.3 | Retention of Property Rights | 56 |
| | 10.4 | Bar Date for Rejection Claims | 56 |
| | 10.5 | Cure Claims Schedule | 56 |
| XI. | EFFECT OF CONFIRMATION OF THIS PLAN | | 57 |
| | 11.1 | Discharge | 57 |
| | 11.2 | Indemnity | 57 |
| | 11.3 | Release | 58 |
| | 11.4 | Distribution of Property Free and Clear of Liens, Claims and Interests | 59 |
| | 11.5 | Binding Effect of Plan | 59 |
| | 11.6 | Revesting of Assets | 59 |
| XII. | LIMITATION ON LIABILITY | | 59 |
| | 12.1 | No Liability for Solicitation or Participation | 59 |
| | 12.2 | Good Faith | 59 |
| | 12.3 | Limitation of Liability Regarding Plan | 59 |
| XIII. | OTHER PLAN PROVISIONS | | 60 |
| | 13.1 | Exemption from Stamp, Transfer and Other Taxes | 60 |
| | 13.2 | Books and Records | 60 |
| | 13.3 | Post-Effective Date Quarterly Fees | 60 |
| | 13.4 | Post-Effective Date Status Reports | 60 |
| | 13.5 | Effectiveness of Court Orders | 61 |
| | 13.6 | No Admissions | 61 |
| | 13.7 | Revocation of the Plan | 61 |
| | 13.8 | Severability of Plan Provisions | 61 |
| | 13.9 | Governing Law | 62 |
| | 13.10 | Retention of Jurisdiction | 62 |

-v-

## **TABLE OF CONTENTS**

### **(Continued)**

| | | PAGE |
|---|---|---|
| 13.11 | Successors and Assigns | 64 |
| 13.12 | Business Day | 64 |
| 13.13 | No Waiver | 64 |
| 13.14 | Post-Effective Date Notice | 65 |
| 13.15 | Modification of this Plan | 65 |
| 13.16 | Nonconsensual Confirmation | 65 |
| 13.17 | Other Documents and Actions | 66 |
| 13.18 | Notices | 66 |
| 13.19 | Inconsistencies | 66 |
| 13.20 | Changes in Rates Subject to Regulatory Commission Approval | 66 |
| 13.21 | Modification/Superseding of Loan Documents | 66 |
| 13.22 | Implementation of Section 1142 of the Bankruptcy Code | 67 |
| 13.23 | Corporate Charter | 67 |
| XIV. | RECOMMENDATION AND CONCLUSION | 67 |

**EXHIBITS**

"1"     TriPharma Settlement Agreement

"2"     Assumed Contracts and Leases

"3"     Rejected Contracts and Leases

"4"     Administrative Claim Assignment Agreements

-vi-

1       Debtor Imagenetix, Inc. hereby proposes this Plan and requests confirmation hereof

2   pursuant to section 1129 of the Bankruptcy Code.[1]

3
# I.

4
## INTRODUCTION

5       This Plan is proposed by the Debtor for the resolution of Claims against the Estate.

6   Pursuant to this Plan, the Allowed Claims of Creditors will be paid in accordance with the terms

7   and conditions of this Plan and otherwise will be discharged.

8       Sent to you in the same envelope as this Plan is the Debtor's Disclosure Statement.  The

9   Disclosure Statement has been approved by the Bankruptcy Court as containing "adequate

10   information" under section 1125 of the Bankruptcy Code, and is being provided along with this

11   Plan in order to help you to understand this Plan and to evaluate the merits of this Plan.  The

12   Disclosure Statement addresses, among other things, the Debtor's business, the Debtor's assets

13   and liabilities and the material terms of this Plan.  Creditors are encouraged to read the

14   Disclosure Statement before voting on this Plan.

15       The objective of this Plan is for the Debtor to reorganize its financial affairs pursuant to a

16   comprehensive debt restructuring of the Debtor, in accordance with the terms and conditions of

17   this Plan.  Pursuant to this Plan, the Reorganized Debtor will continue in business after the

18   Confirmation of the Plan, and will make payments to satisfy Allowed Claims in accordance with

19   the terms and conditions of this Plan.

20       This Plan divides Creditors and the Interest Holders into Classes based upon their

21   respective legal rights and interests, and provides for the satisfaction of Allowed Claims, in

22   accordance with the terms and conditions of this Plan.  The Interest Holders will retain pursuant

23   to this Plan their existing Interests, without alteration or modification.

24

25

26   [1] The definitions of the capitalized terms contained herein are set forth in Article II of this Plan.

-2-

27

**DEBTOR'S THIRD AMENDED CHAPTER 11 PLAN OF REORGANIZATION**

28   MAINDOCS-#204711-v1-Imagenetix_-_Clean_-_3rdAmendedPlan.doc

1    **UNLESS SPECIFICALLY SET FORTH IN THIS PLAN TO THE CONTRARY,**

2    **THE INFORMATION CONTAINED OR REFERRED TO IN THIS PLAN HAS NOT**

3    **BEEN SUBJECT TO CERTIFIED AUDIT.  RECORDS KEPT BY THE DEBTOR RELY**

4    **FOR THEIR ACCURACY ON BOOKKEEPING PERFORMED INTERNALLY BY THE**

5    **DEBTOR.  ALTHOUGH THE DEBTOR BELIEVES THAT EVERY REASONABLE**

6    **EFFORT HAS BEEN MADE TO PRESENT HEREIN ACCURATE FINANCIAL**

7    **INFORMATION, THE RECORDS KEPT BY THE DEBTOR ARE NEITHER**

8    **WARRANTED NOR REPRESENTED TO BE FREE OF INACCURACY.  NEITHER**

9    **THE DEBTOR NOR ANY OF THE PROFESSIONALS EMPLOYED BY THE DEBTOR**

10   **HAS INDEPENDENTLY VERIFIED THE INFORMATION CONTAINED HEREIN,**

11   **AND NONE OF THEM MAKES ANY REPRESENTATION OR WARRANTY WITH**

12   **RESPECT TO THE ACCURACY OF SUCH INFORMATION.**

13   **ANY CREDITOR ENTITLED TO VOTE ON THIS PLAN IS URGED TO**

14   **REVIEW CAREFULLY THIS PLAN PRIOR TO VOTING ON THIS PLAN, AND MAY**

15   **DESIRE TO CONSULT WITH ITS OWN LEGAL COUNSEL PRIOR TO VOTING ON**

16   **THIS PLAN IN ORDER TO ENSURE A COMPLETE UNDERSTANDING OF THE**

17   **TERMS OF THIS PLAN.**

18                                             **II.**

19                        **DEFINITIONS AND RULES OF CONSTRUCTION**

20   **2.1    Defined Terms.**  The following terms (which appear in this Plan as capitalized

21   terms), when used in this Plan, have the meanings set forth below.

22          **2.1.1    "Adequate Protection Payments"** has the meaning set forth in paragraph

23   24(b) of the TriPharma Settlement Agreement.

24          **2.1.2    "Administrative Claim"** means a Claim for costs or expenses that are

25   allowable under sections 503(b) or 507(b) of the Bankruptcy Code or 28 U.S.C. § 1930.

26   These costs or expenses may include: (a) actual, necessary costs and expenses of

27   preserving the Estate after the Petition Date; (b) Ordinary Course Administrative Claims;

28

-3-

(c) Pre-Effective Date Professional Fee Claims; (d) Administrative Tax Claims; and (e) United States Trustee Fees.

**2.1.3    "Administrative Claims Bar Date"** has the meaning set forth in Section 3.1.2 of this Plan.

**2.1.4    "Administrative Claims Objection Deadline"** has the meaning set forth in Section 3.1.3 of this Plan.

**2.1.5    "Administrative Tax Claim"** means a Tax Claim, other than a Secured Claim, that a governmental unit asserts against the Debtor for any tax period that, in whole or in part, falls within the period commencing on the Petition Date and ending on the Effective Date.

**2.1.6    "Allowed Administrative Claim"** means an Administrative Claim that is allowed as set forth in Section 3.1 hereof or otherwise by a Final Order.

**2.1.7    "Allowed Avoidance Action Payment Claim"** means an Allowed Claim based upon or arising from an entity's payment to the Debtor or Reorganized Debtor of a claim asserted against the entity pursuant to an Avoidance Action.  Any Allowed Avoidance Action Payment Claim shall be treated hereunder as an Allowed Class 5 Claim.

**2.1.8    "Allowed Claim"** means a Claim (a) that is listed in the Bankruptcy Schedules filed with the Bankruptcy Court by the Debtor and not listed as disputed, contingent, unliquidated or unknown as to amount and as to which no timely objection has been filed; (b) with respect to which a Proof of Claim has been filed by the Bar Date, and as to which no objection is filed within the time period fixed by the Bankruptcy Code, the Bankruptcy Rules, this Plan or by order of the Bankruptcy Court, or as to which any such objection has been determined in whole or in part in favor of the holder of the Claim by a Final Order; or (c) that has been resolved pursuant to a settlement agreement approved by Final Order of the Court or otherwise authorized pursuant to this Plan.  The amount of an Allowed Claim shall be as follows:  (i) if the Creditor did not file a Proof of

-4-

Claim with the Bankruptcy Court on or before the Bar Date, the amount of the Creditor's Claim as listed in the Bankruptcy Schedules as neither disputed, contingent, unliquidated or unknown; or (ii) if the Creditor filed a Proof of Claim with the Bankruptcy Court on or before the Bar Date, (1) the amount stated in such Proof of Claim if no objection to such Proof of Claim is filed within the time period fixed by the Bankruptcy Code, the Bankruptcy Rules, this Plan or by order of the Bankruptcy Court, (2) the amount thereof fixed by a Final Order of the Bankruptcy Court if an objection to such Proof of Claim is filed within the time period fixed by the Bankruptcy Code, the Bankruptcy Rules, this Plan or by order of the Bankruptcy Court; or (3) the amount fixed pursuant to a settlement agreement approved by Final Order of the Court or otherwise authorized pursuant to this Plan.  Any Claim that is not filed by the Bar Date and that is listed in the Bankruptcy Schedules as wholly disputed, unliquidated, contingent or unknown, or that is not allowed under the terms of this Plan, shall be disallowed in full, and no Distribution shall be made on account of such Claim.  No default interest or late charges or comparable fees, charges or penalties shall be included as part of an Allowed Claim.

**2.1.9** **"Allowed Class '***' Claim"** means an Allowed Claim classified in the specified Class.

**2.1.10** **"Allowed Deficiency Claim"** means that portion of an Allowed Claim that is in excess of the value of any Debtor Collateral which is security for the repayment of such Claim, calculated in accordance with the provisions of section 506 of the Bankruptcy Code.

**2.1.11** **"Allowed General Unsecured Claim"** means a General Unsecured Claim that is an Allowed Claim.

**2.1.12** **"Allowed Priority Non-Tax Claim"** means an unsecured Allowed Claim entitled to priority pursuant to sections 507(a)(4), 507(a)(5), or 507(a)(7) of the Bankruptcy Code.

**DEBTOR'S THIRD AMENDED CHAPTER 11 PLAN OF REORGANIZATION**

MAINDOCS-#204711-v1-Imagenetix_-_Clean_-_3rdAmendedPlan.doc

**2.1.13  "<u>Allowed Priority Tax Claim</u>"** means an Allowed Claim entitled to priority under section 507(a)(8) of the Bankruptcy Code.

**2.1.14  "<u>Allowed Rejection Claim</u>"** means an Allowed General Unsecured Claim based upon or arising from the rejection of an executory contract or unexpired lease pursuant to a Final Order of the Bankruptcy Court or pursuant to this Plan.  Any Allowed Rejection Claim shall be treated hereunder as an Allowed Class 5 Claim.

**2.1.15  "<u>Allowed Secured Claim</u>"** means an Allowed Claim secured by a valid and unavoidable Lien against property in which the Estate has an interest, or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value, determined in accordance with section 506(a) of the Bankruptcy Code, of the Secured Creditor's interest in the Estate's interest in the Debtor Collateral securing the Claim, or to the extent of the amount subject to setoff, whichever is applicable.  Unpaid principal and any accrued interest allowable under section 506 of the Bankruptcy Code with respect to an Allowed Secured Claim shall be computed as of the Effective Date, and the Allowed Secured Claim shall thereafter bear interest as provided in this Plan.

**2.1.16  "<u>Asset Disposition</u>"** has the meaning set forth in Section 6.11 of this Plan.

**2.1.17  "<u>Avoidance Action</u>"** means an adversary proceeding, lawsuit or other action or proceeding filed pursuant to sections 502(d), 506, 510, 542, 543, 544, 545, 547, 548, 549, 553 or other sections of the Bankruptcy Code, an adversary proceeding, lawsuit or other action or proceeding based on applicable non-bankruptcy law that may be incorporated or brought under the foregoing sections of the Bankruptcy Code, an adversary proceeding, lawsuit or other action or proceeding arising under, or relating to, any similar state law or federal law, and any other similar action or proceeding filed to recover property for or on behalf of the Estate, or to avoid a Lien or transfer, whether or not such adversary proceeding, lawsuit, action or proceeding is initiated on or before the Effective Date.

-6-

**2.1.18** "<u>**Avoidance Action Payment Claim**</u>" means a Claim based upon or arising from an entity's payment to the Debtor or Reorganized Debtor of a claim asserted against the entity pursuant to an Avoidance Action.

**2.1.19** "<u>**Bankruptcy Code**</u>" means the United States Bankruptcy Code, as set forth in 11 U.S.C. §§ 101-1532, as now in effect and as may be hereafter amended.

**2.1.20** "<u>**Bankruptcy Court**</u>" means the United States Bankruptcy Court for the Southern District of California.

**2.1.21** "<u>**Bankruptcy Rules**</u>" means, collectively, the Federal Bankruptcy Rules and the Local Bankruptcy Rules.

**2.1.22** "<u>**Bankruptcy Schedules**</u>" means the Schedules of Assets and Liabilities and Statement of Financial Affairs filed by the Debtor in the Case, as they may have been amended and as they may be amended hereafter from time to time.

**2.1.23** "<u>**Bar Date**</u>" means the last date for Creditors whose Claims are not scheduled, or whose Claims are scheduled in the Bankruptcy Schedules as disputed, contingent, unliquidated or unknown as to amount, to file Proofs of Claim, as set forth in an order of the Bankruptcy Court entered on June 19, 2013. The Bar Date for filing a Proof of Claim on account of a General Unsecured Claim was July 24, 2013.

**2.1.24** "<u>**Business Day**</u>" means any day other than a Saturday, Sunday or a legal holiday (as defined in Rule 9006(a) of the Federal Bankruptcy Rules).

**2.1.25** "<u>**Case**</u>" means the case under Chapter 11 of the Bankruptcy Code commenced by the Debtor on the Petition Date and bearing Case No. 12-16423 MM11.

**2.1.26** "<u>**Case Closing Date**</u>" means the date on which the Bankruptcy Court enters a Final Decree closing the Case, in accordance with section 350 of the Bankruptcy Code.

**2.1.27** "<u>**Cash**</u>" means cash or cash equivalents including, but not limited to, checks or other similar forms of payment or exchange.

-7-

**2.1.28** "**Causes of Action**" means any and all claims, demands, rights, actions, causes of action and suits of the Debtor or the Estate, of any kind or character whatsoever, arising prior to the Effective Date, in contract or in tort, at law or in equity or under any other theory of law, that the Debtor or the Debtor's Estate has or asserts, or may have or assert, against third parties, whether or not the subject of litigation or otherwise asserted as of the Effective Date, and which have not been settled or otherwise resolved by Final Order as of the Effective Date, including but not limited to:  (a) Avoidance Actions; (b) claims for refunds, rebates or returns of deposits of any nature, including any Tax or insurance refunds; (c) claims to recover accounts receivable; and (d) any other claims or demands which may be asserted against third parties.

**2.1.29** "**Claim**" means a "claim" against the Debtor, as such term is defined in section 101(5) of the Bankruptcy Code.

**2.1.30** "**Claims Objection Deadline**" means the <u>latest</u> of the following dates:  (a) the one hundred eightieth (180th) day after the Effective Date; (b) with respect to a specific Claim, the ninetieth (90th) day after a Proof of Claim with respect to such Claim is filed by a Creditor; or (c) with respect to a specific Claim, such greater period of limitation as may be fixed or extended by the Bankruptcy Court or by agreement of the Creditor asserting such Claim.

**2.1.31** "**Class**" means a grouping of Claims or the Interests, as classified in Article IV of this Plan.

**2.1.32** "**Class 3 Treatment Option**" has the meaning set forth in Section 5.3 of this Plan.

**2.1.33** "**Common Stock**" means common stock of the Debtor, as traded on the Over-The-Counter Bulletin Board market under the trading symbol "IAGXQ."

**2.1.34** "**Confirmation**" means the entry of the Confirmation Order by the Bankruptcy Court.

**DEBTOR'S THIRD AMENDED CHAPTER 11 PLAN OF REORGANIZATION**
MAINDOCS-#204711-v1-Imagenetix_-_Clean_-_3rdAmendedPlan.doc

**2.1.35  "<u>Confirmation Date</u>"** means the date on which the Bankruptcy Court enters the Confirmation Order on its docket.

**2.1.36  "<u>Confirmation Hearing</u>"** means the hearing before the Bankruptcy Court to consider the confirmation of this Plan pursuant to section 1128(a) of the Bankruptcy Code, as such hearing may be continued from time to time.

**2.1.37  "<u>Confirmation Hearing Date</u>"** means the first date on which the Bankruptcy Court holds the Confirmation Hearing.

**2.1.38  "<u>Confirmation Order</u>"** means the order of the Bankruptcy Court confirming this Plan under section 1129 of the Bankruptcy Code.

**2.1.39  "<u>Creditor</u>"** means the holder of a Claim against the Debtor.

**2.1.40  "<u>Cure Claims</u>"** has the meaning set forth in Section 10.5 of this Plan.

**2.1.41  "<u>Cure Claims Schedule</u>"** has the meaning set forth in Section 10.5 of this Plan.

**2.1.42  "<u>Dameshek</u>"** means Evan Dameshek.  Dameshek is the managing member of TriPharma and is a TriPharma Settlement Agreement Party.

**2.1.43  "<u>Debtor</u>"** means Imagenetix, Inc., the debtor and debtor-in-possession in the Case.  For the purpose of this Plan, references to the "Debtor" shall include the Reorganized Debtor.

**2.1.44  "<u>Debtor Collateral</u>"** means any property or interest in property of the Estate subject to a Lien of a Secured Creditor that is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable federal or state law.

**2.1.45  "<u>Deficiency Claim</u>"** means that portion of a Claim that is in excess of the value of the Debtor Collateral which is security for the repayment of such Claim, calculated in accordance with the provisions of section 506 of the Bankruptcy Code.

**2.1.46  "<u>De Minimis Distribution</u>"** has the meaning set forth in Section 7.2.3 of this Plan.

**2.1.47** "**Disbursing Agent**" has the meaning set forth in Section 7.1.1 of this Plan. The Reorganized Debtor shall serve as Disbursing Agent under this Plan.

**2.1.48** "**Disclosure Statement**" means that Second Amended Disclosure Statement relating to this Plan, including, without limitation, all exhibits and schedules thereto, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code, as may be amended, modified or supplemented from time to time in accordance with the provisions of the Bankruptcy Code and Bankruptcy Rules.

**2.1.49** "**Disclosure Statement Hearing Date**" means the date upon which the Bankruptcy Court initially conducts a hearing regarding the approval of the Disclosure Statement pursuant to section 1125 of the Bankruptcy Code.

**2.1.50** "**Disclosure Statement Order**" means the order entered by the Bankruptcy Court approving the Disclosure Statement.

**2.1.51** "**Disputed Claim**" means (a) any Claim or portion of a Claim as to which an objection to the allowance thereof has been interposed by the deadline set herein or such later date as may be fixed by the Bankruptcy Court, which objection has not been withdrawn or determined by Final Order; (b) any Claim for which a Proof of Claim is required to be filed and no such Proof of Claim is filed or, if filed, is filed after the applicable Bar Date for such Claim; and (c) any contingent Claim or unliquidated Claim.

**2.1.52** "**Disputed Claims Reserve**" has the meaning set forth in Section 8.3.3 of this Plan.

**2.1.53** "**Disputed Class '***' Claim**" means a Disputed Claim classified in the specified Class.

**2.1.54** "**Distribution**" means any transfer of Cash under the Plan to the holder of an Allowed Claim.

**2.1.55** "**Distribution Date**" means, as to any Allowed Claim, the date on which a Distribution on account of such Allowed Claim must be paid under this Plan.

**2.1.56** "<u>**Distribution Schedule**</u>" has the meaning set forth in Section 7.2.9 of this Plan.

**2.1.57** "<u>**Equity Infusion**</u>" means an advance of equity financing to the Reorganized Debtor by an Equity Investor pursuant to the provisions of the Series A Preferred Stock Agreement.

**2.1.58** "<u>**Equity Investor**</u>" means a person or entity that provides to the Reorganized Debtor an Equity Infusion.

**2.1.59** "<u>**Equity Investor Warrant**</u>" means a stock warrant to be issued to an Equity Investor pursuant to a Series A Preferred Stock Agreement.

**2.1.60** [Intentionally omitted.]

**2.1.61** [Intentionally omitted.]

**2.1.62** "<u>**Effective Date**</u>" means the third (3rd) Business Day following the waiver or satisfaction of the conditions set forth in Section 6.3 of this Plan.

**2.1.63** "<u>**Effective Date Cash Balance**</u>" means the Debtor's Cash on hand as of the Effective Date.

**2.1.64** "<u>**Estate**</u>" means the estate created in the Case under section 541 of the Bankruptcy Code.

**2.1.65** "<u>**Federal Bankruptcy Rules**</u>" means the Federal Rules of Bankruptcy Procedure, as now in effect and as may be hereafter amended.

**2.1.66** "<u>**Final Decree**</u>" has the meaning set forth in Section 6.15 of this Plan.

**2.1.67** "<u>**Final Order**</u>" means an order or judgment of the Bankruptcy Court or other applicable court, as entered on the applicable docket, that has not been reversed, stayed, modified or amended, and as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or to obtain a rehearing shall then be pending or as to which any right to appeal, petition for certiorari, reargue, or obtain a rehearing shall have been waived in writing in form and substance satisfactory to the

-11-

_____

**DEBTOR'S THIRD AMENDED CHAPTER 11 PLAN OF REORGANIZATION**

MAINDOCS-#204711-v1-Imagenetix_-_Clean_-_3rdAmendedPlan.doc

Debtor or to the Reorganized Debtor, as the case may be, or, in the event that an appeal, writ of certiorari, or proceeding for reargument or rehearing of such order or judgment has been sought, such order or judgment shall have been affirmed by the highest court to which such order or judgment was appealed, or certiorari has been denied, or from which reargument or rehearing was sought, and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired.

**2.1.68** **"Fraudulent Transfer Action"** has the meaning set forth in paragraph P of the TriPharma Settlement Agreement.

**2.1.69** **"Fraudulent Transfer Action Defendants"** has the meaning set forth in paragraph P of the TriPharma Settlement Agreement.

**2.1.70** **"Frutarom Action"** means that action pending in the United States District Court for the Southern District of California, as Case No. 3:12-CV-02823-GPC-WMC, by which the Debtor asserts against Frutarom USA, Inc. claims for damages.

**2.1.71** "**General Unsecured Claim**" means any Claim that is not an Administrative Claim, a Priority Tax Claim, a Priority Non-Tax Claim or a Secured Claim, including, without limitation, a Rejection Claim, a Deficiency Claim or an Avoidance Action Payment Claim.

**2.1.72** **"GNC Action"** has the meaning set forth in paragraph M of the TriPharma Settlement Agreement.

**2.1.73** **"GNC Action Defendants"** has the meaning set forth in paragraph M of the TriPharma Settlement Agreement.

**2.1.74** **"Initial Distribution Date"** has the meaning set forth in Section 7.2.8 of this Plan.

**2.1.75** **"Interest"** means an "equity security" in the Debtor as of the Effective Date (but not including any equity security issued under this Plan), as such term is defined in section 101(16) of the Bankruptcy Code.

**2.1.76** **"Interest Holder"** means the holder of an Interest in the Debtor.

-12-

**2.1.77 "<u>Internal Revenue Code</u>"** means the Internal Revenue Code of 1986, now in effect and as may be hereafter amended.

**2.1.78 "<u>Lien</u>"** means any lien, security interest, mortgage, deed of trust, encumbrance, pledge or other charge against assets or properties of the Debtor.

**2.1.79 "<u>Loan Documents</u>"** has the meaning set forth in Section 13.21 of this Plan.

**2.1.80 "<u>Local Bankruptcy Rules</u>"** means the Local Bankruptcy Rules applicable to cases pending before the Bankruptcy Court, as now in effect and as may be hereafter amended.

**2.1.81 "<u>Management Individuals</u>"** means, collectively, the following individuals:  Spencer, President and Chief Executive Officer; Debra L. Spencer, Corporate Secretary; Lowell W. Giffhorn, Chief Financial Officer; Jandra Thomas; and William A. Toomey.

**2.1.82 "<u>Max</u>"** has the meaning set forth in paragraph O of the TriPharma Settlement Agreement.

**2.1.83 "<u>Max Action</u>"** has the meaning set forth in paragraph O of the TriPharma Settlement Agreement.

**2.1.84 "<u>McKennon Firm</u>"** has the meaning set forth in paragraph 10(a)(viii) of the TriPharma Settlement Agreement.

**2.1.85 "<u>Net Proceeds</u>"** means any Cash proceeds received by the Reorganized Debtor in connection with or as a result of an Asset Disposition, <u>less</u> the following: (a) the amount of any Liens encumbering the asset or property that is the subject of the Asset Disposition; (b) the costs and expenses, including brokers' commissions, incurred by the Reorganized Debtor with respect to the Asset Disposition; and (c) a reserve for any anticipated Tax obligations arising from the Asset Disposition as determined reasonably by the Reorganized Debtor.

-13-

**2.1.86 "<u>Net Recoveries</u>"** means any Cash proceeds received by the Reorganized Debtor in connection with or as a result of the assertion, litigation or settlement of any Cause of Action, <u>less</u> the following: (a) any reasonable attorneys' fees and costs, other reasonable Professional fees and costs, and any other reasonable fees, costs and expenses incurred by the Debtor or by the Reorganized Debtor with respect to the assertion, litigation or settlement of such Cause of Action; and (b) a reserve for any anticipated Tax obligations arising from the Reorganized Debtor's receiving such Net Recovery, as determined reasonably by the Reorganized Debtor.

**2.1.87 "<u>Nikken Action</u>"** means that action pending in the United States District Court for the Central District of California, as Case No. 7-CV11-3727 GHR (VBKx), by which the Debtor asserts against Nikken, Inc. and other defendants claims for damages and for injunctive relief.

**2.1.88** [Intentionally omitted.]

**2.1.89 "<u>Ordinary Course Administrative Claim</u>"** means an Administrative Claim allowable under section 503(b) of the Bankruptcy Code, that is incurred in the ordinary course of the Debtor's operations, exclusive of any Pre-Effective Date Professional Fee Claims, Administrative Tax Claims and United States Trustee Fees.

**2.1.90 "<u>Pacific Rainbow</u>"** means Pacific Rainbow, Inc.

**2.1.91 "<u>Pacific Rainbow Loan Agreements</u>"** means, collectively, the following agreements between the Debtor and Pacific Rainbow: that Promissory Note, dated May 9, 2011; that Promissory Note, dated October 1, 2011; that Security Agreement, dated October 1, 2011; and any all other loan agreements, security agreements, financing statements, and other instruments and documents evidencing, establishing or perfecting Pacific Rainbow's Secured Claim against the Debtor, and any and all amendments, modifications or supplements thereto.

-14-

2.1.92 **"PerioDyne Acquisition"** means the Reorganized Debtor's acquisition of the common stock in PerioDyne, LLC pursuant to the provisions of the PerioDyne Stock Purchase Agreement.

2.1.93 **"PerioDyne Stock"** means Common Stock to be issued to Vanderlinden pursuant to the PerioDyne Stock Purchase Agreement.

2.1.94 **"PerioDyne Stock Purchase Agreement"** means that Stock Purchase Agreement, entered into between the Debtor and Vanderlinden, a copy of which is attached as Exhibit "G" to the Disclosure Statement.

2.1.95 **"PerioDyne Warrants"** means the stock warrants to be issued to Vanderlinden pursuant to the PerioDyne Stock Purchase Agreement.

2.1.96 **"Petition Date"** means December 17, 2012, the date on which the Debtor filed its voluntary petition commencing the Case.

2.1.97 **"Plan"** means this Third Amended Chapter 11 Plan of Reorganization, including, without limitation, all exhibits, supplements, appendices, and schedules hereto, either in its present form or as it may be altered, amended, or modified from time to time.

2.1.98 **"Plan Completion Certification"** has the meaning set forth in Section 6.14 of this Plan.

2.1.99 **"Plan Completion Date"** means the date upon which the Reorganized Debtor's obligations to the holders of Allowed Class 5 Claims under this Plan are fully, finally and indefeasibly paid.

2.1.100 **"Plan Documents"** means all documents necessary to carry out the purpose and intent of this Plan, including, without limitation, the following documents: the Series A Preferred Stock Agreements; the Stock Option Agreements; and the PerioDyne Stock Purchase Agreement.

2.1.101 **"Post Effective Date Notice Parties"** has the meaning set forth in Section 13.14 of this Plan.

-15-

**2.1.102** **"Pre-Effective Date Professional"** means a person employed in the Case prior to the Effective Date pursuant to an order of the Bankruptcy Court in accordance with sections 327 or 1103 of the Bankruptcy Code.

**2.1.103** **"Pre-Effective Date Professional Fee Claim"** means:  (a) a Claim of a Pre-Effective Date Professional under sections 327, 328, 330, 331 or 1103 of the Bankruptcy Code for compensation for services rendered or expenses incurred prior to the Effective Date on behalf of the Estate; or (b) a Claim, arising prior to the Effective Date, either under section 503(b)(4) of the Bankruptcy Code or under section 503(b)(3)(D) of the Bankruptcy Code.

**2.1.104** "**Priority Non-Tax Claim"** means a Claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

**2.1.105** **"Priority Tax Claim"** means a Claim entitled to priority under section 507(a)(8) of the Bankruptcy Code.

**2.1.106** **"Professional"** means any attorney, accountant, appraiser, auctioneer, broker, financial consultant, expert or other professional person.

**2.1.107** **"Proof of Claim"** means a statement under oath filed in the Case by a Creditor in which the Creditor sets forth the amount claimed to be owed to it and detail sufficient to identify the basis for the Claim, in accordance with Rule 3001 of the Federal Bankruptcy Rules.

**2.1.108** **"Rejection Claim"** means any General Unsecured Claim based upon or arising from the rejection of an executory contract or unexpired lease pursuant to a Final Order of the Bankruptcy Court or pursuant to this Plan.

**2.1.109** **"Reorganized Debtor"** means the Debtor, as its financial affairs are reorganized from and after the Effective Date.  For the purpose of this Plan, a reference to the "Reorganized Debtor" shall include the Debtor.

-16-

**2.1.110** **"Representatives"** has the meaning set forth in Section 7.2.5 of this Plan.

**2.1.111** **"Reserves"** means, collectively, the Disputed Claims Reserve, the Unclaimed Property Reserve, and any other reserves required to be established pursuant to this Plan.

**2.1.112** **"Secured Claim"** means a Claim that is secured by a Lien against property in which the Estate has an interest, or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value, determined under section 506(a) of the Bankruptcy Code, of the Secured Creditor's interest in the Estate's interest in the Debtor Collateral securing the Claim, or to the extent of the amount subject to setoff, whichever is applicable.

**2.1.113** **"Secured Creditor"** means the holder of a Secured Claim.

**2.1.114** **"Series A Preferred Stock"** means preferred stock to be issued to Equity Investors pursuant to the Series A Preferred Stock Agreement.

**2.1.115** **"Series A Preferred Stock Agreement"** means that Term Sheet/Subscription Agreement for 2014 Equity Raise entered into and to be entered into between the Debtor and an Equity Investor, an exemplar of which is attached as Exhibit "H" to the Disclosure Statement.  Executed copies of Series A Preferred Stock Agreements shall be filed by the Debtor on or before the Disclosure Statement Hearing Date.

**2.1.116** **"Solstice Action"** has the meaning set forth in paragraph N of the TriPharma Agreement.

**2.1.117** **"Solstice Cross-Claim"** means the "Imagenetix Cross-Claims," as such term is defined in paragraph N of the TriPharma Settlement Agreement.

**2.1.118** **"Spencer"** means Williams P. Spencer, the President and Chief Executive Officer of the Debtor.

**2.1.119  "Stock Option Agreement"** means the non-qualified stock option agreement to be entered into between the Debtor and a Management Individual, executed copies of which shall be filed by the Debtor on or before the Disclosure Statement Hearing Date.

**2.1.120  "Tax"** means any tax, charge, fee, levy, or other assessment by any federal, state, local or foreign taxing authority, including, without limitation, income, excise, property, sales, transfer, employment, payroll, franchise, profits, license, use, ad valorem, estimated, severance, stamp, occupation and withholding tax.  "Tax" shall include any interest, penalties or additions attributable to, or imposed on or with respect to, such assessments.

**2.1.121  "Tax Claim"** means any Claim, pre-petition or post-petition, relating to a Tax.

**2.1.122  "TriPharma"** means TriPharma, LLC.

**2.1.123  "TriPharma Arbitration II"** means the "Arbitration II," as such term is defined in paragraph L of the TriPharma Settlement Agreement.

**2.1.124  "TriPharma Bankruptcy Claims"** has the meaning set forth in paragraph T of the TriPharma Settlement Agreement.

**2.1.125  "TriPharma Collateral"** has the meaning set forth in Section 5.2.2 of this Plan.

**2.1.126  "TriPharma Judgment"** has the meaning set forth in paragraph J of the TriPharma Settlement Agreement.

**2.1.127  "TriPharma Judgment Lien"** has the meaning set forth in paragraph K of the TriPharma Settlement Agreement.

**2.1.128  "TriPharma Litigation"** means the "Litigation," as such term is defined in paragraph U of the TriPharma Settlement Agreement.

**2.1.129  "TriPharma Prepayment Discount Obligation"** has the meaning set forth in Section 5.2.5 of this Plan.

-18-

**2.1.130** "**TriPharma Settlement Agreement**" means the Settlement and Release Agreement, dated August 29, 2013, entered into by and among the TriPharma Settlement Agreement Parties.  The TriPharma Settlement Agreement was approved by order of the Bankruptcy Court entered on November 4, 2013.  A true and complete copy of the TriPharma Settlement Agreement is attached hereto as Exhibit "1."

**2.1.131** "**TriPharma Settlement Agreement Parties**" means the "Parties," as such term is defined in the preamble to the TriPharma Settlement Agreement.

**2.1.132** "**TriPharma Settlement Payment Obligation**" has the meaning set forth in Section 5.2.1 hereof.

**2.1.133** "**Unclaimed Property**" has the meaning set forth in Section 7.2.7 of this Plan.

**2.1.134** "**Unclaimed Property Reserve**" has the meaning set forth in Section 7.2.7 of this Plan.

**2.1.135** "**Uncured TriPharma Default**" has the meaning set forth in Section 5.2.11 of this Plan.

**2.1.136** "**United States Trustee**" means the Office of the United States Trustee for the Southern District of California.

**2.1.137** "**United States Trustee Fees**" means all fees and charges assessed against the Debtor or the Reorganized Debtor by the United States Trustee and due pursuant to section 1930 of title 28 of the United States Code.

**2.1.138** "**Vanderlinden**" means Kim Vanderlinden.

**2.2** **Rules of Interpretation.**  For the purpose of this Plan, unless otherwise provided in this Plan, (a) the rules of construction set forth in section 102 of the Bankruptcy Code apply to this Plan; (b) Rule 9006(a) of the Federal Bankruptcy Rules applies when computing any time period under this Plan; (c) a term that is used in this Plan and that is not defined in this Plan has the meaning attributed to that term, if any, in the Bankruptcy Code or in the Bankruptcy Rules; (d) the definition given to any term or provision in this Plan supersedes any different meaning that

may be given to that term or provision in the Disclosure Statement; (e) whenever it is appropriate from the context, each term, whether stated in the singular or the plural, includes both the singular and the plural; (f) each pronoun stated in the masculine, feminine or neuter includes each of the masculine, feminine and neuter; (g) any reference to an exhibit, schedule, instrument, Plan Document or other document means such exhibit, schedule, instrument, Plan Document or other document as it has been, or may be, amended, modified, restated or supplemented as of the Confirmation Date, and any such exhibit, schedule, instrument or other document shall be deemed to be included in this Plan, regardless of when it is filed; (h) the phrases "under this Plan," "hereof," "hereto," "hereunder," and similar words or phrases, refer to this Plan in its entirety rather than to only a portion of this Plan; (i) unless otherwise indicated, all references in this Plan to sections, articles or exhibits are references to sections, articles or exhibits in this Plan; (j) section captions and headings are used for convenience only and do not affect the meaning of this Plan; and (k) any reference to the holder of a Claim or Interest includes that entity's successor and assigns.

     **2.3**    **Exhibits.**  All exhibits to this Plan are incorporated into and are a part of this Plan as if set forth in full herein.

## III.

## UNCLASSIFIED CLAIMS

     As required by the Bankruptcy Code, this Plan places Claims and the Interests into various Classes according to their respective legal rights and interests, including their respective rights to priority.  However, in accordance with the provisions of section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims are deemed "unclassified." These Claims are not considered impaired under section 1124 of the Bankruptcy Code, and the holders of these Claims do not vote on this Plan, because these Claims are automatically entitled to specific treatment provided for them in the Bankruptcy Code.  Accordingly, the Debtor has not placed Administrative Claims and Priority Tax Claims in a Class.  The treatment of these unclassified Claims is as provided below.

**3.1**      **Allowed Administrative Claims.**  Administrative Claims generally are Claims for the expenses of administering the Debtor's Case that are allowed under section 503(b) of the Bankruptcy Code.  Administrative Claims also include Claims provided for by section 503(b)(9) of the Bankruptcy Code.  The Bankruptcy Code requires that all Administrative Claims be paid on the Effective Date of this Plan, unless a particular Creditor agrees to a different treatment of its Claim.  The treatment of Administrative Claims under this Plan is as described below.

**3.1.1**    **Payment.**  Except to the extent that the holder of an Allowed Administrative Claim agrees to a less favorable treatment of its Allowed Administrative Claim, and, subject to the Administrative Claims Bar Date set forth in Section 3.1.2 hereof, each holder of an Allowed Administrative Claim shall receive, in full satisfaction, discharge, exchange and release of its Allowed Administrative Claim, Cash in an amount equal to such Allowed Administrative Claim, on the latest of (a) the Effective Date, (b) the seventh (7th) Business Day after the date upon which such Administrative Claim becomes an Allowed Administrative Claim, or (c) the date upon which such Allowed Administrative Claim becomes due according to its terms; provided, however, that an Ordinary Course Administrative Claim shall be paid in full in accordance with the terms and conditions of the agreements giving rise to such Ordinary Course Administrative Claim.

**3.1.2**    **Administrative Claims Bar Date.**  Except for Pre-Effective Date Professional Fee Claims, United States Trustee Fees and Ordinary Course Administrative Claims, and, except as set forth in section 503(b)(1)(D) of the Bankruptcy Code, all requests for payment of Administrative Claims shall be filed with the Bankruptcy Court and served no later than thirty (30) days after the Effective Date (the "Administrative Claims Bar Date").  Any holder of an Administrative Claim that is required to file a request for payment of its Administrative Claim by the Administrative Claims Bar Date and that does not file by the Administrative Claims Bar Date such a request for payment of its Administrative Claim shall be forever barred from asserting such Administrative Claim

against the Debtor, the Reorganized Debtor, the Estate or any of the property or assets of the Debtor or the Reorganized Debtor.

**3.1.3    Deadline for Objections.**  All objections to allowance of Administrative Claims that are subject to the Administrative Claims Bar Date must be filed by no later than forty-five (45) days after the Administrative Claims Bar Date with respect to such Administrative Claim (the "Administrative Claims Objection Deadline").  The Administrative Claims Objection Deadline may be extended for a one-time thirty (30) day period by the Reorganized Debtor by filing a notice of the extended Administrative Claims Objection Deadline with the Bankruptcy Court.  Thereafter, the Administrative Claims Objection Deadline may be further extended only by an order of the Bankruptcy Court.  If the Reorganized Debtor fails to file, by the Administrative Claims Objection Deadline, an objection to an Administrative Claim that must be filed, and is filed, by the Administrative Claims Bar Date, such Administrative Claim shall be deemed allowed as of the Administrative Claims Objection Deadline.

**3.1.4    United States Trustee Fees.**  United States Trustee Fees shall be paid prior to the Effective Date by the Debtor, and, after the Effective Date by the Reorganized Debtor, in each case, when due in accordance with applicable law until the entry of a Final Decree.

**3.1.5    Pre-Effective Date Professional Fee Claims.**

**3.1.5.1 Allowance of Pre-Effective Date Professional Fee Claims.**  Each Pre-Effective Date Professional seeking from the Bankruptcy Court an award with respect to a Pre-Effective Date Professional Fee Claim shall file its final application for allowance of compensation for services rendered and reimbursement of expenses incurred through the Effective Date by no later than the sixtieth (60th) day after the Effective Date or such later date as may be fixed by the Bankruptcy Court.

**3.1.5.2 Issuance of Common Stock in Exchange for Allowed Pre-Effective Date Professional Fee Claims.**  Winthrop Couchot Professional

-22-

Corporation ("Winthrop Couchot") and Shustak & Partners, P.C. ("Shustak Firm") shall receive, in full satisfaction, discharge, exchange and release of their respective Pre-Effective Date Professional Fee Claims, payment in full of the allowed amount of their Pre-Effective Date Professional Fee Claims as and when such Claims are allowed by the Bankruptcy Court ("Allowed Pre-Effective Date Professional Fee Claims").  Winthrop Couchot and the Shustak Firm shall receive Common Stock (and, in the case of Winthrop Couchot, Cash as well) in payment of their respective Allowed Pre-Effective Date Professional Fee Claims in accordance with the provisions of those Administrative Claim Assignment Agreements attached, together, as Exhibit "4" hereto.  Common Stock issued on account of Allowed Pre-Effective Date Professional Fee Claims shall be subject to the exemption provided by Section 1145 of the Bankruptcy Code and shall be unrestricted, freely trading stock pursuant to Section 1145 of the Bankruptcy Code.  In the event that for any reason Winthrop Couchot or the Shustak Firm does not receive timely pursuant to the Administrative Claim Assignment Agreement, in exchange for the Common Stock issued to it pursuant to this Plan, Cash in the unpaid amount of its Allowed Pre-Effective Date Professional Fee Claim, Winthrop Couchot or the Shustak Firm, as the case may be, shall have the irrevocable and unconditional right, in the exercise of its sole and absolute discretion, to require that the Reorganized Debtor pay immediately to it Cash in the unpaid amount of its Allowed Pre-Effective Date Professional Fee Claim.

**3.1.5.3 Objections.**  All objections to allowance of Pre-Effective Date Professional Fee Claims must be filed and served timely in accordance with the requirements of the Bankruptcy Rules.

**3.2** **Allowed Priority Tax Claims.**  Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment of its Allowed Priority Tax Claim, each holder of an Allowed Priority Tax Claim shall receive, in full satisfaction, discharge, exchange and

-23-

release of its Allowed Priority Tax Claim, equal quarterly Cash payments, commencing on the first Business Day of the first full calendar quarter commencing on the Effective Date and continuing on the first Business Day of each full calendar quarter thereafter through October 2017, in an aggregate amount equivalent to such Allowed Priority Tax Claim, plus simple interest thereon calculated at the interest rate available on ninety (90) day United States Treasuries on the Effective Date.

**IV.**

**CLASSIFICATION OF CLAIMS AND INTERESTS**

**4.1** **Overview.** As required by the Bankruptcy Code, this Plan places Claims and Interests into Classes according to their respective legal rights and interests, including their respective rights to priority. In Section 4.2 hereof, the Debtor lists each Class established under this Plan and states whether each Class is impaired or is unimpaired by this Plan. A Class is "unimpaired" by this Plan if this Plan leaves unaltered the legal, equitable and contractual rights to which the holders of Claims in the Class are entitled or the holders of the Interests are entitled, as provided in section 1124 of the Bankruptcy Code. Article V of this Plan sets forth the treatment that each Class will receive under this Plan.

Pursuant to this Plan, a Claim shall be deemed classified in a particular Class only to the extent that the Claim qualifies within the description of that Class and shall be deemed classified in another Class or Classes to the extent that any remainder of the Claim qualifies within the description of such other Class or Classes. A Claim is classified in a particular Class only to the extent that the Claim is an Allowed Claim in that Class and has not been paid, released or otherwise satisfied prior to the Effective Date.

**4.2** **Designation of Classes.** This Plan designates the following Classes of Claims and Interests:

**4.2.1** **Allowed Claims.**

**4.2.1.1** **Class 1:** The Allowed Secured Claim of Pacific Rainbow. This Class is impaired by this Plan.

-24-

**4.2.1.2**    **Class 2:**  The Allowed Secured Claim of TriPharma.  This Class is impaired by this Plan.

**4.2.1.3**    **Class 3:**  Any Allowed Secured Claims, other than the Class 1 and Class 2 Allowed Secured Claims.  This Class is unimpaired by this Plan.

**4.2.1.4**    **Class 4:**  Any Allowed Priority Non-Tax Claims.  This Class is unimpaired by this Plan.

**4.2.1.5**    **Class 5:**  Allowed General Unsecured Claims.  This Class is impaired by this Plan.

**4.2.2**    **Interests.**

**4.2.2.1**    **Class 6:**  The Interests of the Interest Holders.  This Class is unimpaired by this Plan.

**4.3**    **Summary of Classification.**  The following table summarizes the Classes of Claims and Interests established by this Plan:

| CLASS | DESCRIPTION | IMPAIRED/ UNIMPAIRED | VOTING STATUS |
|---|---|---|---|
| Class 1 | Allowed Secured Claim of Pacific Rainbow | Impaired | Entitled to Vote on Plan |
| Class 2 | Allowed Secured Claim of TriPharma | Impaired | Entitled to Vote on Plan |
| Class 3 | Any Allowed Secured Claims Other than the Class 1 and Class 2 Allowed Secured Claims | Unimpaired | Deemed to Accept Plan |
| Class 4 | Any Allowed Priority Non-Tax Claims | Unimpaired | Deemed to Accept Plan |
| Class 5 | Allowed General Unsecured Claims | Impaired | Entitled to Vote on Plan |
| Class 6 | Interests | Unimpaired | Deemed to Accept Plan |

As set forth above, Classes 3 and 4 are unimpaired by this Plan; any holders of Claims in these Classes are conclusively presumed to have accepted this Plan and, hence, are not entitled to vote with respect to this Plan.  Classes 1, 2 and 5 are impaired by this Plan, and holders of Claims in these Classes are entitled to vote to accept or reject this Plan.  The Interests in Class 6 are unimpaired, and, hence, are not entitled to vote with respect to this Plan.

-25-

The treatment of Claims and Interests under this Plan is in full and complete satisfaction of the legal, contractual, and equitable rights that each Creditor or Interest Holder may have in or against the Debtor or its property.  This treatment supersedes and replaces any agreements or rights which those entities have in or against the Debtor or its property.  **NO DISTRIBUTIONS SHALL BE MADE, AND NO RIGHTS SHALL BE RETAINED, ON ACCOUNT OF ANY CLAIM THAT IS NOT AN ALLOWED CLAIM.**

**V.**

**TREATMENT OF CLASSES UNDER THIS PLAN**

The following sets forth the treatment of Classes established by this Plan.

**5.1**    **Class 1 -- Allowed Secured Claim of Pacific Rainbow.**  Class 1 consists of the Allowed Secured Claim of Pacific Rainbow.  Class 1 is impaired by this Plan.  The treatment of Pacific Rainbow's Allowed Secured Claim is as follows:

**5.1.1**    **Amount of Allowed Class 1 Claim.**  Pacific Rainbow's Allowed Secured Claim shall be fixed, for the purpose of this Plan, in the following amount:  $747,000, plus (a) any accrued and unpaid interest thereon at the rate of 7.5% per annum from April 1, 2014 through the Effective Date, and (b) the amount of any reasonable attorneys' fees and costs incurred by Pacific Rainbow from the Petition Date through the Effective Date.  In the event of any dispute between the Debtor and Pacific Rainbow regarding the amount of Pacific Rainbow's Allowed Secured Claim, the Bankruptcy Court shall determine the merits of such dispute.

**5.1.2**    **Debtor Collateral for Allowed Class 1 Claim.**  Pacific Rainbow shall retain, without modification or alteration, all Debtor Collateral in which Pacific Rainbow had a duly perfected and unavoidable security interest as of the Petition Date.

**5.1.3**    **Interest on Allowed Class 1 Claim.**  From the Effective Date through and including the date upon which the Allowed Secured Claim of Pacific Rainbow is paid in full, interest shall accrue on the unpaid amount of Pacific Rainbow's Allowed Secured Claim at the rate of 7.5% per annum.

**5.1.4    Distributions on Account of Allowed Class 1 Claim.**  On or before the forty-fifth (45th) day after the Effective Date of this Plan, the Reorganized Debtor shall pay to Pacific Rainbow, on account of Pacific Rainbow's Allowed Secured Claim, Cash in the full amount of Pacific Rainbow's Allowed Secured Claim.

**5.1.5    Maturity of Allowed Class 1 Claim.**  Any unpaid amount of the Allowed Secured Claim of Pacific Rainbow shall become fully due and payable on the forty-fifth (45th) day after the Effective Date.

**5.1.6    Pacific Rainbow Loan Agreements.**  Except as provided expressly to the contrary by this Plan, the Pacific Rainbow Loan Agreements shall not be modified or altered by this Plan, and Pacific Rainbow shall retain all legal, equitable and contractual rights that Pacific Rainbow has pursuant to the Pacific Rainbow Loan Agreements.

**5.1.7    Satisfaction of Class 1 Allowed Claim/Release of Liens.**  Upon the full, final and indefeasible payment of the Allowed Class 1 Claim, all Distributions to Pacific Rainbow under this Plan shall terminate fully and forever, and Rainbow Pacific shall, as soon as is reasonably practicable, take all acts, and execute all documents, appropriate to evidence the payment of the Allowed Class 1 Claim and to release and extinguish all Liens granted to Pacific Rainbow by the Pacific Rainbow Loan Agreements.  Upon payment in full of the Allowed Class 1 Claim, all pre-Effective Date Secured Claims of any nature that Pacific Rainbow may assert against the Debtor shall be deemed to be fully and completely extinguished and discharged.

**5.1.8    Prepayment of Allowed Class 1 Claim.**  The Reorganized Debtor shall have the right to prepay, in whole or in part, at any time, the Allowed Class 1 Claim.

**5.2    Class 2 -- Allowed Secured Claim of TriPharma.**  Class 2 consists of the Allowed Secured Claim of TriPharma.  Class 2 is impaired by this Plan.  The treatment of TriPharma's Allowed Secured Claim is as follows:

**5.2.1    Amount of Allowed Class 2 Claim.**  Subject to the provisions of Sections 5.2.3 and 5.2.5 hereof, the amount of TriPharma's Allowed Secured Claim shall be fixed,

-27-

for the purpose of this Plan, in the amount of $3.5 million; provided, however, that, subject to the Reorganized Debtor's complying strictly with its payment obligations to TriPharma pursuant to Section 5.2.4 of this Plan, the Reorganized Debtor shall be entitled to satisfy, discharge and pay in full TriPharma's Allowed Secured Claim by paying to TriPharma pursuant to this Plan a total payment of $2.5 million ("TriPharma Settlement Payment Obligation").

      **5.2.2**    **TriPharma Collateral.**  In accordance with the provisions of the TriPharma Settlement Agreement, effective as of the Effective Date of this Plan, and pursuant to this Plan, the Reorganized Debtor shall grant to TriPharma, on account of TriPharma's Allowed Secured Claim, a second-priority security interest encumbering all assets of the Reorganized Debtor, tangible and intangible, including all intellectual property rights, Cash, receivables and rights of any kind ("TriPharma Collateral").  On or as soon as reasonably practicable after the Effective Date of this Plan, the Reorganized Debtor shall execute and deliver to TriPharma any document reasonably requested by TriPharma, and shall take any act reasonably requested by TriPharma, in order to perfect TriPharma's interest in the TriPharma Collateral.

      **5.2.3**    **Interest on Allowed Class 2 Claim.**  Interest on the TriPharma Settlement Payment Obligation shall accrue at the rate of six percent (6%) per annum, compounded quarterly, commencing on the first day of the eighteenth (18th) full calendar month after the Effective Date and continuing until such time as the TriPharma Settlement Payment Obligation is paid in full.

      **5.2.4**    **Distributions on Account of Allowed Class 2 Claim.**  Subject to the provisions of Section 5.2.5 hereof, the Reorganized Debtor shall pay to TriPharma, on account of the TriPharma Settlement Payment Obligation, the following Distributions:

            **5.2.4.1**    **Effective Date Payment.**  Within five (5) calendar days after the Effective Date, the Reorganized Debtor shall pay to TriPharma $250,000, less the amount of the Adequate Protection Payments paid to TriPharma by that date.

-28-

**5.2.4.2    Months 3-24 After the Effective Date.**  Commencing on the first day of the third full calendar month following the Effective Date, and continuing on the first day of each third calendar month thereafter, for a total of eight (8) quarters, the Reorganized Debtor shall pay to TriPharma a quarterly payment in the amount of $100,000 (i.e., for a total of $800,000).

**5.2.4.3    Months 27-36 After the Effective Date.**  Commencing on the first day of the twenty-seventh (27th) full calendar month after the Effective Date and continuing on the first day of each third calendar month thereafter, for a total of four (4) quarters, the Reorganized Debtor shall pay to TriPharma a quarterly payment in the amount of $125,000 (i.e., a total of $500,000).

**5.2.4.4    Month 39 After the Effective Date Through Each Remaining Quarter During the Term of this Plan.**  Commencing on the first day of the thirty-ninth (39th) full calendar month after the Effective Date and continuing on the first day of each third month thereafter, until such time as the TriPharma Settlement Payment Obligation is paid in full, plus any accrued interest thereon, the Reorganized Debtor shall pay to TriPharma the lesser of the following amounts: (i) $150,000, or (ii) the balance of the amount of the TriPharma Settlement Payment Obligation, plus any and all interest accrued thereon pursuant to the provisions of Section 5.2.3 hereof.

**5.2.5    TriPharma Prepayment Discount Obligation.**  Provided that there has not occurred any Uncured TriPharma Default, the Reorganized Debtor shall have the right to satisfy, discharge and pay in full the Allowed Class 2 Claim by paying to TriPharma payments in the aggregate amount of $2.0 million ("TriPharma Prepayment Discount Obligation"), less the amount of the Adequate Protection Payments paid by the Debtor, if the amount of the TriPharma Prepayment Discount Obligation is paid within eighteen (18) months after the Effective Date of this Plan.

-29-

5.2.6    **Right to Prepay Allowed Class 2 Claim.**  Subject to the provisions of Section 5.2.5 hereof, the Reorganized Debtor shall have the right to prepay, in whole or in part, at any time, the Allowed Class 2 Claim as set forth hereunder.

5.2.7    **Manner of Payment.**  All Distributions required to be paid on account of the Allowed Class 2 Claim shall be effected by wire transfer to the Law Offices of John R. Walton Client Trust Account; provided, however, that, if the law firm of McKennon Shindler, LLP ("McKennon Firm") objects to such manner of making Distributions, Distributions of any amounts disputed by the McKennon Firm shall be effected by wire transfer to an account specially designated for receipt of such Distributions acceptable to the McKennon Firm, or shall be interplead by the Reorganized Debtor pursuant to further order of the Bankruptcy Court.

5.2.8    **Application of Payments.**  All pre-Effective Date payments paid by the Debtor to TriPharma pursuant to the TriPharma Settlement Agreement (including, without limitation, Adequate Protection Payments) and all Distributions paid by the Reorganized Debtor to TriPharma pursuant to this Plan (including, without limitation, Distributions on account of TriPharma's Allowed General Unsecured Claim) shall be applied and credited as follows:  (a) absent an Uncured TriPharma Default, as a credit toward and reduction against the TriPharma Prepayment Discount Obligation or the TriPharma Settlement Payment Obligation, whichever is applicable; or (b)  in the event of the occurrence of an Uncured TriPharma Default, as a credit toward and reduction against the Allowed Secured Claim of TriPharma but in no event in excess of $3.5 million, plus any interest thereon.

5.2.9    **Amendment of the TriPharma Bankruptcy Claims.**  Effective as of the Effective Date, the TriPharma Bankruptcy Claims shall be deemed to be amended to reflect that TriPharma shall have an Allowed Secured Claim in the Bankruptcy Case in the amount of $3.5 million, subject to discount as set forth in Sections 5.2.1 and 5.2.5 hereof, and that TriPharma shall have an Allowed General Unsecured Claim in the amount of $4.0 million.  Subject to the provisions of Sections 5.2.8 and 5.2.10 hereof, TriPharma's

Allowed General Unsecured Claim shall be paid pursuant to the provisions of Section 5.5 hereof.

**5.2.10  Satisfaction of TriPharma's Allowed Claims.**  In no event shall TriPharma have the right to collect on account of its Allowed Claims payments in a total amount in excess of $3.5 million plus any interest payable hereunder (i.e., TriPharma shall accept, absolutely and unconditionally, under all circumstances, $3.5 million plus any interest payable hereunder in full and complete satisfaction of its Allowed Secured Claim and its Allowed General Unsecured Claim).  Upon the Reorganized Debtor's payment to TriPharma of the payments required by this Plan (which in no event shall exceed $3.5 million plus any interest payable hereunder), TriPharma's Allowed Claims shall be deemed to be fully and completely satisfied, discharged and extinguished and any unpaid balance of the Allowed Claims shall be deemed irrevocably and unconditionally to have been waived and released by TriPharma.

**5.2.11  Payment Default.**  Except only for the initial $250,000 payment required by Section 5.2.4.1 hereof and the first quarterly payment required by Section 5.2.4.2 hereof, the Reorganized Debtor shall have the right, on two occasions during the term of this Plan, to cure any default by the Reorganized Debtor in paying its payment obligations to TriPharma under this Plan provided that such cure is effected within ten (10) Business Days after notice of default is given.  In the event that the Reorganized Debtor should fail to pay to TriPharma any payment required under this Plan, TriPharma shall provide to the Reorganized Debtor written notice of such default.  In the event that the Reorganized Debtor fails to cure such default within ten (10) Business Days after such written notice, such default shall be deemed to be an uncured default under this Plan ("Uncured TriPharma Default"), and TriPharma then shall be entitled to exercise, without further notice to the Reorganized Debtor or need of any order of the Bankruptcy Court, all rights and remedies that it may have against the Reorganized Debtor as a matter of applicable law.  Without limiting the generality of the foregoing, subject to the provisions of

-31-

Sections 5.2.8, 5.2.10 and 5.5.5.2 hereof, upon the occurrence of an Uncured TriPharma Default, TriPharma shall have the following rights and remedies:

**5.2.11.1 Acceleration.**  All payment obligations of the Reorganized Debtor to TriPharma shall automatically accelerate.

**5.2.11.2 Default Interest.**  Interest shall accrue on the amount of TriPharma's Allowed Secured Claim, less any and all principal payments made to TriPharma hereunder, at the rate of fifteen percent (15%) per annum, compounded quarterly.

**5.2.11.3 Foreclosure.**  TriPharma shall be entitled to foreclose on the TriPharma Collateral.

**5.2.12 Resolution of Litigation.**  In accordance with the provisions of the TriPharma Settlement Agreement, effective as of the Effective Date, and pursuant to this Plan, the TriPharma Litigation shall be disposed of as follows:

**5.2.12.1 Cancellation of Notice of TriPharma Judgment Lien.**  TriPharma shall file a cancellation of the TriPharma Judgment Lien with respect to the TriPharma Judgment.

**5.2.12.2 Satisfaction of Judgment.**  TriPharma shall file a Notice of Satisfaction of Judgment as to Spencer with respect to the TriPharma Judgment.

**5.2.12.3 TriPharma Arbitration II.**  The Reorganized Debtor and TriPharma shall dismiss, with prejudice, TriPharma Arbitration II.

**5.2.12.4 GNC Action.**  The Reorganized Debtor shall dismiss, with prejudice, the GNC Action.  TriPharma shall be solely responsible for paying or otherwise resolving any claims that the GNC Action Defendants may assert against TriPharma in connection with the GNC Action, including, without limitation, any claims for indemnification or contribution.  The Reorganized Debtor shall be solely responsible for paying or otherwise resolving any claims that Shustak & Partners,

**DEBTOR'S THIRD AMENDED CHAPTER 11 PLAN OF REORGANIZATION**

MAINDOCS-#204711-v1-Imagenetix_-_Clean_-_3rdAmendedPlan.doc

PC may assert against the Debtor or Reorganized Debtor with respect to its representation of the Debtor in connection with the GNC Action.

**5.2.12.5  Solstice Action.**  The Reorganized Debtor shall dismiss, with prejudice, the Solstice Cross-Claims asserted with respect to the Solstice Action.

**5.2.12.6  MAX Action.**  At the written request of TriPharma, the Reorganized Debtor shall provide to TriPharma any cooperation reasonably requested by TriPharma with respect to the MAX Action, without any material expense or disruption to the Reorganized Debtor.  The Reorganized Debtor shall not assert any claim against MAX, or any claim with respect to any monies payable to TriPharma with respect to the MAX Action.

**5.2.12.7  Fraudulent Transfer Action.**  TriPharma shall dismiss, with prejudice, the Fraudulent Transfer Action as to all Fraudulent Transfer Action Defendants.

**5.2.13  Mutual Release of Claims.**  Effective as of the Effective Date, TriPharma and Dameshek, on one hand, and the Reorganized Debtor and Spencer, on the other hand, shall waive and release any and all claims that they may have against each other in accordance with the terms and conditions of the TriPharma Settlement Agreement.

**5.2.14  TriPharma Settlement Agreement.**  The TriPharma Settlement Agreement shall not be modified or altered by this Plan and shall remain in full force and effect, and the TriPharma Settlement Agreement Parties shall retain all legal, equitable and contractual rights that they have pursuant to the TriPharma Settlement Agreement.  Any and all provisions of the TriPharma Settlement Agreement that pursuant to the TriPharma Settlement Agreement become effective on the Effective Date of this Plan shall be, and shall be deemed to be, effective on the Effective Date of this Plan.

**5.2.15  Release of TriPharma's Liens.**  Upon the full, final and indefeasible payment of the Allowed Class 2 Claim as provided for hereunder, all Distributions to TriPharma under this Plan shall terminate fully and forever, and TriPharma shall, as soon

as reasonably practicable, take all acts, and execute all documents, appropriate to evidence the payment of the Allowed Class 2 Claim and to release and extinguish all Liens asserted by TriPharma including, without limitation, the Liens granted by the TriPharma Settlement Agreement.  Upon payment in full of the Allowed Class 2 Claim, all Secured Claims of any nature that TriPharma may assert against the Debtor or against the Reorganized Debtor shall be deemed to be fully and complete extinguished and discharged.

**5.3    Class 3 -- Any Allowed Secured Claims, Other than Class 1 and Class 2 Allowed Secured Claims.**  Class 3 consists of any Allowed Secured Claims, other than Class 1 and Class 2 Allowed Secured Claims.  Class 3 is unimpaired by this Plan.  In the event that there is more than one holder of an Allowed Class 3 Claim, the Allowed Secured Claim of each such Secured Creditor shall be deemed to be classified in a separate sub-class of Class 3, and each such sub-class of Class 3 shall be deemed to be a separate Class under this Plan.  The Reorganized Debtor shall elect, in the exercise of its sole and absolute discretion, to provide to each holder of an Allowed Class 3 Claim <u>one</u> of the following treatment options ("Class 3 Treatment Options") in full satisfaction, discharge, exchange and release of such Allowed Class 3 Claim:

**5.3.1    Class 3 Treatment Options.**

**5.3.1.1    Treatment Option 1.**  The holder of the Allowed Class 3 Claim shall receive a return of the Debtor Collateral in which that Secured Creditor has a security interest.  Unless a Secured Creditor holding an Allowed Deficiency Claim should make an election under section 1111(b) of the Bankruptcy Code, any Allowed Deficiency Claim of such Secured Creditor shall be treated hereunder as an Allowed Class 5 Claim.

**5.3.1.2    Treatment Option 2.**  The holder of the Allowed Class 3 Claim shall receive any proceeds actually received by the Reorganized Debtor from the sale or other disposition of the Debtor Collateral in which such Secured Creditor has a security interest.  Unless a Secured Creditor holding an Allowed Deficiency Claim should make an election under section 1111(b) of the Bankruptcy Code, any

-34-

Allowed Deficiency Claim of such Secured Creditor shall be treated hereunder as an Allowed Class 5 Claim

5.3.1.3   **Treatment Option 3.**  The holder of the Allowed Class 3 Claim shall receive Cash in the full amount of such Secured Creditor's Allowed Class 3 Claim.

5.3.1.4   **Treatment Option 4.**  The holder of the Allowed Class 3 Claim shall receive such other Distributions or treatment as is necessary to leave the rights of such Secured Creditor unimpaired under the Bankruptcy Code.

5.3.2   **Time for Making and Implementing Class 3 Treatment Options.**  The Reorganized Debtor shall have until the later of the fifteenth (15th) Business Day after the Effective Date, or the fifteenth (15th) Business Day after the date on which a Class 3 Claim becomes an Allowed Class 3 Claim, to elect which Class 3 Treatment Option to provide to the Secured Creditor holding such Allowed Class 3 Claim, and to perform the Reorganized Debtor's obligations to such Secured Creditor pursuant to such Class 3 Treatment Option.

5.4   **Class 4 -- Any Allowed Priority Non-Tax Claims.**  Class 4 consists of any Allowed Priority Non-Tax Claims.  Class 4 is unimpaired by this Plan.

5.4.1   **Treatment of Allowed Priority Non-Tax Claims.**  Except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to a less favorable treatment of its Allowed Priority Non-Tax Claim, each holder of an Allowed Priority Non-Tax Claim shall receive, in full satisfaction, discharge, exchange and release of its Allowed Priority Non-Tax Claim, Cash in the full amount of the Allowed Priority Non-Tax Claim on the later of (i) the fifteenth (15th) Business Day after the Effective Date, and (ii) the fifteenth (15th) Business Day after such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim.

-35-

5.5  **Class 5 -- Allowed General Unsecured Claims.**  Class 5 consists of all Allowed General Unsecured Claims.  Class 5 is impaired by this Plan.  The treatment of Allowed Class 5 Claims is as follows:

5.5.1  **Distributions on Account of Allowed Class 5 Claims.**  Except to the extent that a holder of an Allowed General Unsecured Claim agrees to a less favorable treatment of its Allowed General Unsecured Claim, each holder of an Allowed General Unsecured Claim shall receive under this Plan Distributions in an aggregate amount of twenty percent (20%) of the amount of its Allowed General Unsecured Claim, payable in accordance with the schedule provided by Section 5.5.2 hereof.

5.5.2  **Schedule of Distributions on Account of Allowed Class 5 Claims.** Commencing on the first day of the thirteenth (13th) full calendar month after the Effective Date and continuing on the first day of each calendar quarter thereafter, for a total of sixteen (16) quarters, the Reorganized Debtor shall pay to each holder of an Allowed General Unsecured Claim 1.25% of the amount of its Allowed General Unsecured Claim, in full and complete satisfaction, discharge, exchange and release of its Allowed General Unsecured Claim.

5.5.3  **No Post-Effective Date Interest.**  No interest shall accrue after the Effective Date on an Allowed General Unsecured Claim.

5.5.4  **Termination of Reorganized Debtor's Obligations to Holders of Allowed Class 5 Claims.**  The Reorganized Debtor's obligations on account of Allowed Class 5 Claims shall terminate, and Allowed Class 5 Claims shall be deemed to be fully and completely satisfied, discharged and released, upon the Reorganized Debtor's payment of the Distributions required by Section 5.5.2 of this Plan.

5.5.5  **Allowed General Unsecured Claim of TriPharma.**  The treatment of TriPharma's Allowed General Unsecured Claim shall be as follows:

5.5.5.1  **Classification of TriPharma's Allowed General Unsecured Claim.**  Subject to the provisions of Sections 5.2.8, 5.2.10 and 5.5.5.2 hereof,

-36-

TriPharma's Allowed General Unsecured Claim shall be classified along with all other Allowed General Unsecured Claims, and shall receive the same treatment as all other Allowed General Unsecured Claims provided by Sections 5.5.1 – 5.5.4 hereof.

**5.5.5.2    <u>Application of Payments Made to TriPharma to Allowed Class 2 Claim</u>**.  The Reorganized Debtor may pay in full TriPharma's Allowed General Unsecured Claim pursuant to this Plan by the Reorganized Debtor's paying to TriPharma the payments required by Section 5.2 or 5.5 of this Plan, notwithstanding the treatment of Allowed General Unsecured Claims under this Plan.  At the option of the Reorganized Debtor, the Reorganized Debtor may apply all Distributions made to TriPharma under this Plan fully toward TriPharma's Allowed Class 2 Claim (including, without limitation, to the TriPharma Prepayment Discount Obligation or to the TriPharma Settlement Obligation, whichever is applicable).  TriPharma shall accept payments on account of its Allowed Secured Claim and Allowed General Unsecured Claim pursuant to this Plan in the aggregate amount of the payments set forth in Sections 5.2.4 and 5.2.5 of this Plan, notwithstanding the treatment of Allowed General Unsecured Claims under this Plan; TriPharma shall waive any right to any Distributions on account of its Allowed Secured Claim or Allowed General Unsecured Claim in excess of the aggregate amount of the payments set forth in Sections 5.2.4 and 5.2.5 of this Plan.  Provided that the Reorganized Debtor complies with its obligations to TriPharma pursuant to this Plan, the Reorganized Debtor shall have the right to pay in full TriPharma's Allowed Secured Claim and Allowed General Unsecured Claim pursuant to this Plan by paying to TriPharma the amount of the TriPharma Settlement Payment Obligation, plus any interest thereon pursuant to the provisions of Section 5.2.3 hereof, or by paying to TriPharma the amount of the Prepayment Discount Obligation, if applicable.  Payments to TriPharma on any Distribution

-37-

Date on account of TriPharma's Allowed Secured Claim and Allowed General Unsecured Claim shall not exceed the total amount of the payments on such Distribution Date set forth in Section 5.2.4 hereof.

**5.5.6    Prepayment of Allowed Class 5 Claims.**  The Reorganized Debtor shall have the right to prepay, in whole or in part, at any time, Allowed Class 5 Claims.

**5.6    Class 6 -- Interests.**  Class 6 consists of the Interests of the Interest Holders. Class 6 is unimpaired under this Plan.

**5.6.1    Treatment of Interests.**  The Interest Holders shall retain, without modification or alteration, all of their rights, remedies and interests pursuant to the Interests.

**5.6.2    Issuance of PerioDyne Stock.**  On the Effective Date, the Reorganized Debtor shall issue to Vanderlinden, as and for consideration for the PerioDyne Acquisition, 3.4 million shares of Common Stock, pursuant to the terms and conditions of the PerioDyne Stock Purchase Agreement.  A copy of the executed PerioDyne Stock Purchase Agreement is attached as Exhibit "G" to the Disclosure Statement.

**5.6.3    Issuance of PerioDyne Warrants.**  On the Effective Date, the Reorganized Debtor shall issue to Vanderlinden the PerioDyne Warrants in accordance with the provisions of the PerioDyne Stock Purchase Agreement.

**5.6.4    Issuance of Series A Preferred Stock.**  On the Effective Date, the Reorganized Debtor shall issue to the Equity Investors the Series A Preferred Stock in accordance with the provisions of the Series A Preferred Stock Agreement.  An exemplar of a Series A Stock Purchase Agreement is attached as Exhibit "H" to the Disclosure Statement.  Copies of executed Series A Preferred Stock Agreement shall be filed by the Debtor on or before the Disclosure Statement Hearing Date.

**5.6.5    Equity Investor Warrants.**  On the Effective Date, the Reorganized Debtor shall issue to the Equity Investors the Equity Investor Warrants in accordance with the provisions of the Series A Preferred Stock Agreement.

-38-

**5.6.6** **Management Stock Options.** On the Effective Date, the Reorganized Debtor shall issue to the Management Individuals stock options pursuant to Stock Option Agreements as follows: (a) Spencer, 525,000 shares; (b) Debra L. Spencer, 261,000 shares; (c) Lowell Giffhorn, 360,000 shares; (d) Jandra Thomas, 297,000 shares; and (e) William A. Toomey, 38,000 shares. Copies of executed Stock Option Agreements shall be filed by the Debtor on or before the Disclosure Statement Hearing Date.

## VI.

## PLAN IMPLEMENTATION

**6.1** **Overview.** This Plan provides for a reorganization of the Debtor's financial affairs in accordance with the terms and conditions of this Plan. This article is intended to address the means by which the Debtor intends to effectuate the reorganization provided for by this Plan and to fund the obligations to Creditors undertaken in this Plan. This article provides information regarding the conditions precedent to Confirmation and the effectiveness of the Plan, the funding for the Plan, corporate governance of the Reorganized Debtor, and other material issues bearing upon the performance of this Plan.

**6.2** **Conditions Precedent to Plan Confirmation.** The following are the conditions precedent to confirmation of this Plan: (a) entry of the Confirmation Order, in form and substance reasonably satisfactory to the Debtor; and (b) the Effective Date Cash Balance shall be sufficient to pay in full, or to reserve for payment in full of, all Administrative Claims, Priority Non-Tax Claims and any and all other Allowed Claims that must be paid by the Reorganized Debtor on or about the Effective Date.

**6.3** **Conditions Precedent to the Effectiveness of the Plan.** The following are the conditions precedent to the effectiveness of this Plan and the occurrence of the Effective Date: (a) the Confirmation Order shall have become a Final Order; and (b) any documents, instruments and agreements, in form and substance reasonably satisfactory to the Debtor, provided for by or appropriate to implement this Plan, including, without limitation, the Plan Documents, shall have been executed and delivered by the parties thereto.

**DEBTOR'S THIRD AMENDED CHAPTER 11 PLAN OF REORGANIZATION**
MAINDOCS-#204711-v1-Imagenetix_-_Clean_-_3rdAmendedPlan.doc

The Debtor, in the exercise of its sole and absolute discretion, may waive either of the conditions to the effectiveness of this Plan and to the occurrence of the Effective Date set forth hereinabove, without the need for any prior notice or hearing with respect thereto.  Without limiting the generality of the foregoing, in the event that an appeal, petition for certiorari or motion for reargument or rehearing or comparable post-confirmation relief is filed with respect to the Confirmation Order, and no stay of the effectiveness of the Confirmation Order is obtained, the Debtor may elect, in the exercise of its sole and absolute discretion, to waive the condition set forth in Section 6.3(a) hereof, and to proceed with the Effective Date of this Plan and to commence to consummate this Plan, by filing and serving notice of such election upon the United States Trustee and the party seeking such post-confirmation relief.

The failure of any condition set forth in this Section 6.3 to be satisfied constitutes good and sufficient cause for the Debtor to have this Plan not become effective regardless of the circumstances giving rise to the failure of such condition to be satisfied (including, without limitation, any act or failure to act by the Debtor).

**6.4**    **Implementation of Plan.**  On or soon as practicable after the Effective Date, the following shall occur with respect to the implementation of this Plan:  (a) all acts, documents and agreements appropriate to implement this Plan shall be effected, executed and/or delivered; and (b) the Reorganized Debtor shall make all Distributions required to be made on or about the Effective Date of this Plan.

**6.5**    **Corporate Action.**  Upon the Effective Date, all transactions provided for under this Plan shall be deemed to have been authorized and approved by the Debtor without any requirement of further action by the Debtor, or by the Debtor's Interest Holders.

**6.6**    **Plan Funding.**  This Plan shall be funded, in part, from the following sources: the revenues generated by the Reorganized Debtor's operations; any Net Recoveries, including, without limitation, any Net Recoveries from the Nikken Action and/or from the Frutarom Action; any Equity Infusions; any Net Proceeds of any Asset Disposition, including, without limitation, from the sale or assignment of intellectual property rights and interests of the Reorganized

-40-

Debtor, and any debt financing to be obtained by the Reorganized Debtor. A further discussion of issues pertaining to the funding of this Plan is set forth in paragraph XII(F) of the Disclosure Statement.

**6.7     Representative of the Estate.** The Reorganized Debtor shall be, and hereby is, appointed as the representative of the Estate pursuant to section 1123(b)(3)(B) of the Bankruptcy Code for the purpose of performing the duties and exercising the rights and remedies granted expressly to the Reorganized Debtor hereunder. The Reorganized Debtor shall be vested exclusively with the rights, authorities and powers to carry out and to implement this Plan, including, without limitation, by managing, administering and disposing of the Reorganized Debtor's assets and properties in accordance with the terms and conditions of this Plan.

**6.8     The Reorganized Debtor.**

**6.8.1     Corporate Powers.** The Debtor, as the Reorganized Debtor, shall continue to exist and to operate after the Effective Date of this Plan. The Reorganized Debtor shall have all of the powers and rights of a corporation under the laws of the State of Nevada, and, except as set forth in this Plan expressly to the contrary, shall continue to have all corporate powers and rights accorded to it under its Articles of Incorporation, Bylaws and other corporate governance agreements.

**6.8.2     Board of Directors.** On the Effective Date, the sole members of the Board of Directors of the Reorganized Debtor shall be Spencer and William A. Toomey.

**6.8.3     Officers of the Reorganized Debtor.** On the Effective Date, the officers of the Reorganized Debtor shall be the following persons: Spencer, President and Chief Executive Officer; Lowell W. Giffhorn, Chief Financial Officer; and Debra L. Spencer, Corporate Secretary. The Board of Directors of the Reorganized Debtor may replace such officers, or appoint other officers, as it deems appropriate in the exercise of its sound business judgment.

-41-

**6.9** **Causes of Action.**

      **6.9.1** **Reorganized Debtor's Right to Prosecute Causes of Action.** Subject to the provisions of Section 6.9.2 hereof, the right to file, litigate, prosecute, settle, adjust, enforce, collect or abandon any or all Causes of Action is deemed automatically transferred on the Effective Date from the Debtor to the Reorganized Debtor. Subject to the provisions of Section 6.9.2 hereof, from and after the Effective Date, the Reorganized Debtor shall have the sole and exclusive right to file, litigate, prosecute, settle, adjust, enforce, collect or abandon any and all Causes of Action.

      **6.9.2** **Creditor's Right to Make Demand for Prosecution of Causes of Action.** Notwithstanding the rights of the Reorganized Debtor with respect to Causes of Action, nothing in this Plan shall require the Reorganized Debtor to file or to prosecute any Cause of Action, both of which may be determined by the Reorganized Debtor in the exercise of its sole and absolute discretion; provided however, that, in the event that the Reorganized Debtor fails to file an action or proceeding with respect to a Cause of Action, or to settle such unfiled Cause of Action, within sixty (60) days after the Effective Date, any Creditor shall be entitled thereafter to serve upon the Reorganized Debtor written demand that the Reorganized Debtor file an action or proceeding with respect to such Cause of Action, or settle such unfiled Cause of Action. In the event that the Reorganized Debtor fails to either file an action or proceeding with respect to such Cause of Action, or to settle such unfiled Cause of Action within thirty (30) days after service of such written demand, unless otherwise ordered by the Bankruptcy Court within such thirty (30) day period, such Cause of Action shall be deemed to be transferred irrevocably and unconditionally to such Creditor and such Creditor then shall be entitled exclusively to file, litigate, prosecute, settle, adjust, enforce, collect or abandon such Cause of Action, at its own expense and without any expense to the Reorganized Debtor (although such Cause of Action may be prosecuted on a contingency fee basis) with any Net Recoveries therefrom turned over to

-42-

the Reorganized Debtor to be used by the Reorganized Debtor solely for the purpose of funding Distributions required by this Plan.

**THE DEBTOR HAS NOT COMPLETED ITS INVESTIGATION REGARDING THE EXISTENCE OF CAUSES OF ACTION.  THE INVESTIGATION IN THIS REGARD IS ONGOING.  AS A RESULT, ALL PARTIES-IN-INTEREST ARE HEREBY ADVISED THAT, NOTWITHSTANDING THE FACT THAT THE EXISTENCE OF ANY PARTICULAR CAUSE OF ACTION MAY NOT BE LISTED, DISCLOSED OR SET FORTH IN THIS PLAN OR IN THE DISCLOSURE STATEMENT, A CAUSE OF ACTION MAY BE FILED AGAINST ANY CREDITOR OR OTHER PARTY AS THE REORGANIZED DEBTOR MAY DETERMINE IN THE EXERCISE OF ITS SOLE AND ABSOLUTE DISCRETION.**

      **6.10**    **Post-Effective Date Professional Fees.**

         **6.10.1**  **Reorganized Debtor's Employment of Professionals.**  The Reorganized Debtor may employ, without any need to give notice to Creditors or to other parties-in-interest or to obtain any approval of the Bankruptcy Court, Professionals to assist the Reorganized Debtor to perform its duties under this Plan, as the Reorganized Debtor deems appropriate in the exercise of its sole and absolute discretion.

         **6.10.2**  **Ordinary Course Payments to Professionals.**  Any Professional employed after the Effective Date shall be entitled to obtain from the Reorganized Debtor payment of the Professional's fees and costs, in the ordinary course, without any need to give notice to Creditors or other parties-in-interest or to obtain any approval of the Bankruptcy Court. Notwithstanding the foregoing, if the Professional does not obtain payment of its post-Effective Date fees and costs within thirty (30) days after the Professional's rendering of its billing statement therefor, the Professional shall be entitled to seek, by application filed in accordance with the Bankruptcy Rules, an order of the Bankruptcy Court requiring prompt payment to the Professional of its fees and costs.

-43-

**6.11    Disposition of Assets.**  The Reorganized Debtor shall be entitled to sell, assign, encumber, dispose of or otherwise transfer any assets or properties, including, without limitation, any intellectual property rights or interests ("Asset Disposition") without any need to give any notice to any Creditors or to obtain any approval of the Bankruptcy Court.

**6.12    Compromise of Claims Objections and Causes of Action.**  The Reorganized Debtor shall be entitled to compromise any objection that it shall have filed to a Disputed Claim or to compromise any controversies relating to any Cause of Action that it shall have filed, without any need to give any notice to any creditors or to obtain any approval of the Bankruptcy Court.

**6.13    Bankruptcy Court Approval Relative to Post-Confirmation Matters.**  Notwithstanding anything to the contrary contained in this Plan, the Reorganized Debtor may seek, after the Effective Date, orders of the Bankruptcy Court approving actions to be taken consistent with this Plan as may be necessary or desirable to effectuate the provisions of this Plan.

**6.14    Plan Completion Certification.**  On or as soon as practicable after the date upon which the Reorganized Debtor determines that all Distributions required to be made under this Plan to holders of Allowed Claims have been made or that final Distributions to holders of Allowed Claims are being made or promptly will be made, the Reorganized Debtor shall file with the Bankruptcy Court and serve upon the Post-Effective Date Notice Parties a certification attesting to such determination ("Plan Completion Certification").

**6.15    Final Decree.**  Unless earlier filed by the Reorganized Debtor, by the thirtieth (30th) day after the filing of the Plan Completion Certification, the Reorganized Debtor shall file, in accordance with Rule 3022 of the Federal Bankruptcy Rules, an application with the Bankruptcy Court to obtain a final decree to close the Case ("Final Decree").  The Reorganized Debtor may file an application to obtain a Final Decree as and when it deems appropriate in the Case, but shall not file any such application unless and until all obligations required to be paid by the Reorganized Debtor on or about the Effective Date of the Plan are fully, finally and indefeasibly paid.

**6.16    Resolution of Disputes.**  In the event that a dispute should arise between Pacific Rainbow and the Reorganized Debtor, or between TriPharma and the Reorganized Debtor,

-44-

regarding any of their respective rights, obligations and remedies pursuant to this Plan, they shall act diligently and in good faith to try to resolve such dispute, but, if such dispute cannot be resolved by them, any of them shall be entitled to request, pursuant to the provisions of the Bankruptcy Rules, that the Bankruptcy Court resolve the merits of such dispute.

**6.17    Disposition of Guarantees.**  In accordance with the provisions of section 101(5) of the Bankruptcy Code, any Claim arising out of or related to any pre-petition guarantee provided by the Debtor shall be and shall be deemed to be solely a General Unsecured Claim, and no Administrative Claim or post-Effective Date claim or other obligation or liability for the Debtor or the Reorganized Debtor shall arise with respect thereto.  In the event that agreement cannot be reached regarding the allowed amount of such Claim, the Debtor shall have the right to have the Bankruptcy Court estimate the amount of such Claim for the purpose of allowance in accordance with the provisions of section 502(c) of the Bankruptcy Code.

## VII.

## DISTRIBUTIONS

**7.1    Designation and Role of the Disbursing Agent**.

**7.1.1    Disbursing Agent.**  The Reorganized Debtor shall be responsible for making all Distributions under this Plan (the Reorganized Debtor, in its role as the entity responsible for making Distributions under this Plan, is referred to herein as the "Disbursing Agent").

**7.1.2    Payment of Fees and Expenses**.  The Reorganized Debtor shall charge no fee, and shall not be entitled to any reimbursement of its expenses, in connection with its serving as the Disbursing Agent under this Plan.

**7.2    Distribution of Property Under this Plan.**

**7.2.1    Cash Distributions.**  All Distributions under this Plan shall be in Cash. Cash Distributions made pursuant to this Plan shall be in United States funds, by checks drawn on a domestic bank or, if the Disbursing Agent so elects, in the exercise of its sole and absolute discretion, by wire transfers from a domestic bank.

-45-

**7.2.2**    **Setoffs and Recoupment.**  Pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, the Disbursing Agent may set off, recoup or withhold against any Allowed Claim and Distribution to be made pursuant to this Plan on account of such Allowed Claim any pre-Petition Date or post-Petition Date account stated, claim, right, or cause of action that the Debtor, the Estate or the Reorganized Debtor may possess against the holder of such Allowed Claim.  Neither the failure to effect such a setoff or recoupment nor the allowance of any Claim shall constitute a waiver or release by the Debtor, the Estate or the Reorganized Debtor of any such account, claim, right, or cause of action against the holder of such Allowed Claim.

**7.2.3**    **No De Minimis Distributions.**  Notwithstanding anything to the contrary in this Plan, no Distribution of less than $10.00 ("De Minimis Distribution") shall be made to any holder of an Allowed Claim on account thereof.  No consideration shall be provided in lieu of any De Minimis Distributions that are not made under this Plan.

**7.2.4**    **Timeliness of Distributions.**  Except as provided expressly to the contrary in Section 5.2 hereof, any Distribution required to be made hereunder shall be deemed timely if made as soon as practicable after the due date therefor but, in any event, within fourteen (14) days after such date.  Any Distribution required to be made upon a Disputed Claim becoming an Allowed Claim and no longer being a Disputed Claim shall be deemed timely if made as soon as practicable thereafter but, in any event, within fourteen (14) days thereafter.

**7.2.5**    **Limitation on Liability.**  Neither the Debtor, the Reorganized Debtor, the Board of Directors of the Reorganized Debtor, nor any of their respective officers, directors, shareholders, employees, agents, attorneys or other Professionals, or representatives (collectively, "Representatives") shall be liable for (a) any acts or omissions (except for acts or omissions constituting gross negligence or willful misconduct) in connection with implementing the Distribution provisions of this Plan and the making or withholding of Distributions pursuant to this Plan, or (b) any change in the

-46-

value of Distributions made pursuant to this Plan resulting from any delays in making such Distributions in accordance with the terms of this Plan (including, but not limited to, any delays caused by the resolution of Disputed Claims).  Notwithstanding the foregoing, nothing in this Section 7.2.5 shall absolve the Reorganized Debtor of its liability to make the Distributions required by this Plan.

**7.2.6** **Delivery of Distributions**.

**7.2.6.1** **Distributions Only to Holders of an Allowed Claim**.  Each Distribution under this Plan shall be tendered only to the holder of the Allowed Claim entitled to such Distribution, in the manner set forth in Section 7.2.6.2 of this Plan.

**7.2.6.2** **Addresses to Which Distributions Will Be Sent**.  Except as provided in Section 7.2.8 with respect to Unclaimed Property, Distributions to holders of Allowed Claims and Allowed Administrative Claims shall be distributed by mail as follows:  (a) with respect to each holder of an Allowed Claim that has filed a Proof of Claim, at the address for such Creditor reflected in such Proof of Claim; (b) with respect to each holder of an Allowed Claim that has not filed a Proof of Claim, at the address reflected in the Bankruptcy Schedules filed by the Debtor; provided, however, that, if the Disbursing Agent receives a written notice of a change of address for such Creditor, the address set forth in such notice shall be used; or (c) with respect to each holder of an Allowed Administrative Claim, at such address as the holder thereof may specify in writing.

**7.2.7** **Undeliverable Distributions**.  If the Distribution to a holder of any Allowed Claim or Allowed Administrative Claim is returned as undeliverable (any such Distribution being hereinafter referred to as "Unclaimed Property"), no further Distribution shall be made to such Creditor unless and until the Disbursing Agent is notified in writing of such Creditor's then current address.  Subject to the provisions of Section 7.2.8 hereof, Unclaimed Property shall remain in the control of the Disbursing Agent and shall be set

-47-

aside and held in a segregated account ("Unclaimed Property Reserve") to be maintained until such time as the subject Distribution becomes deliverable or is disposed of in accordance with the provisions of Section 7.2.8 hereof.  Nothing contained in this Plan shall require the Disbursing Agent or any other entity to attempt to locate such Creditor. No interest shall be payable with respect to any Unclaimed Property.

**7.2.8**    **Disposition of Unclaimed Property.**  If a Creditor entitled to a Distribution of Unclaimed Property gives written notice to the Disbursing Agent of such Creditor's claim to the Distribution of such Unclaimed Property within three (3) months following the date upon which such Distribution initially was sent to such Creditor ("Initial Distribution Date"), the Unclaimed Property distributable to such Creditor shall be released from the Unclaimed Property Reserve and paid to such Creditor within fourteen (14) days thereof.  Any holder of an Allowed Claim or Allowed Administrative Claim that does not assert a claim in writing for Unclaimed Property held by the Disbursing Agent within three (3) months following the Initial Distribution Date with respect to such Unclaimed Property shall no longer have any claim to or interest in such Unclaimed Property, and shall be forever barred from receiving a Distribution on account thereof.  In such cases, any such Unclaimed Property shall be released to the Reorganized Debtor free and clear of any rights, claims or interests of such Creditor.

**7.2.9**    **Approval for Schedule of Proposed Distributions.**  In the discretion of the Disbursing Agent, the Disbursing Agent shall be entitled to prepare a preliminary schedule of proposed Distributions to Creditors ("Distribution Schedule"), and to apply, on an expedited basis, for an order of the Bankruptcy Court approving the making of such Distributions pursuant to the Distribution Schedule.  Notice of any such application shall be served on the Post-Effective Date Notice Parties or as otherwise determined by the Bankruptcy Court.

**7.2.10**    **Compliance with Tax Requirements.**  The Disbursing Agent shall comply with all tax withholding and reporting requirements imposed upon it by any governmental

-48-

unit, and all Distributions pursuant to this Plan shall be subject to such tax withholding and reporting requirements.

**7.2.11  Further Assurances Regarding Distributions.**  In accordance with the provisions of Section 13.22 hereof, as a condition to obtaining Distributions under this Plan, each Creditor shall execute and deliver to the Disbursing Agent, or join in the execution and delivery of, any agreement or instrument appropriate for the consummation of this Plan.

**7.2.12  Creditor's Payment of Obligations or Turn Over of Property to the Reorganized Debtor.**  As a condition to obtaining Distributions under this Plan, any Creditor from which property is recoverable pursuant to a Final Order of the Bankruptcy Court under sections 542, 543, 550 or 553 of the Bankruptcy Code, or otherwise, or that is a transferee of a transfer avoidable pursuant to a Final Order of the Bankruptcy Court under sections 522, 544, 545, 547, 548 or 549 of the Bankruptcy Code or otherwise, shall pay to the Reorganized Debtor the amount, or turn over to the Reorganized Debtor any such property, for which such Creditor is liable to the Debtor.

## VIII.

## OBJECTIONS TO DISPUTED CLAIMS

**8.1     Objections to Claims.**

**8.1.1     Reorganized Debtor's Right to Object to Disputed Claims.**  Subject to the provisions of Section 8.1.2 hereof, the Reorganized Debtor shall have the exclusive right to file, litigate, settle, adjust, enforce or abandon objections to any and all Disputed Claims, including any objection seeking to subordinate a Disputed Claim pursuant to Section 510 of the Bankruptcy Code.

**8.1.2     Creditor's Right to Make Demand for Filing Objection to Disputed Claims.**  Notwithstanding the rights of the Reorganized Debtor with respect to objecting to Disputed Claims set forth above in Section 8.1.1 of this Plan, nothing in this Plan shall require the Reorganized Debtor to file or to prosecute an objection to any Disputed Claim,

-49-

both of which may be determined by the Reorganized Debtor in the exercise of its sole and absolute discretion; provided, however, that, in the event that the Reorganized Debtor fails to file an objection with respect to a Disputed Claim within one hundred twenty (120) days after the Effective Date, any Creditor shall be entitled thereafter to serve upon the Reorganized Debtor written demand that the Reorganized Debtor file an objection with respect to such Disputed Claim.  In the event that the Reorganized Debtor fails to file an objection with respect to such Disputed Claim within thirty (30) days after service of such written demand, or to resolve an objection to such Disputed Claim within thirty (30) days after service of such written demand, unless otherwise ordered by the Bankruptcy Court for good cause shown, the rights to prosecute, control, withdraw and resolve such Disputed Claim shall be deemed to be transferred irrevocably and unconditionally to such Creditor and such Creditor then shall be entitled exclusively to file, litigate, prosecute, settle, adjust, enforce, collect or abandon such objection to the Disputed Claim, at its own expense and without any expense to the Reorganized Debtor.

**THE DEBTOR HAS NOT COMPLETED ITS INVESTIGATION REGARDING THE EXISTENCE OF DISPUTED CLAIMS.  THE INVESTIGATION IN THIS REGARD IS ONGOING.  AS A RESULT, ALL PARTIES-IN-INTEREST ARE HEREBY ADVISED THAT, NOTWITHSTANDING THE FACT THAT THE EXISTENCE OF ANY PARTICULAR DISPUTED CLAIM MAY NOT BE LISTED, DISCLOSED OR SET FORTH IN THIS PLAN OR IN THE DISCLOSURE STATEMENT, SUBJECT ONLY TO THE CLAIMS OBJECTION DEADLINE, AN OBJECTION MAY BE FILED TO ANY DISPUTED CLAIM AS THE REORGANIZED DEBTOR MAY DETERMINE, IN THE EXERCISE OF ITS SOLE AND ABSOLUTE DISCRETION.  THE REORGANIZED DEBTOR SHALL HAVE THE RIGHT TO OBJECT TO AMOUNTS THAT HAVE BEEN SCHEDULED BY THE DEBTOR AND WHICH ARE FOUND TO BE OBJECTIONABLE IN ANY RESPECT.**

**8.2**     **Claims Objection Deadline.**  Unless another date is established by order of the Bankruptcy Court, an objection to a Claim must be filed with the Bankruptcy Court and served on the Creditor holding such Claim on or before the Claims Objection Deadline.  The Bankruptcy Court may extend the Claims Objection Deadline for cause shown.

**8.3**     **Treatment of Disputed Claims.**

**8.3.1     No Distribution Pending Allowance.**  All Distributions under this Plan shall be made only on account of Allowed Claims.  If any portion of a Claim is a Disputed Claim, no Distribution provided for under this Plan shall be made on account of such Claim unless and until such Claim becomes an Allowed Claim and is no longer a Disputed Claim.

**8.3.2     Distribution After Allowance.**  Within fourteen (14) days following the date on which a Disputed Claim becomes an Allowed Claim and is no longer a Disputed Claim, the Disbursing Agent shall distribute to the Creditor holding such Allowed Claim any Cash that would have been distributable to such Creditor as if, at the time of the making of any Distribution to the Class of which such Creditor is a member, such Claim had been an Allowed Claim and not a Disputed Claim.  No interest shall be paid on such Claim, except as provided in Section 8.3.3 hereof.

**8.3.3     Reserve for Disputed Claims.**  On or as soon as practicable after the Effective Date, the Disbursing Agent shall establish, in a segregated, interest-bearing account, a reserve for any Disputed Claim ("Disputed Claims Reserve") in an amount equal to 100% of the Distribution to which the holder of the Disputed Claim would be entitled under this Plan based upon the liquidated, face amount of its non-duplicative Disputed Claim unless such Claim is estimated by Final Order of the Bankruptcy Court; provided, however, that the Disbursing Agent shall have the right to seek from the Bankruptcy Court an order reducing the amount of such Reserve pending the resolution of the Disputed Claim.  If the Disputed Claim does not set forth a liquidated amount of such Claim, then the amount of the Reserve to be established on account of such Disputed

Claim shall be the amount fixed mutually by the Creditor and by the Disbursing Agent or the amount estimated by the Bankruptcy Court for the purpose of this Section 8.3.3.  If the Disputed Claim is estimated, the amount of the Reserve to be established on account of such Disputed Claim shall be the amount of the Distribution payable with respect to the estimated amount of such Disputed Claim as determined by Final Order of the Bankruptcy Court or agreed to in writing by the Creditor, and such estimated amount shall be the maximum amount of the Distribution on account of such Disputed Claim.

**8.3.4    No Distribution Until Allowance of Disputed Claim.**  No disbursement of funds from a Disputed Claims Reserve shall be made on account of a Disputed Claim unless and until such Disputed Claim becomes an Allowed Claim.  Any amount of a Claim which has been disallowed pursuant to an order of the Bankruptcy Court shall be deemed to be extinguished and no Distribution of any amount shall be paid on account thereof. The amount reserved for any Disputed Claim (plus any interest thereon) which has been disallowed by the Bankruptcy Court shall be released to the Reorganized Debtor free and clear of any claims, rights or interests of the Creditor asserting such Disputed Claim.

**8.4    Bar Date for Filing Avoidance Action Payment Claims.**  Any Avoidance Action Payment Claim shall be forever barred, shall not be enforceable against the Debtor or the Reorganized Debtor and shall not be entitled to any Distribution under this Plan, unless a Proof of Claim for such Avoidance Action Payment Claim is filed and served on the Debtor or the Reorganized Debtor within thirty (30) days after the <u>later</u> of (a) the date of entry of the order of the Bankruptcy Court adjudging the Creditor's liability to the Debtor or to the Reorganized Debtor on account of such Avoidance Action, or (b) the date of service of this Plan upon the Creditor asserting the Avoidance Action Payment Claim.

## IX.

## LITIGATION

**9.1    Authorization to Assert Causes of Action.**  From and after the Effective Date, the Reorganized Debtor shall have the right to file, litigate, prosecute, settle, adjust, enforce,

-52-

**DEBTOR'S THIRD AMENDED CHAPTER 11 PLAN OF REORGANIZATION**
MAINDOCS-#204711-v1-Imagenetix_-_Clean_-_3rdAmendedPlan.doc

collect and abandon the Causes of Action without the consent or approval of any third party, and without any further order of the Bankruptcy Court, in accordance with the provisions of Sections 6.9 and 6.12 hereof.

**9.2**    **Evaluation of Causes of Action.** The decision of the Reorganized Debtor to prosecute or to continue to prosecute any Cause of Action shall be based, in part, upon its evaluation of the merits of the Cause of Action as well as the costs required to prosecute such Cause of Action taking into account the resources available to make Distributions to Creditors. Subject to the provisions of Section 6.9.2 hereof, the Reorganized Debtor shall be entitled to determine, in the exercise of its sole and absolute discretion, not to prosecute, or to abandon, any Cause of Action.

**9.3**    **Retention of Professionals.** The Reorganized Debtor may retain Professionals to represent it in prosecuting Causes of Action. The Reorganized Debtor shall be entitled to determine, in the exercise of its business judgment, the terms of the retention of Professionals, including, without limitation, the retention of counsel on a contingency fee basis to prosecute some or all of the Causes of Action, and may seek to finance any costs relating to the prosecution of Causes of Action.

**9.4**    **Preservation of Causes of Action.** Unless a Cause of Action is expressly waived, relinquished, released, compromised, or settled in this Plan or in any Final Order, each Cause of Action is reserved for later adjudication by the Reorganized Debtor (including, without limitation, Causes of Action of which the Debtor presently may be unaware, or which may arise or exist by reason of facts or circumstances unknown to the Debtor at this time, or facts or circumstances which may change or be different from those which the Debtor now believes to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or otherwise), or laches shall apply, based on the Disclosure Statement, this Plan, or the Confirmation Order, to the prosecution of Causes of Action. Without limiting the generality of the foregoing, any entity with respect to which the Debtor has incurred an obligation, or which

**DEBTOR'S THIRD AMENDED CHAPTER 11 PLAN OF REORGANIZATION**

has received services from the Debtor or a transfer of money or property of the Debtor, or which has transacted business with the Debtor, should assume that such obligation, transfer, or transaction may be evaluated subsequent to the Effective Date and may be the subject of an Avoidance Action or other action or proceeding filed after the Effective Date.

**9.5**    **Subordination of Claims.**  The Reorganized Debtor shall have the exclusive right to file an action to subordinate a Claim in accordance with the provisions of Section 8.1 hereof.

**X.**

**EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

**10.1**    **Executory Contracts and Unexpired Leases Being Assumed.**  Effective as of, and conditioned on, the occurrence of the Effective Date, the Debtor shall assume all of the executory contracts and unexpired leases of the Debtor listed on Exhibit "2" attached hereto.  The Debtor may amend, through and including the Confirmation Hearing Date, Exhibit "2" to add thereto any executory contract or unexpired lease, or to delete therefrom any executory contract or unexpired lease.  However, if any amendments are made to Exhibit "2" less than thirty (30) days before the Confirmation Hearing Date, the affected contract or lease parties shall have fifteen (15) days from the date of service of notice of such amendments within which to serve on the Debtor a written objection to the same.  Upon receipt of any such objection, the Debtor shall promptly set a hearing on the same, and the assumption or rejection of the affected contract or lease shall be delayed until the Bankruptcy Court makes a determination on such issue (such determination may be made after the Confirmation Date, without delaying the confirmation of this Plan).  To the extent that an executory contract or unexpired lease has been assumed by the Debtor prior to the Confirmation Date pursuant to an order of the Bankruptcy Court, such assumption shall not be affected by this Plan.  The assumption of any contract or lease pursuant to the provisions of this Section 10.1 shall be only to the extent that such assumed contract or lease constitutes an executory contract or unexpired lease within the meaning of section 365 of the Bankruptcy Code. Inclusion of an agreement in Exhibit "2" does not constitute an admission by the Debtor that (a) such agreement is an executory contract or unexpired lease within the meaning of section 365 of

-54-

the Bankruptcy Code, (b) the Debtor must assume such agreement in order to continue to receive or retain rights, benefits, or performance thereunder or that any Claim under such agreement must be paid or any default thereunder must be cured, or (c) such agreement is a valid contract or lease. Any contract or lease assumed pursuant to this Plan shall be assumed as previously amended or otherwise modified by the parties thereto, whether before or after the Petition Date.

**10.2    Executory Contracts and Unexpired Leases Being Rejected.**  Effective as of, and conditioned on, the occurrence of the Effective Date, the Debtor shall reject all of the executory contracts and unexpired leases of the Debtor not listed on Exhibit "2" attached hereto including, without limitation, those executory contracts and unexpired leases listed on Exhibit "3" attached hereto.  The Debtor may amend, through and including the Confirmation Hearing Date, Exhibit "3" to add thereto any executory contract or unexpired lease, or to delete therefrom any executory contract or unexpired lease.  However, if any amendments are made to Exhibit "3" less than thirty (30) days before the Confirmation Hearing Date, the affected contract or lease parties and any other party-in-interest shall have fifteen (15) days from the date of service of notice of such amendments within which to serve on the Debtor a written objection to the same.  Upon receipt of any such objection, the Debtor shall promptly set a hearing on the same, and the rejection of the affected contract or unexpired lease shall be delayed until the Bankruptcy Court makes a determination on such issue (such determination may be made after the Confirmation Date, without delaying the confirmation of this Plan).  To the extent that an executory contract or unexpired lease has been rejected by the Debtor prior to the Confirmation Date pursuant to an order of the Bankruptcy Court, such rejection shall not be affected by this Plan.  The rejection of any contract or lease pursuant to the provisions of this Section 10.2 shall be only to the extent that such rejected contract or lease constitutes an executory contract or unexpired lease within the meaning of section 365 of the Bankruptcy Code.  Inclusion of an agreement in Exhibit "3" does not constitute an admission by the Debtor that (a) such agreement is an executory contract or unexpired lease within the meaning of section 365 of the Bankruptcy Code, or (b) such agreement is a valid contract or lease.  Any contract or lease rejected pursuant to this Plan shall be rejected as

previously amended or otherwise modified by the parties thereto, whether before or after the Petition Date.  Any executory contract or unexpired lease not listed in Exhibit "2" or in Exhibit "3" shall be deemed to be rejected by the Reorganized Debtor on the Effective Date.

**10.3    Retention of Property Rights.**  To the extent that the Debtor has obtained property rights under the executed portion of an executory contract or unexpired lease, rejection of such agreement shall not constitute abandonment by the Debtor of any such property rights.

**10.4    Bar Date for Rejection Claims.**  Any Rejection Claim shall be forever barred, shall not be enforceable against the Debtor or the Reorganized Debtor, and shall not be entitled to any Distribution under this Plan, unless a Proof of Claim for such Rejection Claim is filed and served on the Reorganized Debtor within thirty (30) days after the later of (a) the date of entry of the order of the Bankruptcy Court approving the rejection of the executory contract or unexpired lease, or (b) the date of service of notice of the Bar Date upon the Creditor asserting the Rejection Claim (which service may be effected by service of this Plan upon such Creditor).

**10.5    Cure Claims Schedule.**  A schedule of the amounts necessary to cure any defaults under executory contracts and unexpired leases assumed under this Plan ("Cure Claims") is set forth in a schedule ("Cure Claims Schedule") included in Exhibit "2" attached hereto.  Any objection to the amount of any Cure Claim set forth in the Cure Claims Schedule shall be filed and served upon the Debtor and counsel for the Debtor on or before the fifteenth (15th) day prior to the Confirmation Hearing Date.  In the event that any such objection to the amount stated for a Cure Claim in the Cure Claims Schedule is not filed and served as set forth herein, the amount of the Creditor's Cure Claim shall be deemed forever to be the amount set forth in the Cure Claims Schedule, and any Cure Claim in excess of the amount set forth in the Cure Claims Schedule shall be waived and shall be forever barred in the Case, without further notice.  If the Debtor cannot resolve any such objection with the Creditor, the Debtor may either (a) elect to reject the executory contract or unexpired lease at the Confirmation Hearing, or (b) have the Bankruptcy Court determine the merits of the objection on or after the Confirmation Hearing (without delaying the confirmation of this Plan).  Any amount of a Cure Claim payable upon the assumption of an

executory contract or unexpired lease shall be due and payable on or before the <u>later</u> of the fourteenth (14th) day after the entry of a Final Order fixing the amount of the Cure Claim and then only in the amount fixed by such Final Order, or fifth (5th) Business Day after the Effective Date.

**XI.**

**<u>EFFECT OF CONFIRMATION OF THIS PLAN</u>**

**11.1    <u>Discharge</u>.**  Confirmation of this Plan shall have all of the effects provided by section 1141 of the Bankruptcy Code which are not inconsistent with the terms of this Plan. Except as provided expressly to the contrary in this Plan or in the Confirmation Order, pursuant to section 1141(d) of the Bankruptcy Code, the Distributions and rights that are provided in this Plan shall be in complete satisfaction, settlement, release and discharge, effective as of the Effective Date, of all known or unknown Claims and Administrative Claims against, rights against, liabilities of, obligations of, and any Liens encumbering the Debtor's assets and properties, including but not limited to, Claims of the kind specified in sections 502(g), 502(h) and 502(i) of the Bankruptcy Code, in each case whether or not (a) a Proof of Claim based upon such Claim is filed or deemed filed under section 501 of the Bankruptcy Code, (b) such Claim is allowed under section 502 of the Bankruptcy Code, or (c) the holder of such Claim accepted the Plan.  The Confirmation Order shall constitute a determination of the discharge of all Claims and Administrative Claims against the Debtor, subject only to the occurrence of the Effective Date, to the fullest extent permitted by section 1141 of the Bankruptcy Code.  Any obligations of the Debtor to Creditors imposed by this Plan shall be compensable only from Distributions made pursuant to the Plan.

**11.2    <u>Injunction</u>.**  Except as provided expressly to the contrary in this Plan, or in the Confirmation Order, on and after the Effective Date, all Creditors who have held, hold, or who may hold a Claim discharged pursuant to the terms of this Plan (including, but not limited to, the United States of America, any states and other governmental units, and any employee or other person or entity acting in an individual or official capacity on behalf of the United States of America, any state or other governmental unit) shall be permanently enjoined from the following:

-57-

(a) taking any of the following actions on account of any such discharged Claim:  (i) commencing or continuing in any manner any action or other proceeding against the Debtor or the Reorganized Debtor, their respective Representatives, successors, or property; (ii) enforcing, attaching, executing, collecting, or recovering in any manner any judgment, award, decree, or order against the Debtor or the Reorganized Debtor, their respective Representatives, successors, or property; (iii) creating, perfecting, or enforcing any Lien against the Debtor or the Reorganized Debtor, their respective Representatives, successors, or property; (iv) asserting any set off, right of subrogation, or recoupment of any kind against any obligation due to the Debtor or the Reorganized Debtor, their respective Representatives, successors, or property; and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of this Plan; and (b) taking any acts on account of any Causes of Action that are vested in, or transferred to, the Reorganized Debtor as of the Effective Date, including, without limitation, commencing or continuing in any manner any Avoidance Action (i.e., no party may pursue any Causes of Action except as provided by this Plan).  Any person or entity injured by any willful violation of such injunction shall recover its actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages from the willful violator of such injunction.

**11.3    Release.**  Except as provided expressly to the contrary in this Plan or in the Confirmation Order, the rights afforded under this Plan and the treatment of all Claims under this Plan shall be in exchange for and in complete satisfaction, settlement, release and discharge of all Claims (including Administrative Claims and any interest accrued on any Claim from and after the Petition Date) against the Debtor, the Reorganized Debtor, and any of their respective assets and property, except with respect to the obligations imposed thereon in connection with the Plan and any Plan Documents.  Except as otherwise provided in this Plan or in the Confirmation Order, upon the Effective Date, each Creditor shall be deemed to have irrevocably and unconditionally settled and released, fully and forever, any Claims against the Debtor and the Reorganized Debtor, and their respective assets and properties.  Except as otherwise provided in this Plan or in the

-58-

Confirmation Order, all Creditors shall be precluded from asserting all Claims against the Debtor and the Reorganized Debtor, and their respective assets and properties.  Notwithstanding anything herein to the contrary, no Cause of Action that is the property of the Debtor and/or the Estate shall in any way be released, modified, altered or compromised by virtue of the confirmation of this Plan and all Causes of Action shall automatically be transferred, as of the Effective Date, to the Reorganized Debtor in accordance with the provisions of Section 6.9 of this Plan.

**11.4    Distribution of Property Free and Clear of Liens, Claims, and Interests.**

Except as otherwise provided in this Plan or in the Confirmation Order, all property distributed under this Plan shall be distributed free and clear of all Liens and other Claims of Creditors and the Interests of the Interest Holders.

**11.5    Binding Effect of Plan.**  Upon the Effective Date, the provisions of this Plan shall be binding upon the Debtor, the Reorganized Debtor, each Creditor and the Interest Holders.

**11.6    Revesting of Assets**.  On the Effective Date, all assets, properties and interests of the Estate shall vest in, and shall be property of, the Reorganized Debtor.

## XII.

## LIMITATION OF LIABILITY

**12.1    No Liability for Solicitation or Participation.**  As specified in section 1125(e) of the Bankruptcy Code, entities that solicit acceptances or rejections of this Plan, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, shall not be liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or the offer, issuance, sale, or purchase of securities.

**12.2    Good Faith.**  Confirmation of this Plan shall constitute a finding that the Plan was proposed, and that acceptances of the Plan were solicited, in good faith and in compliance with applicable provisions of the Bankruptcy Code.

**12.3    Limitation of Liability Regarding Plan.**  Effective as of the Effective Date, neither the Debtor, the Reorganized Debtor, the Board of Directors of the Reorganized Debtor, nor

any of their respective Representatives shall have or incur any liability to any Creditor or to any Interest Holder for any act or omission in connection with or arising out of the negotiation, preparation and pursuit of confirmation of this Plan, the approval of the Disclosure Statement, the administration of this Plan or the consummation of this Plan (except for any act or omission constituting gross negligence or willful misconduct), to the fullest extent permitted by applicable statutory and case law, except only for the obligations of the Reorganized Debtor to make the Distributions required by this Plan.

## XIII.

## OTHER PLAN PROVISIONS

**13.1    Exemption from Stamp, Transfer and Other Taxes.**  Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of assets under this Plan, including, without limitation, the issuance of equity securities, the making or assignment of any lease or sublease, or the making or delivery of any deed or instrument of transfer under, in furtherance of, or in connection with this Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.

**13.2    Books and Records.**  The Reorganized Debtor shall maintain all of its books and records until entry of the Final Decree, unless the Bankruptcy Court enters an order authorizing the Reorganized Debtor to discard or destroy books and records, after notice to Post-Effective Date Notice Parties.

**13.3    Post-Effective Date Quarterly Fees.**  After the Effective Date, the Reorganized Debtor shall be responsible for paying, and shall pay timely, all accruing United States Trustee Fees until the entry of a Final Decree.

**13.4    Post-Effective Date Status Reports.**  The Reorganized Debtor shall file reports regarding the status of implementation of this Plan and regarding the review, prosecution and resolution of Causes of Action, every 120 days following the entry of the Confirmation Order through the Case Closing Date, or as otherwise ordered by the Bankruptcy Court.  Such reports shall be served on the Post-Effective Date Notice Parties.

**13.5** **Effectiveness of Court Orders.** Unless otherwise provided by this Plan or by the Confirmation Order, all orders and judgments, including injunctions, entered by the Bankruptcy Court during the Case and in existence on the Confirmation Date shall remain in full force and effect from and after the Effective Date, to the extent not inconsistent with the provisions of this Plan or the Confirmation Order.

**13.6** **No Admissions.** Nothing contained in this Plan shall be deemed or construed in any manner as an admission by the Debtor with respect to any matter set forth in this Plan, including, without limitation, the amount or allowability of any Claim, or the value of any property of the Estate.

Notwithstanding anything to the contrary in this Plan, if this Plan is not confirmed or the Effective Date does not occur, this Plan shall be null and void, and nothing contained in this Plan shall: (a) be deemed to be an admission by the Debtor with respect to any matter discussed in this Plan, including liability on any Claim or the propriety of any classification of a Claim; (b) constitute a waiver or release of any Cause of Action held by the Debtor; or (c) prejudice in any manner the rights of the Debtor in any action or proceeding.

**13.7** **Revocation of the Plan.** The Debtor reserves the right to withdraw this Plan before the Confirmation Date.

**13.8** **Severability of Plan Provisions.** If, before Confirmation, the Bankruptcy Court holds that any term or provision of this Plan is invalid, void, or unenforceable, the Bankruptcy Court may alter or interpret that term or provision so that it is valid and enforceable to the maximum extent possible consistent with the original purpose of that term or provision. However, such term or provision, as altered or interpreted by the Bankruptcy Court, shall be effective in this Plan, and the remaining terms and provisions of this Plan shall remain in full force and effect and shall not be affected, impaired, or invalidated in any manner. The Confirmation Order shall constitute a judicial determination that each term and provision of this Plan, as it may have been altered or interpreted in accordance with this Section 13.8, is valid and enforceable.

**13.9** **Governing Law.** The rights and obligations arising under this Plan or in any Plan Document shall be governed by, and construed and enforced in accordance with, California law without giving effect to conflict of law principles under California law, unless a rule of law or procedure is supplied by: (a) federal law (including, without limitation, the Bankruptcy Code and the Federal Bankruptcy Rules); or (b) an express choice-of-law provision in any Plan Document provided for, or executed under or in connection with, this Plan.

**13.10** **Retention of Jurisdiction.** After the Effective Date, the Bankruptcy Court shall have, to the fullest extent permitted by the Bankruptcy Code, jurisdiction over any matter related to the Case or this Plan, including, without limitation, with respect to any of the following matters:

13.10.1    resolution of any matters related to the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease to which the Debtor is a party or with respect to which the Debtor may be liable, and to hear, determine and, if appropriate, liquidate, any Claims arising therefrom;

13.10.2    entry of such orders as may be appropriate to interpret, enforce, implement or consummate the provisions of this Plan and all Plan Documents;

13.10.3    determination of any and all motions, adversary proceedings, applications, and contested or litigated matters that may be pending on the Effective Date or that, pursuant to this Plan, may be instituted by the Reorganized Debtor after the Effective Date, including, without limitation, any matters related to Causes of Action;

13.10.4    hearing and determining any objections to the allowance of Claims or Administrative Claims, whether filed before or after the Confirmation Date, including any objections to the classification of any Claim, and any proceedings to allow, disallow, determine, liquidate, estimate, or establish the priority or the secured or unsecured status of any Claim, in whole or in part, or to establish Reserves pending the resolution of Disputed Claims;

13.10.5    entry and implementation of such orders as may be appropriate in the event that the Confirmation Order is, for any reason, stayed, revoked, modified, reversed, or vacated;

13.10.6    consideration of any modifications of this Plan, after confirmation of this Plan, and, if in the best interests of Creditors, modification of this Plan after this Plan has been substantially consummated;

13.10.7    interpreting and enforcing orders of the Bankruptcy Court, including, without limitation, the cure of any defect or omission, or the reconciliation of any inconsistency, in any order of the Bankruptcy Court, including the Confirmation Order;

13.10.8    hearing and determining all applications for awards of compensation for services rendered and reimbursement of expenses incurred prior to the Effective Date, including, without limitation, all Pre-Effective Date Fee Claims of Pre-Effective Date Professionals;

13.10.9    hearing and determining disputes arising in connection with, or relating to, this Plan or the interpretation, implementation, or enforcement of this Plan, or the extent of any entity's obligations in connection with this Plan;

13.10.10    the recovery of all assets, properties and interests of the Debtor and the Estate, wherever located;

13.10.11    issuance of injunctions or other orders as may be necessary or appropriate to aid in the implementation of this Plan or to restrain interference by any entity with the consummation or the enforcement of this Plan;

13.10.12    hearing and determining matters concerning Taxes and tax refunds, tax attributes, and tax benefits and similar and related matters, with respect to the Debtor or the Reorganized Debtor, in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

13.10.13    hearing and determining any issue or dispute arising from or related to the assets and properties of the Debtor or the Reorganized Debtor;

-63-

13.10.14    the effectuating of Distributions under, and the performance of, the provisions of this Plan;

13.10.15    hearing and determining any other matter deemed relevant to the consummation of this Plan and the administration of the Case;

13.10.16    resolution of any disputes regarding the rights, remedies, interests and properties of the Reorganized Debtor pursuant to this Plan; and

13.10.17    the issuance of a Final Decree.

Notwithstanding anything to the contrary contained in the foregoing, in the event that the Bankruptcy Court determines that it is without jurisdiction, or abstains from exercising jurisdiction, over any matter, the provisions of this Section 13.10 shall not affect, control, prohibit, or limit in any manner the exercise of jurisdiction over any such matter by any other court or tribunal that has jurisdiction over such matter.

**13.11    Successors and Assigns.**  Except as provided expressly to the contrary in this Plan, the rights, benefits, and obligations of any entity referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of that entity.

**13.12    Business Day.**  If any payment or act under this Plan is required to be made or performed on a day that is not a Business Day, then the payment or act may be completed on the next succeeding day that is a Business Day, in which event the payment or act shall be deemed to have been completed on the required day.

**13.13    No Waiver.**  Except as provided expressly to the contrary in this Plan, neither any failure to list a Claim in the Bankruptcy Schedules filed by the Debtor, any failure of the Debtor to object to any Claim for purposes of voting, any failure of the Debtor to object to a Claim or Administrative Claim prior to the Effective Date, any failure of the Debtor to assert a Cause of Action prior to the Effective Date, nor any action or inaction of the Debtor with respect to a Claim, Administrative Claim, or Cause of Action, other than a legally effective express waiver or release, shall be deemed to be a waiver or release of the right of the Reorganized Debtor under this Plan to

-64-

(a) object to or examine such Claim or Administrative Claim, in whole or in part, or (b) retain and assert, pursue, prosecute, litigate, or otherwise enforce any Cause of Action.

13.14   **Post-Effective Date Notice.**  From and after the Effective Date, any entity which desires to obtain notice of any pleading or document filed in the Case, or of any hearing in the Bankruptcy Court, or of any matter as to which notice is to be provided under this Plan (collectively, "Post-Effective Date Matters"), must file a request for post-Effective Date notice and serve such request on the Reorganized Debtor and its counsel. Notice of any Post-Effective Date Matters must be served on the following parties: the United States Trustee, the Reorganized Debtor, Pacific Rainbow, TriPharma and any entity that files a request for such post-Effective Date notice ("Post-Effective Date Notice Parties").

13.15   **Modification of this Plan.**  At any time prior to the confirmation of this Plan, the Debtor may supplement, amend or modify this Plan in accordance with section 1127(a) of the Bankruptcy Code.  After confirmation of this Plan, the Reorganized Debtor may (a) apply to the Bankruptcy Court to modify this Plan, notwithstanding any substantial consummation of this Plan, and (b) apply to the Bankruptcy Court to remedy defects or omissions in this Plan or to reconcile inconsistencies in this Plan.

13.16   **Nonconsensual Confirmation.**  The Debtor hereby requests that the Bankruptcy Court confirm this Plan in accordance with the "cram down" provisions of section 1129(b) of the Bankruptcy Code, notwithstanding any deemed non-acceptance of this Plan by any Class 3 Creditor or Class 4 Creditor and any other non-acceptance of this Plan by any other Class established by this Plan.  In the event that (as expected) no vote is cast with respect to this Plan by a Class 3 or Class 4 Creditor, at the option of the Debtor, such Class shall be deemed to be eliminated from this Plan.  Subject to the provisions of Section 13.15 hereof, the Debtor hereby reserves the right to modify this Plan in accordance with section 1127 of the Bankruptcy Code and Section 13.15 of this Plan in connection with confirmation proceedings with respect to this Plan, and, unless the Bankruptcy Court should determine that such modification affects materially adversely the treatment of any Class of Creditors or Interest Holders established by this Plan, such

**DEBTOR'S THIRD AMENDED CHAPTER 11 PLAN OF REORGANIZATION**
MAINDOCS-#204711-v1-Imagenetix_-_Clean_-_3rdAmendedPlan.doc

modification of this Plan may be effectuated without the need to amend the Disclosure Statement or to re-solicit votes with respect to this Plan.

**13.17    Other Documents and Actions.**  The Reorganized Debtor may execute such other documents and take such other actions as may be necessary or appropriate to effectuate the transactions contemplated under this Plan.

**13.18    Notices.**  Except as provided expressly to the contrary in this Plan, after the Effective Date of this Plan, all notices and requests in connection with this Plan shall be in writing and shall be hand delivered, sent by e-mail transmission or sent by telefacsimile, with a copy sent by first-class mail, addressed to the Reorganized Debtor and to its counsel at the addresses that will be set forth in the Confirmation Order.

All notices to any Creditor shall be sent to it at its last known address or to the last known address of its attorney of record.  Any such Creditor may designate in writing any other address for the purpose of this Section 13.18, which designation shall be effective on receipt thereof by the Debtor or by the Reorganized Debtor.

Service of any notice or request shall be deemed to be effective on the date delivered or sent if delivered or sent in accordance with the provisions of this Section 13.18.

**13.19    Inconsistencies.**  In the event that any provisions of this Plan are inconsistent with the provisions of the Disclosure Statement, the provisions of this Plan shall control.  In the event that any provisions of this Plan are inconsistent with the provisions of any Plan Document, the provisions of the Plan Document shall control.

**13.20    Changes in Rates Subject to Regulatory Commission Approval.**  The Debtor is not subject to governmental regulatory commission approval of its rates.

**13.21    Modification/Superseding of Loan Documents.**  Except as provided expressly to the contrary in this Plan, from and after the Effective Date, all loan documents, security documents, Liens, promissory notes, indemnity agreements, surety agreements, purchase orders, invoices, and other contracts documenting Claims against the Debtor (collectively, "Loan Documents") shall be deemed modified or superseded completely, as the case may be, by the terms

-66-

of this Plan.  Upon the Effective Date, any defaults under such Loan Documents shall be deemed cured as of the Effective Date.  After the Effective Date, Claims shall be paid only in accordance with the terms of this Plan, and any effort by any Creditor to compel any payment to it of more than its Allowed Claim, or the payment of its Claim in any manner other than as provided in this Plan, shall constitute a violation of the Confirmation Order and section 1141 of the Bankruptcy Code.

13.22   **Implementation of Section 1142 of the Bankruptcy Code.**  Pursuant to section 1142(a) of the Bankruptcy Code, the Reorganized Debtor is authorized to carry out the terms of this Plan.  Pursuant to section 1142(b) of the Bankruptcy Code, all Creditors shall execute and deliver, or join in the execution and delivery of, any instrument or document appropriate to effectuate this Plan, and perform any other act that is appropriate for the consummation of this Plan.  To the extent that any Creditor fails to comply with these provisions, the Reorganized Debtor shall be entitled to obtain, on an expedited basis, an order of the Bankruptcy Court compelling such Creditor's compliance with these provisions, and, during the time period encompassed by such Creditor's non-compliance, no payment shall be made to such Creditor under this Plan and such Creditor shall be responsible for all costs and damages incurred by the Reorganized Debtor as a result of such Creditor's non-compliance with these provisions.

13.23   **Corporate Charter.**  The Reorganized Debtor's corporate charter shall include a provision prohibiting the issuance of nonvoting Interests, consistent with the provisions of section 1123(a)(6) of the Bankruptcy Code.

**XIV.**

**RECOMMENDATION AND CONCLUSION**

The Debtor believes that confirmation of this Plan is in the best interests of Creditors because, in the Debtor's view, this Plan will provide to Creditors the maximum recovery possible under the circumstances of this Case on their Allowed Claims.  Accordingly, the Debtor urges

1  Creditors to vote to accept this Plan.

2  Dated:  August 29, 2014                    **IMAGENETIX, INC.**

3

4                                              By: _____

5                                              Name:  Lowell W. Giffhorn
                                                Its:  Chief Financial Officer
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                        –68–

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT "1"**

[TriPharma Settlement Agreement]

Exhibit "1" Page 69

## SETTLEMENT AND RELEASE AGREEMENT

This Settlement and Release Agreement ("Agreement") is entered into this 29th day of August 2013 ("Execution Date") by and among Imagenetix, Inc. ("Imagenetix") and William Spencer ("Spencer"), on one hand, and TriPharma, LLC ("TriPharma") and Evan Dameshek ("Dameshek"), on the other hand (Imagenetix, Spencer, TriPharma and Dameshek are referred to herein, collectively, as the "Parties"), with reference to the following facts and circumstances.

### RECITALS

A.      On December 17, 2012 ("Petition Date"), Imagenetix filed in the United States Bankruptcy Court for the Southern District of California ("Bankruptcy Court"), as Case No. 12-16423-MM11, a Chapter 11 petition for relief ("Bankruptcy Case").

B.      Imagenetix is a Nevada corporation.  Spencer is the Chief Executive Officer and President of Imagenetix.

C.      TriPharma is a Delaware limited liability company.  Dameshek is the managing member of TriPharma.

D.      Imagenetix had a license from the University of Minnesota for the exclusive rights to use the University of Minnesota's patent (Patent No. 6,899,892), which patent was subsequently purchased from the University of Minnesota (subject only to a limited retention of rights for non-commercial use in research by the University of Minnesota) and then assigned to First Fruits Business Ministry, LLC ("UM Patent").

E.      By utilizing the UM Patent, Imagenetix is able to cause to be manufactured nutritional supplement products, intended for fat and weight reduction, based upon clinical studies related thereto, including a study by the University of Connecticut ("UConn Study") (collectively, the "Product").

F.      Imagenetix and TriPharma entered into an Exclusive Marketing and Supply Agreement, dated June 27, 2006, and a number of amendments and restatements thereto, and modified thereafter in arbitration (collectively, the "Original EMSA").

G.      Pursuant to the Original EMSA, Imagenetix has granted to TriPharma an exclusive license to distribute the Product worldwide, in accordance with the terms and conditions of the Original EMSA.

H.      On or about June 17, 2010, Imagenetix filed a Demand for Arbitration, naming TriPharma and Dameshek as respondents, and asserting, in part, causes of action against TriPharma and Dameshek for declaratory relief and breach of contract.  On July 1, 2010, TriPharma and Dameshek filed an Answer to Imagenetix's Notice of Claim and TriPharma filed a Counterclaim against Imagenetix and Spencer.  On July 15, 2010, Imagenetix and Spencer filed a Reply and Answer to TriPharma's Counterclaim.  The Parties thereafter addressed their disputes through arbitration ("Arbitration I").

I.      In September 2011, an arbitrator issued an interim arbitration award, followed by a final award (the "Arbitration I Award") on November 2, 2011, against Imagenetix on its claims for termination of the Original EMSA and breach by TriPharma and in favor of TriPharma in the amount of approximately $3,935,000 for its claims of fraud and breach of contract.  In addition to awarding actual and punitive damages, costs, interest and attorneys' fees, the Arbitration I Award confirmed that Imagenetix had not terminated the Original EMSA, confirmed the exclusivity of TriPharma's rights to the UM Patent, confirmed TriPharma's exclusive right to market Product by reference to the UConn Study, and extended the initial term of the Original EMSA.

J.      On April 27, 2012, the Arbitration I Award was confirmed as a judgment of the Superior Court of the State of California for the County of San Diego (the "TriPharma Judgment").  On August 3, 2012, the TriPharma Judgment was amended to add an additional award of $157,005 in post-arbitration attorneys' fees.

K.      On July 16, 2012, TriPharma recorded a Notice of Judgment Lien ("TriPharma Judgment Lien").  The TriPharma Judgment also formed the basis for an Order to Appear for Judgment Debtor Exam ("ORAP"), which created an ORAP lien.  TriPharma asserts that, by reason of the TriPharma Judgment Lien and the creation of the ORAP lien, TriPharma has a lien encumbering all of Imagenetix's assets.  Imagenetix disputes such assertion, contending, among other things, that (i) TriPharma's judgment lien encumbers only Imagenetix's accounts receivable and inventory, and (ii) TriPharma's judgment lien is junior in priority to a security interest encumbering Imagenetix's assets in favor of Pacific Rainbow, Inc. ("Pacific Rainbow") and that TriPharma's junior-priority interest has no value in accordance with the provisions of Section 506 of the Bankruptcy Code.  TriPharma disputes such contention, asserting, among other things, that Pacific Rainbow's security interest is subject to avoidance as a fraudulent conveyance under Section 548 of the Bankruptcy Code and under applicable California law.

L.      On April 25, 2012, TriPharma filed a Demand for Arbitration before JAMS Dispute Resolution, requesting a declaratory judgment that TriPharma is entitled to the exclusive use of the trademark, "Trisynex" ("Arbitration II").  On June 7, 2012, Imagenetix filed an Answer to the Demand for Arbitration.

M.      On January 12, 2012, Imagenetix filed in the United States District Court for the Southern District of California, as Case No. 3:12-cv-00089-H-RBB, an action later amended to include claims against GNC Holdings, Inc. and other defendants (collectively, "GNC Action

Defendants"), pursuant to which Imagenetix asserts, in part, causes of action for infringement of the Trisynex trademark and unfair competition under the Lanham Act ("GNC Action").

N.       On or about February 23, 2010, TriPharma filed in the United States District Court for the Central District of California, as Case No. SACV 10-222, an action against Solstice International Partners, LLC and other defendants (collectively, "Solstice Action Defendants"), asserting, in part, causes of action for false advertising and unfair competition ("Solstice Action").  Imagenetix filed in the Solstice Action cross-claims against TriPharma, asserting, in part, causes of action for set off and equitable apportionment of recovery ("Imagenetix Cross-Claims").  On February 8, 2013, the Solstice Action Defendants filed a Third-Party Complaint against Spencer asserting, in part, causes of action for breach of warranty, negligent misrepresentation and equitable indemnity.

O.       On or about February 17, 2010, TriPharma filed in the United States District Court for the Central District of California, as Case No. SACV10-00196, an action against MAX International, LLC ("MAX") and other defendants (collectively, "MAX Action Defendants"), asserting, in part, causes of action for breach of contract and false advertising ("MAX Action").

P.       On or about August 24, 2012, TriPharma filed in the Superior Court for the State of California, County of San Diego, as Case No. 37-2012-00102957, an action against Spencer, Debra Spencer, Lowell Giffhorn ("Giffhorn"), Shannon Cooper, Imagenetix, and Carla Rosewall (collectively, "Fraudulent Transfer Action Defendants"), asserting, in part, causes of action for fraudulent transfer in connection with Spencer's and Debra Spencer's post-judgment transfer of their stock in Imagenetix allegedly for little or no consideration  ("Fraudulent Transfer Action").

Q.       In or about March 2011, Imagenetix transferred to First Fruits Business Ministry, LLC ("FFBM") Imagenetix's right, title and interest in and to the UM Patent ("FFBM

Transaction").  Pursuant to the terms of the FFBM Transaction, Imagenetix was granted membership interests in FFBM amounting to 30% of the issued and outstanding membership interests in FFBM.  In lieu of cash for the final payment that FFBM owed to Imagenetix in connection with the FFBM Transaction, Imagenetix also was granted interests in an affiliate of FFBM, First Fruits Beverage Company, LLC ("FFBC").

R.     Imagenetix asserts that FFBM contends that Imagenetix's interest in FFBM has been diluted such that Imagenetix had, as of the Execution Date, a 12% interest in FFBM.

S.     On or about March 14, 2012, TriPharma filed in the United States District Court for the Central District of California, as Case No. SACV12-00404, an action against FFBM, FFBC, Roger Catarino ("Catarino") and other defendants (collectively, "First Fruits Defendants"), asserting, in part, causes of action for declaratory relief, false advertising, and tortious interference with contractual relations ("First Fruits Action").  On or about April 2, 2013, TriPharma was awarded in the First Fruits Action a judgment against the First Fruits Defendants in the amount of $4,659,990, and thereafter obtained an award of $643,360.50 in attorneys' fees.

T.     On or about July 24, 2013, TriPharma filed in the Bankruptcy Case the following proofs of claim:  a proof of claim (Claim No. 15) in the amount of $4,496,044.86; a proof of claim (Claim No. 16) in the amount of $37,145,966.23; and a proof of claim (Claim No. 17) in the amount of $277,766.04 plus additional unspecified damages (such claims are referred to herein, collectively, as the "TriPharma Bankruptcy Claims").

U.     The Parties have engaged in negotiations to resolve all of the disputes existing among them, including, without limitation, disputes with respect to Arbitration I, Arbitration II, the GNC Action, the Solstice Action, the MAX Action, and the Fraudulent Transfer Action

(collectively, the "Litigation"), the payment of the TriPharma Judgment, and the treatment of the TriPharma Bankruptcy Claims pursuant to the terms of a Chapter 11 plan of reorganization to be filed by Imagenetix in the Bankruptcy Case ("Plan").  The Parties enter into this Agreement for the purpose of resolving, fully and finally, such disputes, in accordance with the terms and conditions set forth herein.

**NOW, THEREFORE,** based upon the foregoing Recitals, the mutual covenants, promises and agreements contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged by the Parties, and the Parties intending to be legally bound hereby, the Parties agree as follows:

**AGREEMENT**

1.      **Incorporation of Provisions of Agreement into the Plan.**  Subject to the occurrence of the Approval Date (as defined in paragraph 26 hereof), the provisions of this Agreement, as applicable, shall be incorporated into the Plan.  Except as provided expressly herein to the contrary, the provisions of this Agreement shall become effective and binding upon the Parties only upon the "Effective Date" of the Plan, as such term will be defined by the Plan and approved by any order of the Bankruptcy Court confirming the Plan ("Plan Confirmation Order").

2.      **Amendment of Original EMSA.**  Imagenetix and TriPharma hereby agree to amend the Original EMSA in accordance with the terms and conditions of that Further Amendment to Amended and Restated Exclusive Marketing and Supply Agreement, dated, effective as of August 29, 2013 ("Amended EMSA"), a true and complete copy of which is attached hereto as Exhibit "1" and is incorporated herein by this reference.  Subject to the provisions of paragraph 27(e) hereof, the Original EMSA, as amended by the Amended EMSA,

shall be assumed by Imagenetix, in accordance with the provisions of Section 365 of the

Bankruptcy Code, effective as of the Approval Date of this Agreement.  TriPharma shall consent

to Imagenetix's assumption of the Original EMSA, as amended by the Amended EMSA, and

TriPharma hereby acknowledges and agrees that Imagenetix shall not be required to pay to

TriPharma any cure payments in connection with Imagenetix's assumption of the Original

EMSA, as amended by the Amended EMSA, except that Imagenetix shall be required to comply,

fully and completely, with all of its obligations to TriPharma pursuant to this Agreement.

Imagenetix and TriPharma hereby acknowledge and agree that the Amended EMSA shall not be

effective or binding upon them until the occurrence of the Approval Date of this Agreement.

3.    **Rights of TriPharma Pursuant to Amended EMSA.**  Imagenetix hereby

acknowledges and agrees that, subject to the provisions of paragraph 27(e) hereof, upon the

Approval Date of this Agreement, TriPharma shall have pursuant to the Amended EMSA a paid-

up license under the Amended EMSA and that TriPharma shall be deemed to have satisfied all

conditions to TriPharma's exercise of TriPharma's rights of renewal pursuant to the Amended

EMSA, without any requirement by TriPharma to give to Imagenetix any notice of the exercise

of such rights of renewal.

4.    **TriPharma's Right to Manufacture Product/Supply of Celadrin.**

a.    Manufacture of Product.  Imagenetix hereby acknowledges and agrees

that, subject to the provisions of paragraph 27(e) hereof, effective as of the Approval

Date of this Agreement, TriPharma shall have the absolute and irrevocable right to

manufacture itself all Product provided for by the Amended EMSA.

b.    Supply of Celadrin.  Subject to the provisions of paragraph 27(e) hereof,

effective as of the Approval Date of this Agreement, TriPharma may order from

Imagenetix, and Imagenetix then shall supply to TriPharma, for a period of five years after the Approval Date of this Agreement, Celadrin at a price of $30.00 per kilogram of Celadrin for use by TriPharma solely in connection with the sale of weight loss products, which use is expressly licensed by Imagenetix, and for no other purpose. Thereafter, Imagenetix shall supply Celadrin to TriPharma for the same purpose at a price not greater than the lowest price Imagenetix charges in the ordinary course to any of its customers.

5.  **Transfer of Trade Secrets.**  Subject to the provisions of paragraph 27(e) hereof, effective as of the Approval Date of this Agreement, Imagenetix shall irrevocably assign and otherwise transfer to TriPharma all rights, know-how, trade secrets and all manufacturing, technical and testing information relating to the Product.  Without limiting the generality of the foregoing, subject to the provisions of paragraph 27(e) hereof, as soon as practicable after the Approval Date of this Agreement, Imagenetix shall notify The Dow Chemical Company ("Dow") that Imagenetix does not object to Dow's selling directly to TriPharma ingredients necessary to manufacture the Product.  Imagenetix acknowledges that it is barred by injunction from selling the Product and accordingly, on or as soon as practicable after the Approval Date of this Agreement, Imagenetix shall deliver to TriPharma Imagenetix's entire remaining inventory of Product (consisting of approximately 700 kg) in accordance with TriPharma's directions with TriPharma bearing the cost of such delivery.

6.  **Assignment of Trisynex Trademark.**  Subject to the provisions of paragraph 27(e) hereof, effective as of the Approval Date of this Agreement, Imagenetix shall assign and transfer to TriPharma all of Imagenetix's right, title and interest in and to the trademark, "Trisynex" ("Trisynex Trademark").

7.        **Representations and Warranties of Imagenetix with Respect to Original EMSA.**  Imagenetix hereby represents and warrants to TriPharma the following with respect to the Original EMSA:

a.        No Conflicting Transactions.  Except for Imagenetix's sale of the UM Patent and license of the Trisynex Trademark to FFBM (now terminated), Imagenetix has not purported to license or otherwise enter into transactions in conflict with TriPharma's exclusive rights under the Original EMSA, or under the Amended EMSA as and when the Amended EMSA becomes effective and binding upon Imagenetix and TriPharma.

b.        No Competitive Products.  Imagenetix does not have, either currently or under development, any weight-loss products competitive with the Product.

c.        No Sales of Product after November 8, 2011.  Except for a single shipment of approximately 1,000 kg shipped on or about November 8, 2011, Imagenetix has not sold or delivered any Product to any person after the date of the Arbitration I Award.

8.        **Transfer of Interests in FFBM and FFBC.**  Effective as of the Effective Date of the Plan, and pursuant to the Plan, Imagenetix shall transfer to TriPharma all of Imagenetix's ownership interests and related rights in and to FFBM and FFBC and any and all rights and interests that Imagenetix may have in any assignee or successor of FFBM or FFBC, including, without limitation, Trinity Beverage ("FFBM/FFBC Interests Transfer").  The FFBM/FFBC Interests Transfer shall be effectuated pursuant to the Plan without any representation or warranty of any nature whatsoever made by Imagenetix regarding the scope or extent of the interests transferred by Imagenetix except only that Imagenetix shall represent and warrant that it has not consented expressly or affirmatively to any dilution of its membership interest in FFBM

to an interest less than 26% in FFBM, or regarding the rights and remedies that may be conferred upon TriPharma, as a consequence of the FFBM/FFBC Interests Transfer.  Without limiting the generality of the foregoing, the Parties hereby acknowledge and agree that, by the FFBM/FFBC Interests Transfer, Imagenetix shall make no representation or warranty of any nature whatsoever regarding whether any consent of any other member of FFBM or FFBC is required in order to effectuate the FFBM/FFBC Interests Transfer; provided, however, that, in the event that consent to the FFBM/FFBC Interests Transfer is required and cannot reasonably be obtained by Imagenetix (a) Imagenetix shall assign to TriPharma, pursuant to the FFBM/FFBC Interests Transfer, all rights, interests and remedies with respect to FFBM and FFBC which Imagenetix may assign to TriPharma pursuant to applicable law and the applicable governance agreements of FFBM and FFBC, including, without limitation, all economic benefits that Imagenetix may have pursuant to its interests in FFBM and FFBC, including any right to receive distributions from FFBM or FFBC, and (b) Imagenetix shall vote its membership interests in FFBM and FFBC as reasonably requested by TriPharma, consistent with any duties and obligations that Imagenetix may have as a member of FFBM or FFBC.  Notwithstanding anything to the contrary contained in the foregoing, the FFBM/FFBC Interests Transfer shall not include any transfer of Imagenetix's agreement with FFBM entitled, "Agreement for Assignment of Patent and Other Property," or any amendments or restatements thereof.  Imagenetix shall give all notices of such transfers required by operating agreements.

9.    **Allocation of Value with Respect to FFBM/FFBC Interests Transfer.**

Imagenetix hereby makes no representation or warranty of any nature whatsoever with regard to the value of the FFBM/FFBC Interests Transfer; provided, however, for the purpose of this Agreement only, Imagenetix and TriPharma shall attribute a value of $300,000 to Imagenetix's

transfer to TriPharma of Imagenetix's interest in FFBM, and a value of $150,000 to Imagenetix's transfer to TriPharma of Imagenetix's interest in FFBC.

10.    **Imagenetix Payments to TriPharma/Amendment of TriPharma Bankruptcy Claims.**

a.    Settlement Payments.  Imagenetix and TriPharma hereby acknowledge and agree that, subject to the terms and conditions of this Agreement, as of the Execution Date of this Agreement, Imagenetix is indebted to TriPharma in the aggregate amount of $7.5 million ("Stipulated Obligation"), $3.5 million of which shall be deemed to be an allowed secured claim in the Bankruptcy Case and $4.0 million of which shall be deemed to be an allowed general unsecured claim in the Bankruptcy Case; provided, however, that, subject to Imagenetix's complying strictly with its payment obligations pursuant to this Agreement, Imagenetix shall be entitled to satisfy, discharge and pay in full the Stipulated Obligation by paying to TriPharma pursuant to the Plan a total payment of $2.5 million ("Settlement Payment Obligation").  The Settlement Payment Obligation shall be payable pursuant to the Plan in accordance with the following terms and conditions:

i.    Effective Date Payment.  Within five calendar days after the Effective Date of the Plan, Imagenetix shall pay to TriPharma $250,000, less the amount of any Adequate Protection Payments (as defined in paragraph 24(b) hereinbelow) paid to TriPharma by that date.

ii.    Months 3-24 After Effective Date.  Commencing on the first day of the third full month following the Effective Date of the Plan, and continuing on the first day of each third month thereafter, for a total of eight quarters,

Imagenetix shall pay to TriPharma a quarterly payment in the amount of $100,000 (i.e., for a total of $800,000).

iii.      Months 27-36 After Effective Date.  Commencing on the first day of the twenty-seventh full month after the Effective Date of the Plan, and continuing on the first day of each third month thereafter, for a total of four quarters, Imagenetix shall pay to TriPharma a quarterly payment in the amount of $125,000 (i.e., a total of $500,000).

iv.      Month 39 After Effective Date Through Each Remaining Quarter During the Term of the Plan.  Commencing on the first day of the thirty-ninth  full month after the Effective Date of the Plan, and continuing on the first day of each third month thereafter, until such time as the Settlement Payment Obligation is paid in full, plus any accrued interest thereon, Imagenetix shall pay to TriPharma the lesser of the following amounts:  (i) $150,000, or (ii) the balance of the amount of the Settlement Payment Obligation, plus any and all interest accrued thereon pursuant to the provisions of paragraph 10(a)(vi) hereof.

v.      Prepayment Discount Obligation.  Provided that there has not occurred any Uncured Default (as defined in paragraph 12 hereof), Imagenetix shall have the right to satisfy, discharge and pay in full the Settlement Payment Obligation by paying to TriPharma payments in the aggregate amount of $2.0 million ("Prepayment Discount Obligation"), less the amount of any Adequate Protection Payments paid by Imagenetix, if the amount of the Prepayment Discount Obligation is paid within 18 months after the Effective Date of the Plan.

vi.      <u>Interest</u>.  Interest on the Settlement Payment Obligation shall accrue at the rate of 6% per annum, compounded quarterly, commencing on the first day of the 18th month after the Effective Date of the Plan, and continuing until such time as Imagenetix's obligations to TriPharma, as set forth hereunder, are paid in full.

vii.     <u>Right to Prepay Obligations</u>.  Subject to the provisions of paragraph 10(a)(v) hereof, Imagenetix shall have the right to prepay, at any time, its obligations to TriPharma set forth hereunder.

viii.    <u>Manner of Payment</u>.  All payments required to be paid by Imagenetix shall be effected by wire transfer to the Law Offices of John R. Walton Client Trust Account; provided, however, that, if the law firm of McKennon Shindler, LLP ("McKennon Firm") objects to such manner of payment, payments of any amounts disputed by the McKennon Firm shall be effected by wire transfer to an account specially designated for receipt of such payments acceptable to the McKennon Firm, or shall be interplead by Imagenetix pursuant to further order of the Bankruptcy Court.

ix.     <u>Application of Payments</u>.  All payments paid by Imagenetix to TriPharma pursuant to this Agreement (including, without limitation, Adequate Protection Payments, payments on account of TriPharma's allowed secured claim and payments on account of TriPharma's allowed general unsecured claim) shall be applied against, and in reduction of, the Settlement Payment Obligation (if made timely) or the Stipulated Obligation (in the event of a default, but in no event in excess of $3.5 million, plus any interest thereon).

-13-

b.      Amendment of TriPharma Bankruptcy Claims.  Effective as of the Effective Date of the Plan, the TriPharma Bankruptcy Claims shall be deemed to be amended to reflect that TriPharma's allowed claims in the Bankruptcy Case are in the aggregate amount of the Stipulated Obligation and are payable under the Plan in accordance with the terms and conditions set forth herein.

c.      Plan Terms.  The Plan shall provide, in part, the following material terms for the treatment of the Stipulated Obligation:

i.      TriPharma shall have an allowed secured claim against Imagenetix in the amount of $3.5 million.

ii.      TriPharma shall have an allowed general unsecured claim against Imagenetix in the amount of $4.0 million.

iii.      TriPharma's allowed secured claim shall be secured by a second-priority security interest encumbering all assets of Imagenetix, as provided by paragraph 11 of this Agreement.

iv.      TriPharma's allowed general unsecured claim shall be classified along with all other allowed general unsecured claims against Imagenetix under the Plan.  Pursuant to the Plan, holders of allowed general unsecured claims shall be paid not less than 20% of the amount of their allowed general unsecured claims, in quarterly installments, over a period not to exceed the term set forth in paragraph 10(a)(iv) of this Agreement.

v.      Imagenetix may pay in full TriPharma's allowed secured claim and allowed general unsecured claim pursuant to the Plan by Imagenetix's paying to TriPharma the payments required by paragraphs 10(a)(i) - (vi) of this Agreement,

-14-

notwithstanding the treatment of allowed general unsecured claims under the Plan.  At the option of Imagenetix, Imagenetix may apply the payments made to TriPharma fully toward TriPharma's allowed secured claim.

vi.      TriPharma shall accept installment payments on account of its allowed secured claim and allowed general unsecured claim pursuant to the Plan in the aggregate amount of the payments set forth in paragraphs 10(a)(i) - (vi) of this Agreement, notwithstanding the treatment of allowed general unsecured claims under the Plan.

vii.      TriPharma hereby acknowledges and agrees that, provided that Imagenetix complies with its obligations to TriPharma pursuant to the Plan, Imagenetix shall have the right to pay in full TriPharma's allowed secured claim and general unsecured claim pursuant to the Plan by paying to TriPharma the amount of the Settlement Payment Obligation, plus any interest thereon pursuant to the provisions of paragraph 10(a)(vi), or by paying to TriPharma the amount of the Prepayment Discount Obligation, if applicable.

viii.      TriPharma hereby acknowledges and agrees that in no event shall TriPharma have the right to collect on account of the Stipulated Obligation payments in a total amount in excess of $3.5 million plus any interest payable hereunder (i.e., TriPharma shall accept, absolutely and unconditionally, under all circumstances, $3.5 million plus any interest payable hereunder in full and complete satisfaction of its allowed secured claim and allowed general unsecured claim against Imagenetix).  Upon Imagenetix's payment to TriPharma of the payments required by this Agreement (which in no event shall exceed

-15-

$3.5 million plus any interest payable hereunder), the Stipulated Obligation shall be deemed to be fully and completely satisfied, discharged and extinguished and any unpaid balance of the Stipulated Obligation shall be deemed irrevocably and unconditionally to have been waived and released by TriPharma.

      d.    <u>TriPharma's Acceptance of Payments Outside of Plan</u>.  Imagenetix shall have the right to pay in full its obligations to TriPharma under this Agreement by paying to TriPharma the Settlement Payment Obligation, or the Prepayment Discount Obligation, if applicable, in the manner set forth by paragraph 10(a) hereof, whether or not a Plan is confirmed by Imagenetix in the Bankruptcy Case (<u>e.g.</u>, upon any dismissal of the Bankruptcy Case); under such circumstances, references to the "Effective Date of the Plan" in paragraph 10(a) shall be deleted and shall be replaced by a date to be fixed by Imagenetix but in no event later than April 1, 2014.

**11.**    **<u>Collateral</u>.**  Effective as of the Effective Date of the Plan, and pursuant to the Plan, Imagenetix shall grant to TriPharma, on account of TriPharma's allowed secured claim, a second-priority security interest encumbering all assets of Imagenetix, tangible and intangible, including all intellectual property rights, cash, receivables and rights of any kind ("Collateral"). On or as soon as reasonably practicable after the Effective Date of the Plan, Imagenetix shall execute and deliver to TriPharma any document reasonably requested by TriPharma, and shall take any act reasonably requested by TriPharma, in order to perfect TriPharma's interest in the Collateral.

**12.**    **<u>Payment Default</u>.**  Except only for the initial $250,000 payment required by paragraph 10(a)(i) hereof and the first quarterly payment required by paragraph 10(a)(ii) hereof, Imagenetix shall have the right, on two occasions during the term of the Plan, to cure any default

by Imagenetix in paying its payment obligations to TriPharma under the Plan provided that such cure is effected within ten (10) business days after notice as described herein.  In the event that Imagenetix should fail to pay to TriPharma any payment required under the Plan, TriPharma shall provide to Imagenetix written notice of such default.  In the event that Imagenetix fails to cure such default within ten (10) business days after such written notice, such default shall be deemed to be an uncured default under the Plan ("Uncured Default"), and TriPharma then shall be entitled to exercise, without further notice to Imagenetix or need of any order of the Bankruptcy Court, all rights and remedies that it may have against Imagenetix as a matter of applicable law.  Without limiting the generality of the foregoing, subject to the provisions of paragraph 10(c)(vii) hereof, upon the occurrence of an Uncured Default, TriPharma shall have the following rights and remedies:

        a.     <u>Acceleration</u>.  All payment obligations of Imagenetix to TriPharma shall automatically accelerate.

        b.     <u>Default Interest</u>.  Interest shall accrue on the amount of TriPharma's allowed secured claim, less any and all principal payments made to TriPharma hereunder, at the rate of 15% per annum, compounded quarterly.

        c.     <u>Foreclosure</u>.  TriPharma shall be entitled to foreclose on the Collateral.

**13.**    **<u>Resolution of Litigation</u>.**  Effective as of the Effective Date of the Plan, and pursuant to the Plan, the Parties shall take the following acts in connection with the Litigation:

        a.     <u>Cancellation of Notice of Judgment Lien</u>.  TriPharma shall file a cancellation of the TriPharma Judgment Lien with respect to the TriPharma Judgment.

        b.     <u>Satisfaction of Judgment</u>.  TriPharma shall file a Notice of Satisfaction of Judgment as to Spencer with respect to the TriPharma Judgment.

-17-

c.      Arbitration II.  The Parties shall dismiss, with prejudice, Arbitration II.

d.      GNC Action.  Imagenetix shall dismiss, with prejudice, the GNC Action. TriPharma shall be solely responsible for paying or otherwise resolving any claims that the GNC Action Defendants may assert against TriPharma in connection with the GNC Action, including, without limitation, any claims for indemnification or contribution. Imagenetix shall be solely responsible for paying or otherwise resolving any claims that Shustak & Partners, PC may assert against Imagenetix with respect to its representation of Imagenetix in connection with the GNC Action.

e.      Solstice Action.  Imagenetix shall dismiss, with prejudice, the Imagenetix Cross-Claims asserted with respect to the Solstice Action.

f.      MAX Action.  At the written request of TriPharma, Imagenetix shall provide to TriPharma any cooperation reasonably requested by TriPharma with respect to the MAX Action, without any material expense or disruption to Imagenetix.  Imagenetix shall not assert any claim against MAX, or any claim with respect to any monies payable to TriPharma with respect to the MAX Action.

g.      Fraudulent Transfer Action.  TriPharma shall dismiss, with prejudice, the Fraudulent Transfer Action as to all Fraudulent Transfer Action Defendants.

**14.    Mutual Release of Claims.**

a.      Releases by Imagenetix Parties.  Subject to the provisions of paragraph 20 hereof, effective as of the Effective Date of the Plan, except only for the obligations imposed upon TriPharma and Dameshek by this Agreement and the rights reserved by Imagenetix and Spencer by this Agreement (as such obligations and rights may be effectuated pursuant to the Plan and the Amended EMSA), Imagenetix and Spencer, for

-18-

themselves and for their respective predecessors, heirs, successors, assigns, affiliates, principals, members, shareholders, directors, officers, employees, parent corporations or entities, subsidiary corporations or entities, representatives, agents, attorneys, accountants, spouses, and each of them (collectively, "Imagenetix Parties"), absolutely, fully and forever, release, relieve, waive, relinquish and discharge TriPharma and Dameshek and their respective predecessors, heirs, successors, assigns, affiliates, principals, members, shareholders, directors, officers, employees, parent corporations or entities, subsidiary corporations or entities, representatives, agents, attorneys, accountants, spouses, and each of them (collectively, "TriPharma Parties"), of and from any and all such manner of actions, causes of action, suits, debts, deficiencies, liabilities, demands, claims, obligations, costs, expenses (including attorneys' fees and costs), sums of money, controversies, damages, accounts, reckonings, security interests and liens of every kind or nature whatsoever, whether known or unknown, suspected or unsuspected, fixed or contingent, matured or unmatured, liquidated or unliquidated, in tort, in contract or otherwise, which relate to or arise out of any matter, fact or transaction arising prior to the Execution Date of this Agreement, including, without limitation, any claims relating to or arising under the TriPharma Judgment and any claims relating to any of the facts or matters set forth in the Recitals to this Agreement.

b. <u>Releases by TriPharma Parties</u>.  Subject to the provisions of paragraph 20 hereof, effective as of the Effective Date of the Plan, except only for the obligations imposed upon Imagenetix and Spencer by this Agreement and the rights reserved by TriPharma and Dameshek by this Agreement (as such rights and obligations may be effectuated pursuant to the Plan and the Amended EMSA), the TriPharma Parties

-19-

absolutely, fully and forever, release, relieve, waive, relinquish and discharge the

Imagenetix Parties, Debra Spencer and the Fraudulent Transfer Action Defendants, and

each of them, of and from any and all such manner of actions, causes of action, suits,

debts, deficiencies, liabilities, demands, claims, obligations, costs, expenses (including

attorneys' fees and costs), sums of money, controversies, damages, accounts, reckonings,

security interests and liens of every kind or nature whatsoever, whether known or

unknown, suspected or unsuspected, fixed or contingent, matured or unmatured,

liquidated or unliquidated, in tort, in contract or otherwise, which relate to or arise out of

any matter, fact or transaction arising prior to the Execution Date of this Agreement,

including, without limitation, any claims relating to or arising under the Imagenetix

Cross-Claims and any claims relating to any of the facts or matters set forth in the

Recitals to this Agreement.  Notwithstanding anything to the contrary contained in the

foregoing, the releases given herein by the TriPharma Parties do not include releases of

and shall not operate to release, any claims against any of the following parties or any of

their respective officers, directors, employees, agents, successors or partners:  MAX; the

Solstice Action Defendants.  Regenyx Ltd., Kenneth Cole, Penelope Cole, John Payne

and Donna Payne; or the First Fruits Action Defendants.

15. **Scope of Releases.**  Each of the Parties acknowledges the fact that it is its

intention that, upon the Effective Date of the Plan, this Agreement shall be effective as a full and

final accord and satisfaction and settlement of and as a bar to each such manner of action, cause

of action, suit, debt, deficiency, liability, demand, claim, obligation, cost, expense, sum of

money, controversy, damage, account, reckoning, security interest and lien of every kind or

nature whatsoever, heretofore referred to and released as of the Execution Date of this

Agreement, which any of the Imagenetix Parties, on one hand, and any of the TriPharma Parties, on the other hand, has had, has, or may have against each other.  In connection with such waiver and relinquishment, each Party acknowledges that it is aware that it or its attorneys may hereafter discover facts different from or in addition to the facts which it or its attorneys now know or believe to be true with respect to the subject matters of this Agreement and that it may have sustained or may yet sustain damages, costs or expenses that are presently unknown and that relate to those claims, but that it is its intention hereby to fully, finally, absolutely and forever settle, as of the Effective Date of the Plan, any and all claims which do now exist, may exist or heretofore have existed among the Imagenetix Parties, on one hand, and the TriPharma Parties, on the other hand, in accordance with the terms of this Agreement and that, in furtherance of such intention, the releases herein given shall be and shall remain in effect for all time as full and complete general releases notwithstanding the discovery of any such different or additional facts or of any such additional damages, costs or expenses.  Therefore, each Party acknowledges that it is familiar with Section 1542 of the Civil Code of the State of California, which provides as follows:

> **"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."**

Except only for the rights expressly reserved by each Party pursuant to this Agreement, effective as of the Effective Date of the Plan and the Amended EMSA, each Party does hereby waive and relinquish all rights and benefits which it has or may have under Section 1542 of the Civil Code of the State of California, and any other comparable statutes of any other states in the

United States, to the full extent that it may lawfully waive all such rights and benefits pertaining to the subject matters of this Agreement.

16. **No Rescission of Releases.** As a part of the foregoing releases, each Party acknowledges that it understands and accepts the risk that the facts with respect to which the releases provided by this Agreement are entered into may be different from the facts now known or believed by it to be true. From and after the Effective Date of the Plan, the releases provided by this Agreement shall not be subject to termination or rescission by virtue of any such differences in fact. In entering into this Agreement, and the releases provided by this Agreement, each of the Parties acknowledges that it has conducted its own independent investigation, has consulted with legal counsel of its own choice, and has not relied on any statement, representation, promise, inducement or agreement not expressly contained within this Agreement.

17. **Covenants Not to Sue.**

a. <u>No Commencement or Continuation of Actions or Proceedings</u>. The Parties hereby covenant and agree not to commence or to continue against each other any action or proceeding of any nature whatsoever with respect to any of the claims released by this Agreement. The Parties hereby further covenant and agree not to join in or to participate in any action or proceeding based upon, arising out of or relating to any of the claims released by this Agreement, unless such participation is compelled by order of a court of competent jurisdiction.

b. <u>No Inconsistent Acts</u>. The Parties hereby covenant and agree not to take any acts inconsistent with the intent and purposes of the releases provided by this Agreement.

18.     **No Assignment of Released Claims.**  Each Party represents and warrants to the other Parties that it has not assigned or transferred, and will not assign or transfer, to any person or entity any of the claims released by this Agreement.

19.     **No Admission of Wrongdoing.**  Each Party acknowledges and agrees that this Agreement contemplates and provides for the resolution of disputed claims, and that no Party makes any admission of any wrongdoing.  By this Agreement, no Party admits any liability to the other Party, except as set forth expressly to the contrary herein.

20.     **Limitation on Releases.**

a.     **FFBM/FFBC/Catarino/Guss.**  Nothing contained herein shall be construed to provide to FFBM, FFBC, Catarino or Greg Guss, or to any of their respective predecessors, heirs, successors, assigns, affiliates, principals, members, shareholders, directors, officers, employees, parent corporations or entities, subsidiary corporations or entities, representatives, agents, attorneys, accountants, or spouses, any release of any claims that any Party may have against any of them.

b.     **Solstice Action Defendants.**  Nothing contained herein shall be construed to provide to any of the Solstice Action Defendants, Regenx, One on One, John Payne or Kenneth Cole, or to any of their respective predecessors, heirs, successors, assigns, affiliates, principals, members, shareholders, directors, officers, employees, parent corporations or entities, subsidiary corporations or entities, representatives, agents, attorneys, accountants, or spouses, any release of any claims that any Party may have against any of them.

c.     **MAX Action Defendants.**  Nothing contained herein shall be construed to provide to any of the MAX Action Defendants or to any of their respective predecessors,

heirs, successors, assigns, affiliates, principals, members, shareholders, directors, officers, employees, independent business operators, parent corporations or entities, subsidiary corporations or entities, representatives, agents, attorneys, accountants, or spouses, any release of any claims that any Party may have against any of them.

        d.      <u>Spencer/Fraudulent Transfer Action Defendants</u>.  Nothing contained herein shall be construed to provide to Spencer, to any of the Fraudulent Transfer Action Defendants, or to any of their respective predecessors, heirs, successors, assigns, affiliates, principals, members, shareholders, directors, officers, employees, parent corporations or entities, subsidiary corporations or entities, representatives, agents, attorneys, accountants, or spouses, any release of any claims that Imagenetix may have against any of them.

**21.**      **<u>Non-Interference and Non-Disparagement.</u>**

        a.      <u>No Disparaging Comments</u>.  The Imagenetix Parties, on one hand, and the TriPharma Parties, on the other hand, shall refrain from volunteering comments disparaging about each other, unless the making of any such comments is compelled by order of a court of competent jurisdiction and the entity making such comments reasonably believes them to be true.  This obligation shall expire as of the first day of the 18th month after the Effective Date of the Plan.

        b.      <u>Non-Interference</u>.  The Imagenetix Parties, on one hand, and the TriPharma Parties, on the other hand, shall refrain from interfering with, or causing any disruption to, the business activities of each other.  Without limiting the generality of the foregoing, Imagenetix hereby agrees that, subject to the occurrence of the Approval Date of this Agreement, it will take no voluntary act to challenge or impair in any manner the

validity or value of the rights granted to TriPharma under the Original EMSA, as will be amended by the Amended EMSA, and this agreement shall survive indefinitely.

**22.**     **Cooperation Pending Confirmation of Plan.**

Effective as of the Approval Date of this Agreement, and so long as this Agreement has not been terminated pursuant to paragraph 27 of this Agreement, the Parties shall take the following acts:

      a.      <u>No Acts Contrary to Interests of the Parties</u>.  The Imagenetix Parties, on one hand, and the TriPharma Parties, on the other hand, shall exert their respective reasonable best efforts to refrain from taking any acts contrary to the interests of the other Parties, except as otherwise provided herein and except as necessary to enforce their respective rights not related to the Bankruptcy Case.

      b.      <u>Assumption of Original EMSA</u>.  In furtherance of the settlement provided for by this Agreement, effective as of the Approval Date of this Agreement, Imagenetix shall assume, pursuant to Section 365 of the Bankruptcy Code, the Original EMSA, as amended by the Amended EMSA.

      c.      <u>Rights to UM Patent and Trisynex Trademark</u>.  Upon any inquiry made from third parties, Imagenetix shall acknowledge and confirm that, apart from any record ownership interests of FFBM, TriPharma is the sole and exclusive licensee of the UM Patent and the owner of the Trisynex Trademark, and is the sole legitimate supplier of the formulation tested in the UConn Study.

      d.      <u>Stay of Litigation</u>.  To the maximum extent practicable, the Imagenetix Parties, on one hand, and the TriPharma Parties, on the other hand, shall stipulate to a stay of all pending litigation activity among them, including, without limitation, by using

their reasonable best efforts to take off calendar pending motions and by seeking the vacating of trial and other litigation deadlines by notifying the applicable courts that a conditional settlement has been reached among the Parties.  Without limiting the generality of the foregoing, the Parties shall use their reasonable best efforts to continue the hearing dates on Imagenetix's pending summary judgment motion in the GNC Action, and on TriPharma's opposition to Imagenetix's Motion for Order Authorizing Compensation to Insiders ("Insider Compensation Motion") in the Bankruptcy Court.  In the event that the Parties are unable to obtain from a court a stay of pending litigation, the Parties shall execute and file stipulated dismissals, without prejudice, with all costs and fees waived, of such litigation, subject to an agreement of the Parties that such litigation may be re-filed in the same court and service of process with respect thereto effectuated upon existing counsel of record, provided that any such dismissals does not impair materially the rights, interests, claims or remedies of a party to such litigation.

       e.      <u>Cooperation by Imagenetix</u>.  Subject to Imagenetix's right to comply with its contractual obligations and other duties, including any fiduciary duties of Imagenetix, Imagenetix shall (i) refrain from offering any voluntary assistance to any party adverse to TriPharma, and (ii) vote its membership interests in FFBM and FFBC in support of any proposition that TriPharma may reasonably propose.

       f.      <u>TriPharma's Cooperation in Bankruptcy Case</u>.  Subject to and conditioned upon the occurrence of the Approval Date of this Agreement, TriPharma shall provide to Imagenetix cooperation with respect to facilitating an orderly, efficient and expeditious administration of the Bankruptcy Case and confirmation of a Conforming Plan, including, without limitation, as follows:

-26-

i.      TriPharma shall take no actions in the Bankruptcy Case which would have the effect of delaying or interfering with Imagenetix's efforts to obtain confirmation of a Conforming Plan, except only to the extent necessary to enforce its rights hereunder.

ii.     TriPharma shall provide to Imagenetix any cooperation reasonably requested by Imagenetix with respect to Imagenetix's efforts to obtain confirmation of a Conforming Plan.

iii.    After any approval by the Bankruptcy Court of any disclosure statement that may be filed by Imagenetix accompanying a Conforming Plan ("Disclosure Statement"), TriPharma shall vote its claims in acceptance of the Conforming Plan.

iv.     TriPharma shall take no act, or file any objection or other pleading, in opposition to any action or proceeding filed by Imagenetix in the Bankruptcy Case, provided that such action or proceeding is not inconsistent with the terms and conditions of this Agreement.  Without limiting the generality of the foregoing, TriPharma shall not oppose any of the following:  the Insider Compensation Motion, provided that the hearing on the Insider Compensation Motion occurs not earlier than two weeks after the entry of an order of the Bankruptcy Court approving this Agreement; a Disclosure Statement; any motion filed by Imagenetix for authority to use any cash collateral of any secured claimant in the Bankruptcy Case; and a Conforming Plan.  Notwithstanding anything to the contrary contained in the foregoing, TriPharma shall reserve any

-27-

and all rights that it may have to object to any claims asserted in the Bankruptcy Case by FFBM, FFBC, any of the Solstice Action Defendants.

        v.     TriPharma shall not object to Pacific Rainbow's claim or seek to avoid the security interest asserted by Pacific Rainbow so long as, by so doing, TriPharma's right to object to such claim or to seek to avoid such security interest is not impaired in the event of any termination of this Agreement pursuant to paragraph 27 hereof.

Any silence or non-opposition by TriPharma with respect to actions or proceedings filed by Imagenetix or claims or remedies asserted by Imagenetix in the Bankruptcy Case shall not be interpreted as agreement with such actions, proceedings, claims or remedies, or as an admission that any particular statement or claim made by Imagenetix is true.

        g.     <u>No Filing of Non-Conforming Plan</u>.  Imagenetix shall file no Plan other than a Conforming Plan, except that Imagenetix may file a Plan other than a Conforming Plan if Imagenetix terminates this Agreement pursuant to the provisions of paragraph 27 hereof.

        h.     <u>Forbearance on TriPharma's Rights to Assert Claims</u>.  TriPharma hereby agrees that it will not assert any new claims, or file any new action or proceeding seeking monetary damages from a third party with respect to any sales by such third party of Product that it purchased from Imagenetix prior to November 15, 2011.  Notwithstanding the foregoing:

        i.     Such forbearance by TriPharma shall not be deemed to be a license, release, waiver or acquiescence by TriPharma with respect to such sales

and shall not be construed as making any third party within the scope of this limited forbearance a beneficiary of such forbearance.

      ii.      Nothing contained herein shall impair or limit any right of TriPharma to assert claims, including claims seeking damages, based upon false advertising, unfair competition, false labeling or false marking

      iii.      Nothing contained herein shall impair or limit any right of TriPharma to assert the primacy of its rights with respect to the Product or to oppose in any manner any claim or argument that may be asserted by any person or entity that it holds rights competing with or inconsistent with TriPharma's rights under the EMSA, this Agreement or the Amended EMSA.

      iv.      This forbearance shall not apply to claims against the First Fruits Defendants, the MAX Defendants, the Solstice Defendants, Regenyx Ltd., Kenneth Cole, Penelope Cole, John Payne or Donna Payne.

      v.      Imagenetix commits to provide all reasonable cooperation to TriPharma in the enforcement of its rights under this Agreement and the Amended EMSA, without any material expense to Imagenetix.

23.    **Rule 9019 Motion.**  Within ten (10) business days after the execution of this Agreement by each of the Parties, Imagenetix shall file in the Bankruptcy Court, and serve on all appropriate parties (including, without limitation, FFBM, Trinity Beverage Company and Catarino), pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure, a motion to obtain from the Bankruptcy Court approval of this Agreement ("Rule 9019 Motion"), in a form reasonably acceptable to TriPharma.  In connection with the proceedings regarding the Rule 9019 Motion, Imagenetix shall file pleadings, attend hearings and take such other legal

action as may be appropriate to seek approval as promptly as reasonably practicable of this Agreement. TriPharma shall cooperate in submitting declarations and other legal pleadings in support of the approval of the Rule 9019 Motion.

24. **Pre-Confirmation Allowed Secured Claim of TriPharma/Adequate Protection Payments.**

a. <u>Pre-Confirmation Allowed Secured Claim</u>. Pursuant to the Rule 9019 Motion, Imagenetix shall request that the Bankruptcy Court enter an order determining that, effective as of the Approval Date, TriPharma shall have an allowed secured claim against Imagenetix, to the extent of $75,000, secured by a lien encumbering Imagenetix's accounts receivable and inventory junior to any valid, duly perfected and unavoidable security interest held by Pacific Rainbow ("Pre-Confirmation Allowed Secured Claim").

b. <u>Adequate Protection Payments</u>. Commencing on the first day of the first full month following the Approval Date, and continuing on the first day of each month thereafter until the <u>earlier</u> of the Effective Date of the Plan or such time as the Pre-Confirmation Allowed Secured Claim is paid in full, Imagenetix shall pay to TriPharma, in the manner provided for by paragraph 10 hereof, monthly payments in the amount of $15,000 on account of and applied against TriPharma's Pre-Confirmation Allowed Secured Claim ("Adequate Protection Payments"). The fixing of the amount of the Pre-Confirmation Allowed Secured Claim of TriPharma hereunder is without prejudice to any rights that TriPharma may have to contend that the entire amount of the Stipulated Obligation is secured in the event that the Rule 9019 Motion is not approved by the Bankruptcy Court.

c.    <u>Application of Plan Payment</u>.  Upon Imagenetix's payment under the Plan of the payment to be paid to TriPharma pursuant to paragraph 10(a)(i) hereof, the Pre-Confirmation Allowed Secured Claim of TriPharma shall be and shall be deemed to be paid in full.

d.    <u>Release of Liens</u>.  Upon payment in full of the amount of the Pre-Confirmation Allowed Secured Claim, TriPharma shall take as soon as reasonably practicable thereafter all acts appropriate to release any liens on account of the Pre-Confirmation Allowed Secured Claim.

**25.    <u>Imagenetix's Diligence with Respect to Confirmation of a Plan</u>.**  Imagenetix shall file in the Bankruptcy Court, within 30 days after the Approval Date, a Conforming Plan and an accompanying Disclosure Statement.  Imagenetix shall act diligently to attempt to obtain approval of the Disclosure Statement and confirmation of the Conforming Plan such that an order of the Bankruptcy Court confirming the Plan is obtained as promptly as reasonably practicable after the Approval Date.

**26.    <u>Approval Date</u>.**  Subject to the provisions of paragraph 27 hereof, this Agreement shall be effective and binding on the Parties on the first day upon which each of the following conditions have been satisfied ("Approval Date"):  (a) each Party has executed this Agreement and delivered the signed Agreement to the other Parties; (b) the Bankruptcy Court enters an order approving this Agreement and authorizing Imagenetix to perform its obligations under this Agreement ("Bankruptcy Court Approval Order"); and (c) the Bankruptcy Court Approval Order becomes a final and non-appealable order.

**27.    <u>Termination</u>.**

-31-

a. _Termination Events_.  This Agreement may be terminated at the option of a non-defaulting Party upon the occurrence of any of the following events:

i. _Denial of Approval of Agreement_.  The Bankruptcy Court enters an order denying approval of this Agreement;

ii. _Denial of Confirmation of the Plan_.  The Bankruptcy Court enters an order denying confirmation of a Conforming Plan, and Imagenetix does not or cannot propose an amended Plan by March 31, 2014; or

iii. _Effective Date Deadline Not Met_.  The Effective Date of the Plan has not occurred by March 31, 2014; provided however, that, at the request of Imagenetix, TriPharma shall extend such deadline by ninety (90) days provided that Imagenetix is acting diligently and in good faith to effectuate the Effective Date of the Plan.

b. _Effect of Termination_.  In the event of any termination of this Agreement as permitted by paragraph 27(a) hereof, except only as provided expressly to the contrary in paragraph 27(d) of this Agreement, this Agreement, and all of the provisions of this Agreement, shall be null and void _ab initio_ and of no force or effect, and shall not be binding upon the Parties and the Parties shall be restored to the same respective positions that they were in as of the Execution Date of this Agreement, without any prejudice to such positions, and no Party shall have any liability or further obligation to the other Party by reason of this Agreement, except only for any breach of this Agreement occurring prior to or as a result of the termination of this Agreement.  Except only as provided expressly to the contrary in paragraph 27(d) of this Agreement, upon any termination of this Agreement, neither the existence of this Agreement nor its contents

shall be deemed to be a presumption, concession, or admission by or against a Party or be admissible in evidence, or referred to for any purpose in the Bankruptcy Case, or in any action or proceeding, except in any action or proceeding relating to or arising out of any breach of this Agreement by a Party.

      c.    <u>Notice of Termination</u>.  A Party terminating this Agreement pursuant to paragraph 27(a) hereof shall give immediate written notice of such termination to the other Party at the address to which notices must be provided pursuant to paragraph 28(m) hereof.

      d.    <u>Retention of Rights by TriPharma</u>.  Notwithstanding any provision to the contrary contained in paragraph 27(b) of this Agreement, subject to the provisions of paragraph 27(e) of this Agreement, upon an occurrence of the Approval Date of this Agreement, TriPharma shall be entitled to retain, without termination or rescission or modification of any nature, all of the rights, interests, claims and remedies provided for by paragraphs 2, 3, 4, 5, 6, 22(b) and 24 hereof.

      e.    <u>Rescission of TriPharma's Rights</u>.  Notwithstanding any provision to the contrary contained in paragraph 27(d) of this Agreement, in the event that Imagenetix obtains an order from the Bankruptcy Court on no less than 28 days' notice determining that termination of this Agreement by Imagenetix is justifiable by reason of a material breach by TriPharma of any of its obligations pursuant to paragraph 22(f) hereof (and only as to obligations in paragraph 22(f)), the provisions of paragraph 27(d) shall be of no force and effect and all rights, interests, claims and remedies granted to TriPharma pursuant to paragraphs 2, 3, 4, 5, 6, 22(b) and 24 hereunder shall be and shall be deemed to be automatically and unconditionally rescinded, revoked and terminated, and, in

accordance with the provisions of paragraph 27(b) hereof, the Parties shall be restored to the same respective positions that they were in as of the Execution Date of this Agreement, without any prejudice to such positions, and no Party shall have any liability or further obligation to any other Party by reason of this Agreement, except only for any breach of this Agreement occurring prior to or as a result of the termination of this Agreement.  Alternatively, in lieu of a termination of this Agreement by reason of any material breach by TriPharma of any of its obligations pursuant to paragraph 22(f) hereof after an order of the Bankruptcy Court finding such material breach occurred, Imagenetix may elect to temporarily rescind, revoke and terminate the rights and remedies granted to TriPharma pursuant to paragraphs 2, 3, 4, 5, 6, 22(b) and 24 hereunder ("Revocation Election").  In the event of any exercise of the Revocation Election, all rights of TriPharma under paragraphs 2, 3, 4, 5, 6, 22(b) and 24 hereunder shall be restored and shall be in full and effect upon the Effective Date of any Conforming Plan, but Imagenetix shall preserve all rights, remedies and claims against TriPharma as a result of such alleged breach by TriPharma of its obligations under paragraph 22(f) hereof.  Imagenetix shall file with the Bankruptcy Court notice of its election to either terminate this Agreement or to exercise the Revocation Election within 30 days after the entry of an order of the Bankruptcy Court finding material breach by TriPharma of its obligations under paragraph 22(f).

**28.** __Miscellaneous__.

      a.    __Modification__.  This Agreement may not be modified or amended, except by an instrument in writing signed by each of the Parties.

b.      <u>No Waiver; Delay in Acting</u>.  To be effective, any waiver by a Party of any rights hereunder must be expressed in a writing executed by such Party.  If a Party waives any power, right or remedy arising hereunder or under any applicable law, such waiver shall not be deemed to be a waiver upon any later occurrence or recurrence of any events giving rise to the earlier waiver.  No failure or delay by a Party to insist upon the strict performance of any term, condition, covenant, or agreement of this Agreement, or to exercise any right, power or remedy hereunder shall constitute a waiver of any such term, condition, covenant or agreement or of any such breach, or preclude such Party from exercising any such right, power, or remedy at any later time or times.

c.      <u>Counterparts; Facsimile or Electronic Signature</u>. This Agreement may be signed in counterparts with the same effect as if the signatures appeared on the same instrument, and each signed counterpart shall be deemed to be an original.  Facsimile or electronic transmission of any signed original document, and retransmission of any signed facsimile or electronic transmission, shall be the same as delivery of an original.

d.      <u>Authorized Execution</u>.  Each individual executing this Agreement on behalf of a Party represents and warrants that (i) he is authorized to execute this Agreement for such Party, and (ii) such Party shall be bound in all respects hereby.

e.      <u>Attorneys' Fees and Costs</u>.  Each Party shall bear its own attorneys' fees and costs arising from or related to the negotiation and execution of this Agreement.  In the event of any action or proceeding to enforce, modify, interpret, construe, invalidate, rescind, or set aside any term or provision of this Agreement, however, a prevailing Party shall be entitled to an award of its costs and expenses, including reasonable attorneys'

fees and costs, incurred as a result of such action or proceeding, including any appeals resulting therefrom.

   f. <u>Governing Law; Choice of Forum</u>.  This Agreement shall be construed and enforced according to the laws of the State of California, without reference to conflicts of law principles.  Any action or proceeding brought to enforce, modify, interpret, construe, invalidate, rescind or set aside any of the terms or provisions of this Agreement, may be brought only in the Bankruptcy Court (subject only to the right of appeal).  Each of the Parties hereby consents to the exclusive jurisdiction of the Bankruptcy Court to enforce the provisions of this Agreement and for all such matters, and hereby waives any objection that it may have to such jurisdiction.  Notwithstanding the foregoing, in the event that the Bankruptcy Case should be closed or dismissed, any action or proceeding to enforce, modify, interpret, construe, invalidate, rescind or set aside any of the terms or provisions of this Agreement shall be resolved solely through binding arbitration at JAMS-Orange County under JAMS Commercial Arbitration Rules. If either TriPharma or Imagenetix fails to pay its share of JAMS fees and such failure delays the progress of the arbitration, the arbitrator is directed to enter a default and render the award in favor of the non-defaulting party.

   g. <u>Severability</u>.  If any part of this Agreement shall be determined to be illegal, invalid or unenforceable, that part shall be severed from the Agreement and the remaining parts shall be valid and enforceable, so long as the remaining parts continue to fulfill the original intent of the Parties.

   h. <u>Free and Voluntary Act</u>.  The Parties hereby acknowledge and agree that they have read carefully this Agreement, know the contents thereof, have discussed them

with legal counsel, and sign the same of their own free and voluntary act with the intent to be legally bound thereby.

i.      No Construction against a Party.  The Parties have cooperated in the drafting and preparation of this Agreement.  In any construction of this Agreement, or of any of its terms and provisions, the same shall not be construed against any Party.

j.      Reliance on Representations.  Each Party specifically acknowledges that it has not relied on any statement, representation, or promise of any other Party, or of any representative of any other Party, in executing this Agreement, except as expressly set forth herein.

k.      Entire Agreement.  This Agreement constitutes the entire agreement of the Parties with respect to the matters set forth herein, and supersedes any and all prior agreements or understandings, written or oral, between them relating to the subject matter of this Agreement.  No other promises or agreements shall be binding upon the Parties with respect to this subject matter unless contained in this Agreement or separately agreed to in writing and signed by an authorized representative of each Party.

l.      Bankruptcy Court Approval.  Each Party shall take any and all acts, and execute any and all further documents, that may be reasonably appropriate to obtain Bankruptcy Court approval of this Agreement.

m.      Notices.  All notices, requests, demands, and other communications required by this Agreement shall be in writing and shall be delivered by facsimile, e-mail transmission (confirmed by "Read Receipt"), or in person, or mailed by first class registered or certified mail, as follows:

<u>If Directed to Imagenetix</u>:

Imagenetix, Inc.
10845 Rancho Bernardo Rd.
San Diego, CA 92127
Attn:  William Spencer
Tel:  (858) 674-8455
Fax:  (858) 674-8460
E-Mail:  Bill@imagenetix.net

<u>With a Copy to</u>:

Winthrop Couchot Professional Corporation
660 Newport Center Dr., #400
Newport Beach, CA 92660
Attn: Robert E. Opera, Esq.
Tel.:  (949) 720-4130
Fax:  (949) 720-4111
E-Mail:  ropera@winthropcouchot.com

<u>If Directed to Spencer</u>:

William Spencer
c/o Imagenetix, Inc.
10845 Rancho Bernardo Road
San Diego, CA  92127
Tel: (858) 674-8455
Fax: (858) 674-8460
E-Mail:  Bill@imagenetix.net

<u>With a Copy to</u>:

Shustak & Partners, P.C.
401 West A St., #2330
San Diego, CA 92101
Attn:  Erwin J. Shustak, Esq.
Tel.:  (800) 496-5900
Fax:  (800) 868-9350
E-Mail:  eshustak@shufirm.com

<u>If Directed to TriPharma or Dameshek</u>:

TriPharma, LLC
1278 Gleneyre Street
Laguna Beach, CA 92651
Attn:  Evan Dameshek
Tel.:  (949) 209-9957
Fax:  (949) 315-3747
Email:  edame@mac.com

<u>With a copy to</u>:

Law Officers of John R. Walton, P.C.
35 N. Lake Ave., #700
Pasadena, CA 91101
Attn:  John R. Walton, Esq.
Tel.:  (626) 578-6000
Fax:  (626) 578-6012
E-Mail:  jrw@waltonlawpc.com

If delivered by facsimile, by e-mail transmission, or personally, the date on which the notice, request, demand or other communication is delivered, and a copy thereof is sent by first class mail, postage prepaid, addressed to the addresses required by this paragraph 28(m), shall be the date on which such delivery is made.  If such notice, request, demand or other communication is delivered solely by mail as aforesaid, the date on which such notice, request, demand or other communication is received shall be the date of delivery.  A Party may designate in writing a different address to which any notice, request, demand or other communication is to be given hereunder to such Party.  Telephone numbers are listed for convenience purposes only and not for the purpose of giving notice pursuant to this Agreement.

n.    <u>Captions</u>.  Any captions to the paragraphs of this Agreement are solely for the convenience of the Parties, are not a part of this Agreement, and shall not be used for the interpretation or determination of the validity of this Agreement or any provisions thereof.

      o.      <u>Binding Obligation</u>.  Upon the Approval Date of this Agreement, this Agreement shall be a legal, valid and binding obligation of each of the Parties in accordance with the terms of this Agreement.

      p.      <u>Interpretation</u>.  Wherever in this Agreement the context so requires, reference to the neuter, masculine or feminine shall be deemed to include each of the others, and reference to either the singular or the plural shall be deemed to include the other.

      q.      <u>Further Assurances</u>.  Except as set forth expressly to the contrary in this Agreement, each Party, at the request of another Party, shall execute and deliver to the requesting Party all such further documents, and shall take such further acts, as may be reasonably appropriate in order to confirm or carry out the provisions of this Agreement.

      r.      <u>Successors and Assigns</u>.  This Agreement shall be binding upon and inure to the benefit of the respective predecessors, heirs, successors and assigns of the Parties.

      s.      <u>Parties-in-Interest</u>.  Except as set forth expressly to the contrary in paragraph 14 hereof, nothing in this Agreement is intended to confer any rights or remedies under or by reason of this Agreement on any persons other than the Parties and any of their respective heirs, successors**,** and assigns, nor is anything in this Agreement intended to relieve or discharge the obligation of any third persons to a Party, nor shall any provision hereof give any third persons any right of subrogation against a Party.

      t.      <u>Amendments to Documents</u>.  Any reference in this Agreement to a document means such document as it has been, or may be, amended, modified, restated or supplemented as of the Effective Date of the Plan, regardless of when it is prepared.

      **IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the date and year first above written.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date and year first above written.

IMAGENETIX, INC.

By: William Spencer
Its: Chief Executive Officer and President

William Spencer

TRIPHARMA, LLC

By: Evan Dameshek
Its: Managing Member

Evan Dameshek

-41-

MAINDOCS-#190247-v9-Imagenetix_TriPharmaSilentAgmt-final

Exhibit 1 Page 111

Exhibit "1" Page 110

**Further Amendment to Amended and Restated Exclusive Marketing and Supply Agreement**

This amendment is made and entered into as of August 29, 2013, with respect to the Exclusive Marketing and Sales Agreement as previously amended and restated and otherwise amended between Imagenetix, Inc., a Nevada corporation, on the one hand, and TriPharma, LLC, a Delaware limited liability company on the other, and as further modified by the arbitration award dated November 2, 2011 ("EMSA").

1.   **Acknowledgment of TriPharma's Rights.**

a.    Imagenetix acknowledges and confirms that, pursuant to the terms of the EMSA, TriPharma has been granted an exclusive license worldwide to market, sell  and distribute any and all products covered by Patent No. 6,899,892  ("892 Patent") in whole or in part ("Product") and to exclusively market, distribute, and sell the Product by referencing the 892 Patent and the University of Connecticut clinical study on a compound identified as Trisynex, and the exclusive right to market, distribute, and sell Trisynex (whether by that name or any other name  to which TriPharma or its customers have rights) to the exclusion of all others.  Per the terms of the EMSA, the initial term of this exclusive license expires on October 1, 2014 subject to TriPharma's right of renewal for successive five-year terms.

b.    Imagenetix acknowledges that TriPharma has fulfilled the minimum purchase or royalty requirements necessary for TriPharma to maintain the exclusivity on its rights and to renew the EMSA.  Unless notice of non-renewal is given by TriPharma, the EMSA shall automatically renew for successive five-year terms as provided in Section 3.  No further minimum orders or royalty payments shall be required for such automatic renewal.

c.    Imagenetix acknowledges that Trisynex is the "Original Trademark" within the meaning of the EMSA and that, as a result, "all right, title and interest in" the Trisynex mark belongs "exclusively to TriPharma" as provided in Section 1.7 of the EMSA.

d.    Imagenetix acknowledges that from November 2, 2011 to date, whether because of the requirements of the Bankruptcy Code or otherwise, it is has not been capable of manufacturing and delivering Product in response to TriPharma's orders and does not intend to fulfill such orders in the future.  Accordingly, pursuant to Section 2.1 of the EMSA, Imagenetix irrevocably assigns to TriPharma all rights to manufacture Product, and likewise assigns to TriPharma all documents, information, know-how and trade secrets associated with such manufacturing.  Imagenetix agrees that it shall not disclose or transmit to any third-party such documents, information, know-how and trade secrets except by written consent of TriPharma or upon lawful order of a court.  In the event such information is sought by court order, Imagenetix shall give TriPharma immediate notice of such event and shall cooperate with TriPharma in either resisting disclosure or ensuring that adequate safeguards are in place to protect confidentiality.

e.    Imagenetix acknowledges that it retains no further rights, current or residual, with respect to the '892 Patent, the UConn Study or the Product.

1

Exhibit 1 Page 112

Exhibit "1" Page 111

2.    **Imagenetix Waiver of Further Performance by TriPharma.**

a.    Pursuant to the terms of this Amendment, and in consideration of the payments already made and the release of claims by TriPharma for further payments by Imagenetix, no further orders, payments, notices or other performance by TriPharma under the EMSA shall be required.

b.    Henceforth, Imagenetix shall have no involvement whatsoever in TriPharma's manufacturing, marketing and sales of Product under the EMSA.   TriPharma is free to assign, license or sublicense its rights under the EMSA without notice to or approval by Imagenetix.

3.    **Continued Obligations of Imagenetix.**

a.    Imagenetix grants a paid-up, irrevocable license to TriPharma to use Celadrin in manufacturing Product.

b.    Imagenetix agrees to supply Celadrin for use in manufacturing Product to TriPharma at a price equal to $30.00 per kilogram for a period of 5 years for use by TriPharma solely in connection with the sale of weight loss products, which use is expressly licensed by Imagenetix, and for no other purpose. Thereafter, Imagenetix shall supply Celadrin to TriPharma for the same purposes at a price not greater than the lowest price Imagenetix charges in the ordinary course to any of its customers.

4.    **All Prior Inconsistent Terms Deemed Deleted**

a.    This Amendment shall operate to amend but not replace the EMSA.  Except to the extent supplanted or contradicted by this Amendment, the terms of the Original EMSA shall continue to apply.

b.    To the extent there is any ambiguity or contradiction between the terms of the Original EMSA and the terms of this Amendment, the terms of this Amendment shall control and govern. All terms and provisions in the EMSA that are contradictory or inconsistent with the terms of this Amended EMSA are deemed to be removed.

5.    **General Terms**

a.    As with the Original EMSA, this Amendment is governed by the internal laws of the State of California applicable to contracts made and to be performed in California.

b.    Imagenetix and TriPharma agree that any future disputes arising under or relating to the EMSA shall be resolved exclusively by arbitration at JAMS-Orange County under JAMS Commercial Arbitration Rules.  If any party fails to pay arbitration fees or arbitrator fees and the arbitration is delayed as a result, the arbitrator is directed to enter a default against the party not paying and proceed to enter a default award against such non-paying party.

c.    This Amendment may be executed in counterparts.

2

Exhibit 1 Page 113

Exhibit "1" Page 112

d.    The effectiveness of this Amendment is subject to and conditioned upon an order from the Bankruptcy Court approving the terms of the Settlement and Release Agreement between Imagenetix and TriPharma, but is not otherwise subject to any conditions as to enforceability. In the event of any inconsistency between the terms of this Amendment and the terms of the Settlement and Release Agreement, the terms of the Settlement and Release Agreement shall govern and control.

**IN WITNESS WHEREOF**, the Parties have executed this Amendment as of the date and year first above written.

IMAGENETIX, INC.

By:  William Spencer
Its:  Chief Executive Officer and President

TRIPHARMA, LLC

By:  Evan Dameshek
Its:  Managing Member

3

Exhibit 1 Page 114

Exhibit "1" Page 113

# EXHIBIT "2"

## ASSUMED CONTRACTS AND LEASES

| Party to Executory Contract or Lease | Executory Contract or Lease | Cure Claim |
|---|---|---|
| Bernardo Gateway Partners c/o Brehn Communications PO Box 28429 San Diego, CA 92198 | Building lease on 10845 Rancho Bernardo Rd., Suite 105, San Diego, CA 92127 | $0 |
| Proprietary Nutritionals, Inc. 265 Harrison Ave. Kearney, NJ 07032 | Purchase and Marketing Agreement dated 11/23/2009, as amended | $0 |
| William P. Spencer 17322 4s Ranch Parkway San Diego, CA 92127 | Employment agreement dated 8/7/2009 | $0 |
| Debra L. Spencer 17322 4s Ranch Parkway San Diego, CA 92127 | Employment agreement dated 8/7/2009 | $0 |
| Lowell W. Giffhorn 10875 Kemah Ln. San Diego, CA 92131 | Engagement agreement dated 8/7/2009 | $0 |
| UHC of California dba United Healthcare of California c/o Shipman & Goodwin LLP c/o Latonia C. Williams One Constitution Plaza Hartford, CT 06103-1919 | Small Employer Group Medical and Hospital Group Subscriber Agreement | $0 |

Exhibit "2" Page 114

**EXHIBIT "3"**

**REJECTED CONTRACTS AND LEASES**

[None]

Exhibit "3" Page 115

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT "4"

## [ADMINISTRATIVE CLAIM ASSIGNMENT AGREEMENTS]

[Attached]

**[In Substantially Final Form]**

Exhibit "4" Page 116

## ADMINISTRATIVE CLAIM ASSIGNMENT AGREEMENT

This Administrative Claim Assignment Agreement ("Agreement") is entered into effective as of September __, 2014 by and among Winthrop Couchot Professional Corporation ("Winthrop Couchot"), on one hand, and Barbara Opperman, IRA, James Zolin and Josephine Zolin, Victor Gabourel, George Georgeklis and Kim Vanderlinden (collectively, "Assignees"), on the other hand (Winthrop Couchot and the Assignees are referred to herein, collectively, as the "Parties"), with regard to the following facts and circumstances.

## RECITALS

A.      On December 17, 2012, Imagenetix, Inc. ("Imagenetix") filed in the United States Bankruptcy Court for the Southern District of California ("Bankruptcy Court"), as case number 12-16423 MM11, a chapter 11 petition for relief.

B.      Imagenetix has employed Winthrop Couchot as its general insolvency counsel in Imagenetix's chapter 11 case.

C.      As of July 31, 2014, Imagenetix owed to Winthrop Couchot the amount of approximately $470,536.

D.      Imagenetix has filed its Third Amended Chapter 11 Plan of Reorganization ("Plan").  A hearing on the confirmation of the Plan is presently scheduled for September 10, 2014.

E.      In the event that the Bankruptcy Court enters an order confirming the Plan, Winthrop Couchot intends to apply to the Bankruptcy Court, pursuant to the provisions of section 330 of the Bankruptcy Code, for an order allowing, on a final basis, Winthrop Couchot's fees and costs in Imagenetix's chapter 11 case, including Winthrop Couchot's unpaid fees and costs.

F.      Section 3.1.5.2 of the Plan provides that Winthrop Couchot will receive Common Stock in payment of the amount of its administrative claim allowed by the Bankruptcy Court in Imagenetix's chapter 11 case ("Allowed Administrative Claim").  Section 3.1.5.2 provides further that the Common Stock issued on account of Winthrop Couchot's Allowed Administrative Claim will be subject to the exemption provided by section 1145 of the Bankruptcy Code and will be unrestricted, freely trading stock pursuant to section 1145 of the Bankruptcy Code.[1]

G.      Assignees have deposited with Winthrop Couchot the amount of $490,000 ("Acquisition Deposit"), in the respective amounts set forth by Exhibit "A" hereto ("Investment Schedule"), for the purpose of funding Assignees' purchase of Winthrop Couchot's Allowed Administrative Claim and the Common Stock issued to Winthrop Couchot on account thereof.

H.      Assignees desire to acquire Winthrop Couchot's Allowed Administrative Claim by acquiring the Common Stock to be issued to Winthrop Couchot pursuant to the Plan, in an amount not to exceed $490,000.  Winthrop Couchot is prepared to sell and assign to

---

[1] Except as otherwise defined herein, the definitions of the capitalized terms contained herein are as set forth in the Plan.

Assignees Common Stock issued to Winthrop Couchot pursuant to the Plan in accordance with the terms and conditions set forth herein.

NOW, THEREFORE, based upon the foregoing Recitals and the mutual covenants, promises and agreements contained herein, and for good and valuable consideration, the receipt and sufficiency of which are acknowledged by the Parties, and intending to be legally bound hereby, the Parties hereby agree as follows:

## AGREEMENT

**1.    Purchase and Sale of Common Stock.**  Pursuant to the provisions of this Agreement, Winthrop Couchot shall sell and assign to Assignees, and Assignees shall acquire from Winthrop Couchot, any Allowed Administrative Claim awarded to Winthrop Couchot by the Bankruptcy Court, and Common Stock to be issued to Winthrop Couchot pursuant to the Plan on account of such Allowed Administrative Claim, in an amount not to exceed $490,000. Winthrop Couchot shall not sell or assign to Assignees, and Assignees shall not acquire from Winthrop Couchot, any amount of an Allowed Administrative Claim awarded to Winthrop Couchot in excess of $490,000; any such excess amount of the Allowed Administrative Claim shall be satisfied by Imagenetix pursuant to the provisions of the Plan.

**2.    Payment of Purchase Price.**  As consideration for the acquisition of Winthrop Couchot's Allowed Administrative Claim and the Common Stock to be issued to Winthrop Couchot pursuant to the Plan on account of Winthrop Couchot's Allowed Administrative Claim, Assignees shall pay to Winthrop Couchot the lesser of the following amounts: (a) $490,000; or (b) the amount of the Allowed Administrative Claim ("Purchase Price").  The Purchase Price shall be paid from the Acquisition Deposit.

**3.    Covenants of Winthrop Couchot.**  Winthrop Couchot hereby covenants and agrees as follows:

a.    Fee Application.  Winthrop Couchot shall file, by the forty-fifth (45th) day after the Effective Date of the Plan, an application to obtain from the Bankruptcy Court allowance of Winthrop Couchot's fees and costs in Imagenetix's chapter 11 case.

b.    Approval of Fees and Costs.  Winthrop Couchot shall use commercially reasonable efforts to take, or cause to be taken, all acts on its part as may be advisable to obtain approval of its unpaid fees and costs in Imagenetix's case.

**4.    Covenants of Assignees.**  Assignees hereby covenant and agree as follows:

a.    Approval of Agreement.  Assignees shall promptly take such actions as reasonably requested by Winthrop Couchot to assist in the Bankruptcy Court's approval of this Agreement.

b.    No Return of Acquisition Deposit.  No Assignee shall request that its pro rata share of the Acquisition Deposit be returned to him, and the Acquisition Deposit shall not be returned to him, unless and until he validly terminates his participation as a Party to this Agreement pursuant to the provisions of paragraph 9(a) hereof.

**5.    No Representations or Warranties.**  Winthrop Couchot hereby makes no representation or warranty, expressed or implied, to Assignees, and hereby disclaims any representation or warranty, express or implied, with respect to the amount of the Allowed Administrative Claim that will be awarded to Winthrop Couchot by the Bankruptcy Court, the

-2-

Common Stock or with respect to any other matter.  Assignees hereby acknowledge and agree that they are purchasing the Allowed Administrative Claim, and the Common Stock to be issued to Winthrop Couchot pursuant to the Plan on account of Winthrop Couchot's Allowed Administrative Claims, on an "AS IS," "WHERE IS" and "WITH ALL FAULTS" basis.

**6.      Effectiveness of This Agreement/Closing of Transaction.**

a.      Closing.  Subject to the provisions of paragraph 8 hereof, the closing ("Closing") of the transaction contemplated by this Agreement ("Transaction") shall be held within three (3) business days after the Approval Date (as such term is defined by paragraph 8(a) hereof), or on such other date as the Parties may mutually agree in writing.  The Closing shall take place at the office of Winthrop Couchot, or at such other location as the Parties mutually agree in writing.

b.      Winthrop Couchot's Obligations at the Closing.  At the Closing, Winthrop Couchot shall take the following acts:

i.      Possession of Common Stock.  Winthrop Couchot shall deliver or shall cause to be delivered to Assignees immediate possession of the Common Stock.

ii.      Execution of Documents.  Winthrop Couchot shall execute and deliver to Assignees such documents as may be reasonably requested by Assignees in connection with the consummation of the Transaction.  The Assignees shall prepare such documents.

c.      Assignees' Obligations at the Closing.  At the Closing, Assignees shall take all acts appropriate to cause the Acquisition Deposit to be released to Winthrop Couchot, and shall execute and deliver to Winthrop Couchot such documents as may be reasonably requested by Winthrop Couchot in connection with such release of the Acquisition Deposit to Winthrop Couchot, in accordance with the terms and conditions of this Agreement.

d.      Binding Agreement.  This Agreement, and all of the terms and conditions hereof, shall be effective and binding upon the Parties upon the satisfaction or waiver of the conditions set forth in paragraph 8 hereof.

**7.      Delivery and Condition of the Common Stock.**

a.      As Is, Where Is.  The Assignees hereby acknowledge and agree that they are purchasing, and shall take possession of, the Common Stock in an "AS IS, WHERE IS" and "WITH ALL FAULTS" condition, and that they have been given the opportunity to conduct, and have conducted, such investigations and inspections of the Common Stock as they have deemed necessary or appropriate for the purpose of this Agreement.

b.      No Warranties Regarding Common Stock.  Winthrop Couchot makes no representations, statements or warranties, expressed or implied, of any kind or nature whatsoever regarding the Common Stock, including, without limitation, any warranties regarding any of the following: (i) the condition, quantity, value or quality of any or all of the Common Stock; (ii) the past, present or future profitability or viability of Imagenetix's business; or (iii) the value of Imagenetix's assets.  All such representations and warranties, expressed or implied, are hereby disclaimed by Winthrop Couchot.

**8.    Conditions Precedent to Effectiveness of this Agreement and the Closing of the Transaction.**

a.    Effectiveness of this Agreement. Subject to the provisions of paragraph 9 hereof, this Agreement shall be effective and binding, irrevocably and unconditionally, on the Parties on the first day upon which each of the following conditions has been satisfied ("Approval Date"):

i.    Execution of Agreement. Each Party has executed this Agreement and has delivered the signed Agreement to the other Parties.

ii.    Entry of Confirmation Order. The Bankruptcy Court shall have entered an order confirming the Plan and, in accordance with the provisions of Section 3.1.5.2 of the Plan, the Common Stock to be issued to Winthrop Couchot under the Plan is deemed to be unrestricted, freely trading stock.

iii.    Entry of Fee Order. The Bankruptcy Court shall have entered an order awarding to Winthrop Couchot an Allowed Administrative Claim in Imagenetix's chapter 11 case on account of unpaid fees and costs of Winthrop Couchot.

b.    Assignees' Conditions to Closing. Subject to the occurrence of the Approval Date, the obligations of the Assignees to proceed with the Closing of the Transaction is subject only to the Assignees' obtaining title to the Common Stock in accordance with the terms and conditions of this Agreement.

c.    Winthrop Couchot's Conditions to Closing. Subject to the occurrence of the Approval Date, the obligation of Winthrop Couchot to proceed with the Closing of the Transaction is subject only to Winthrop Couchot's obtaining the Acquisition Deposit in accordance with the terms and conditions of this Agreement.

d.    Satisfaction of Conditions. The Parties shall use their respective commercially reasonable efforts to satisfy the conditions set forth herein with respect to the Closing of the Transaction.

e.    No Condition to Closing. Assignees expressly acknowledge and agree that any loss in value of the Common Stock, any material adverse change in value of Imagenetix's assets or any material adverse change with respect to Imagenetix's business shall not constitute grounds for terminating this Agreement, and that Assignees hereby assume all risks associated therewith.

**9.    Termination of This Agreement.**

a.    Party's Right to Terminate this Agreement. Winthrop Couchot shall have the right to terminate this Agreement, and an Assignee shall have the right to terminate its participation as a Party to this Agreement, upon the occurrence of any of the following events:

i.    Denial of Approval of this Agreement. The Bankruptcy Court enters an order denying approval of this Agreement;

ii.    Failure to Obtain Timely Order of the Bankruptcy Court. The Bankruptcy Court has not entered by October 31, 2014, an order confirming the

Plan, or the Bankruptcy Court has not entered, by December 15, 2014, an order awarding to Winthrop Couchot an Allowed Administrative Claim for its unpaid fees and costs in an amount not less than $200,000.

   iii.  <u>Mutual Consent</u>.  Winthrop Couchot and such Assignee give their mutual consent.

  b.  <u>Effect of Termination of This Agreement</u>.

   i.  <u>Termination by Winthrop Couchot</u>.  In the event of any termination of this Agreement by Winthrop Couchot as permitted by paragraph 9(a) hereof, all provisions of this Agreement shall forthwith become void, and no Party shall have any liability or further obligation to any other Party under or by reason of this Agreement, except for any breach of this Agreement occurring prior to or as a result of a termination of this Agreement, and except that Winthrop Couchot shall return to Assignees the Acquisition Deposit.

   ii.  <u>Termination by an Assignee</u>.  In the event that an Assignee terminates his participation as a Party to this Agreement as permitted by paragraph 9(a) hereof, all provisions of this Agreement as to such Assignee shall forthwith become void, and such Assignee shall have no liability or further obligation to any other Party under or by reason of this Agreement, except for any breach of this Agreement occurring prior to or as a result of a termination of this Agreement.  Upon any such termination of an Assignee's participation as a Party to this Agreement, Winthrop Couchot shall return to such Assignee such Assignee's pro rata share of the Acquisition Deposit.  In the event that an Assignee terminates his participation as a Party to this Agreement pursuant to the provisions of paragraph 9(a) hereof, Winthrop Couchot and other Assignees may elect not to terminate this Agreement and to continue to perform their respective obligations pursuant to the terms and conditions of this Agreement.

  c.  <u>Notice of Termination</u>.  In the event that Winthrop Couchot terminates this Agreement, or an Assignee terminates his participation as a Party to this Agreement, pursuant to the provisions of paragraph 9(a) hereof, such Party shall give immediate written notice of such termination to the other Parties at the addresses to which notices must be provided pursuant to paragraph 12(j) hereof.

  **10.**  **Disposition of Acquisition Deposit.**  Winthrop Couchot shall maintain the Acquisition Deposit in Winthrop Couchot's client trust account until the earlier to occur of the following events:  the Closing of the Transaction; or a termination of an Assignee's participation as a Party to this Agreement pursuant to the provisions of paragraph 9(a) hereof.

  a.  <u>Release of Acquisition Deposit at the Closing</u>.  Upon the satisfaction of the conditions set forth in paragraph 8(b) hereof, the Acquisition Deposit shall be released, irrevocably and unconditionally, to Winthrop Couchot in accordance with the terms and conditions of this Agreement.

  b.  <u>Return of Acquisition Deposit Upon Termination of Agreement</u>.  Upon an Assignee's termination of his participation as a Party to this Agreement in accordance with the provisions of paragraph 9(a) hereof, Winthrop Couchot shall return as soon as practicable to such Assignee his pro rata interest in the Acquisition Deposit.

**11.** **Notice of Transfer of Claim.** The Assignees shall be solely responsible for filing any required notice of the transfer of the Allowed Administrative Claim to the Assignees, in accordance with the provisions of Rule 3001(e) of the Federal Rules of Bankruptcy Procedure.

**12.** **Miscellaneous.**

a.      Modification.  This Agreement may not be modified or amended, except by an instrument in writing signed by each of the Parties.

b.      Waiver.  Acceptance by a Party of any performance less than required hereunder shall not be deemed to be a waiver of the rights of such Party to enforce all of the terms and conditions hereof. No waiver of any such right hereunder shall be binding unless reduced to writing and signed by the Party to be charged therewith.

c.      Counterparts; Facsimile or Electronic Signature. This Agreement may be signed in any number of counterparts with the same effect as if the signatures appeared on the same instrument, and all signed counterparts shall be deemed to be an original. Facsimile or electronic transmission of any signed original document, and retransmission of any signed facsimile or electronic transmission, shall be the same as delivery of an original.

d.      Authorized Execution. Each individual executing this Agreement on behalf of a Party represents and warrants that (i) he is authorized to execute this Agreement for such Party, and (ii) such Party shall be bound in all respects hereby.

e.      Attorneys' Fees and Costs.  Each Party shall bear his own attorneys' fees and costs arising from or related to the negotiation and execution of this Agreement. In the event of any action or proceeding to enforce, modify, interpret, construe, invalidate, rescind, or set aside any term or provision of this Agreement, however, the prevailing Party shall be entitled to an award of his costs and expenses, including reasonable attorneys' fees and costs, incurred as a result of such claim, action, or lawsuit, including any appeals resulting therefrom.

f.      Governing Law; Choice of Forum.  This Agreement shall be construed and enforced according to the laws of the State of California, without reference to conflicts of law principles. Any action or proceeding brought to enforce, modify, interpret, construe, invalidate, rescind or set aside any of the terms or provisions of this Agreement may be brought only in the Bankruptcy Court (subject only to the right of appeal). Each of the Parties hereby consents to the exclusive jurisdiction of the Bankruptcy Court to enforce the provisions of this Agreement and for all such matters, and hereby waives any objection that he may have to such jurisdiction.  Notwithstanding the foregoing, in the event that Imagenetix's bankruptcy case should be closed or dismissed, any action or proceeding to enforce, modify, interpret, construe, invalidate, rescind or set aside any of the terms or provisions of this Agreement shall be brought only in the state or federal courts of California sitting in Orange County, California.

g.      No Construction against any Party; Headings for Convenience Only.  The Parties have cooperated in the drafting and preparation of this Agreement. In any construction of this Agreement, or of any of its terms and provisions, the same shall not be construed against any Party. All headings in this Agreement are inserted for

convenience of reference only, and shall not affect the construction or interpretation hereof.

      h.    <u>Reliance on Representations</u>.  Each Party hereby acknowledges that he has not relied on any statement, representation or promise of any other Party, or of any of his agents, employees, attorneys or representatives, in executing this Agreement, except as expressly set forth herein.

      i.    <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement of the Parties with respect to the matters set forth herein, and supersedes any and all prior agreements or understandings, written or oral, between them relating to the subject matter of this Agreement.  No other promises or agreements shall be binding upon the Parties with respect to this subject matter unless contained in this Agreement or separately agreed to in writing and signed by an authorized representative of each Party.

      j.    <u>Notices</u>.  All notices, requests, demands, and other communications required by this Agreement shall be in writing and shall be delivered by facsimile, e-mail transmission, or in person, or mailed by first class registered or certified mail, as follows:

If Directed to Winthrop Couchot:

Winthrop Couchot Professional Corporation
660 Newport Center Drive #400
Newport Beach, CA 92660
Attn: Robert E. Opera, Esq.
Tel.: (949) 720-4130
Fax: (949) 720-4111

If Directed to the Assignees:

Barbara Opperman, IRA
36837 Wax Myrtle Pl.
Murrieta, CA 92562
Tel.: (951) 445-4251
Email: oppassociates@verizon.net

James and Josephine Zolin
P.O. Box 1903
Rancho Santa Fe, CA 92067
Tel.: (858) 756-3347
Email: jzolin@pacbell.net

Victor Gabourel
11404 Cypress Woods Dr.
San Diego, CA 92131
Tel.: (858) 566-5450
Email: vgabourel@san.rr.com

George Georgeklis
4510 Executive Dr., Ste. 106
San Diego, CA 92121
Tel.: (858) 735-6688
Email: george@drgeorgedds.com

Kim Vanderlinden
PO Box 181825
Coronado, CA 92178
Tel.: (619) 319-5833
Email: drkim@gmail.com

     If delivered by facsimile, by e–mail transmission, or personally, the date on which the notice, request, demand or other communication is delivered, and a copy thereof is sent by first class mail, postage prepaid, addressed to the addresses required by this paragraph 12(j), shall be the date on which such delivery is made. If such notice, request, demand or other communication is delivered by first class mail, the date on which such notice, request, demand or other communication is received shall be the date of delivery. Any Party may designate in writing a different address to which any notice, request, demand or other communication is to be given hereunder to such Party. Telephone numbers are listed for convenience purposes only and not for the purpose of giving notice pursuant to this Agreement.

[Continued on Page 9]

Exhibit "4" Page 124

[Continued From Page 8]

     k.    <u>Successors and Assigns</u>.  This Agreement shall be binding upon and inure to the benefit of the respective successors and assigns of the Parties.

     l.    <u>Interpretation</u>.  Wherever in this Agreement the context so requires, reference to the neuter, masculine or feminine shall be deemed to include each of the others, and reference to either the singular or the plural shall be deemed to include the other.

**IN WITNESS WHEREOF,** the Parties have executed this Agreement as of the date and year first above written.

**WINTHROP COUCHOT**
**PROFESSIONAL CORPORATION**

By: _____
       Robert E. Opera

Barbara Opperman, IRA
By: _____
Its: _____

_____
James Zolin

_____
Josephine Zolin

_____
Victor Gabourel

_____
George Georgeklis

_____
Kim Vanderlinden

## EXHIBIT "A"

## INVESTMENT SCHEDULE

| | |
|---|---|
| Barbara Opperman, IRA | $93,038 |
| James & Josephine Zolin | $186,076 |
| Victor Gabourel | $93,038 |
| George Georgeklis | $93,038 |
| Kim Vanderlinden | $24,810 |
| Total | $490,000 |

## ADMINISTRATIVE CLAIM ASSIGNMENT AGREEMENT

       This Administrative Claim Assignment Agreement ("Agreement") is entered into effective as of September __, 2014 by and among Shustak & Partners, PC ("Shustak Firm"), on one hand, and Barbara Opperman, IRA, James Zolin and Josephine Zolin, Victor Gabourel, George Georgeklis and Kim Vanderlinden (collectively, "Assignees"), on the other hand (Shustak Firm and the Assignees are referred to herein, collectively, as the "Parties"), with regard to the following facts and circumstances.

## RECITALS

A.     On December 17, 2012, Imagenetix, Inc. ("Imagenetix") filed in the United States Bankruptcy Court for the Southern District of California ("Bankruptcy Court"), as case number 12-16423 MM11, a chapter 11 petition for relief.

B.     Imagenetix has employed the Shustak Firm as its special litigation counsel in Imagenetix's chapter 11 case.

C.     As of July 31, 2014, Imagenetix owed to the Shustak Firm the amount of approximately $300,000.

D.     Imagenetix has filed its Third Amended Chapter 11 Plan of Reorganization ("Plan").  A hearing on the confirmation of the Plan is presently scheduled for September 10, 2014.

E.     In the event that the Bankruptcy Court enters an order confirming the Plan, the Shustak Firm intends to apply to the Bankruptcy Court, pursuant to the provisions of section 330 of the Bankruptcy Code, for an order allowing, on a final basis, the Shustak Firm's fees and costs in Imagenetix's chapter 11 case, including the Shustak Firm's unpaid fees and costs.

F.     Section 3.1.5.2 of the Plan provides that the Shustak Firm will receive Common Stock in payment of the amount of its administrative claim allowed by the Bankruptcy Court in Imagenetix's chapter 11 case ("Allowed Administrative Claim").  Section 3.1.5.2 provides further that the Common Stock issued on account of the Shustak Firm's Allowed Administrative Claim will be subject to the exemption provided by section 1145 of the Bankruptcy Code and will be unrestricted, freely trading stock pursuant to section 1145 of the Bankruptcy Code.[1]

G.     Assignees have deposited with the Debtor's general insolvency counsel, Winthrop Couchot Professional Corporation ("Winthrop Couchot") the amount of $300,000 ("Acquisition Deposit"), in the respective amounts set forth by Exhibit "A" hereto ("Investment Schedule"), for the purpose of funding Assignees' purchase of the Shustak Firm's Allowed Administrative Claim and the Common Stock issued to the Shustak Firm on account thereof.

H.     Assignees desire to acquire the Shustak Firm's Allowed Administrative Claim by acquiring the Common Stock to be issued to the Shustak Firm pursuant to the Plan, in an amount not to exceed $300,000.  The Shustak Firm is prepared to sell and assign to

---

[1] Except as otherwise defined herein, the definitions of the capitalized terms contained herein are as set forth in the Plan.

Assignees Common Stock issued to the Shustak Firm pursuant to the Plan in accordance with the terms and conditions set forth herein.

NOW, THEREFORE, based upon the foregoing Recitals and the mutual covenants, promises and agreements contained herein, and for good and valuable consideration, the receipt and sufficiency of which are acknowledged by the Parties, and intending to be legally bound hereby, the Parties hereby agree as follows:

<u>AGREEMENT</u>

**1.**    **<u>Purchase and Sale of Common Stock.</u>**    Pursuant to the provisions of this Agreement, the Shustak Firm shall sell and assign to Assignees, and Assignees shall acquire from the Shustak Firm, any Allowed Administrative Claim awarded to the Shustak Firm by the Bankruptcy Court, and Common Stock to be issued to the Shustak Firm pursuant to the Plan on account of such Allowed Administrative Claim, in an amount not to exceed $300,000.

**2.**    **<u>Payment of Purchase Price.</u>**    As consideration for the acquisition of the Shustak Firm's Allowed Administrative Claim and the Common Stock to be issued to the Shustak Firm pursuant to the Plan on account of the Shustak Firm's Allowed Administrative Claim, Assignees shall pay to the Shustak Firm the <u>lesser</u> of the following amounts: (a) $300,000; or (b) the amount of the Allowed Administrative Claim ("Purchase Price"). The Purchase Price shall be paid from the Acquisition Deposit.

**3.**    **<u>Covenants of The Shustak Firm.</u>**    The Shustak Firm hereby covenants and agrees as follows:

a.    <u>Fee Application.</u>    The Shustak Firm shall file, by the forty-fifth (45th) day after the Effective Date of the Plan, an application to obtain from the Bankruptcy Court allowance of the Shustak Firm's fees and costs in Imagenetix's chapter 11 case.

b.    <u>Approval of Fees and Costs.</u>    The Shustak Firm shall use commercially reasonable efforts to take, or cause to be taken, all acts on its part as may be advisable to obtain approval of its unpaid fees and costs in Imagenetix's case.

**4.**    **<u>Covenants of Assignees.</u>**    Assignees hereby covenant and agree as follows:

a.    <u>Approval of Agreement.</u>    Assignees shall promptly take such actions as reasonably requested by Winthrop Couchot to assist in the Bankruptcy Court's approval of this Agreement.

b.    <u>No Return of Acquisition Deposit.</u>    No Assignee shall request that its pro rata share of the Acquisition Deposit be returned to him, and the Acquisition Deposit shall not be returned to him, unless and until he validly terminates his participation as a Party to this Agreement pursuant to the provisions of paragraph 9(a) hereof.

**5.**    **<u>No Representations or Warranties.</u>**    The Shustak Firm hereby makes no representation or warranty, expressed or implied, to Assignees, and hereby disclaims any representation or warranty, express or implied, with respect to the amount of the Allowed Administrative Claim that will be awarded to the Shustak Firm by the Bankruptcy Court, the Common Stock or with respect to any other matter. Assignees hereby acknowledge and agree that they are purchasing the Allowed Administrative Claim, and the Common Stock to be issued to the Shustak Firm pursuant to the Plan on account of the Shustak Firm's Allowed Administrative Claims, on an "AS IS," "WHERE IS" and "WITH ALL FAULTS" basis.

6.      **Effectiveness of This Agreement/Closing of Transaction.**

a.      <u>Closing</u>.  Subject to the provisions of paragraph 8 hereof, the closing ("Closing") of the transaction contemplated by this Agreement ("Transaction") shall be held within three (3) business days after the Approval Date (as such term is defined by paragraph 8(a) hereof), or on such other date as the Parties may mutually agree in writing.  The Closing shall take place at the office of Winthrop Couchot, or at such other location as the Parties mutually agree in writing.

b.      <u>The Shustak Firm's Obligations at the Closing</u>.  At the Closing, the Shustak Firm shall take the following acts:

i.      <u>Possession of Common Stock</u>.  The Shustak Firm shall deliver or shall cause to be delivered to Assignees immediate possession of the Common Stock.

ii.      <u>Execution of Documents</u>.  The Shustak Firm shall execute and deliver to Assignees such documents as may be reasonably requested by Assignees in connection with the consummation of the Transaction.  The Assignees shall prepare such documents.

c.      <u>Assignees' Obligations at the Closing</u>.  At the Closing, Assignees shall take all acts appropriate to cause the Acquisition Deposit to be released to the Shustak Firm, and shall execute and deliver to the Shustak Firm such documents as may be reasonably requested by the Shustak Firm in connection with such release of the Acquisition Deposit to the Shustak Firm, in accordance with the terms and conditions of this Agreement.

d.      <u>Binding Agreement</u>.  This Agreement, and all of the terms and conditions hereof, shall be effective and binding upon the Parties upon the satisfaction or waiver of the conditions set forth in paragraph 8 hereof.

7.      **Delivery and Condition of the Common Stock.**

a.      <u>As Is, Where Is</u>.  The Assignees hereby acknowledge and agree that they are purchasing, and shall take possession of, the Common Stock in an "AS IS, WHERE IS" and "WITH ALL FAULTS" condition, and that they have been given the opportunity to conduct, and have conducted, such investigations and inspections of the Common Stock as they have deemed necessary or appropriate for the purpose of this Agreement.

b.      <u>No Warranties Regarding Common Stock</u>.  The Shustak Firm makes no representations, statements or warranties, expressed or implied, of any kind or nature whatsoever regarding the Common Stock, including, without limitation, any warranties regarding any of the following: (i) the condition, quantity, value or quality of any or all of the Common Stock; (ii) the past, present or future profitability or viability of Imagenetix's business; or (iii) the value of Imagenetix's assets.  All such representations and warranties, expressed or implied, are hereby disclaimed by the Shustak Firm.

8.      **Conditions Precedent to Effectiveness of this Agreement and the Closing of the Transaction.**

a.      <u>Effectiveness of this Agreement</u>. Subject to the provisions of paragraph 9 hereof, this Agreement shall be effective and binding, irrevocably and unconditionally,

on the Parties on the first day upon which each of the following conditions has been satisfied ("Approval Date"):

        i.        <u>Execution of Agreement</u>.  Each Party has executed this Agreement and has delivered the signed Agreement to the other Parties.

        ii.        <u>Entry of Confirmation Order</u>.  The Bankruptcy Court shall have entered an order confirming the Plan and, in accordance with the provisions of Section 3.1.5.2 of the Plan, the Common Stock to be issued to the Shustak Firm under the Plan is deemed to be unrestricted, freely trading stock.

        iii.        <u>Entry of Fee Order</u>.  The Bankruptcy Court shall have entered an order awarding to the Shustak Firm an Allowed Administrative Claim in Imagenetix's chapter 11 case on account of unpaid fees and costs of the Shustak Firm.

        b.        <u>Assignees' Conditions to Closing</u>.  Subject to the occurrence of the Approval Date, the obligations of the Assignees to proceed with the Closing of the Transaction is subject only to the Assignees' obtaining title to the Common Stock in accordance with the terms and conditions of this Agreement.

        c.        <u>The Shustak Firm's Conditions to Closing</u>.  Subject to the occurrence of the Approval Date, the obligation of the Shustak Firm to proceed with the Closing of the Transaction is subject only to the Shustak Firm's obtaining the Acquisition Deposit in accordance with the terms and conditions of this Agreement.

        d.        <u>Satisfaction of Conditions</u>.  The Parties shall use their respective commercially reasonable efforts to satisfy the conditions set forth herein with respect to the Closing of the Transaction.

        e.        <u>No Condition to Closing</u>.  Assignees expressly acknowledge and agree that any loss in value of the Common Stock, any material adverse change in value of Imagenetix's assets or any material adverse change with respect to Imagenetix's business shall not constitute grounds for terminating this Agreement, and that Assignees hereby assume all risks associated therewith.

**9.**      <u>**Termination of This Agreement.**</u>

        a.        <u>Party's Right to Terminate this Agreement</u>.  The Shustak Firm shall have the right to terminate this Agreement, and an Assignee shall have the right to terminate its participation as a Party to this Agreement, upon the occurrence of any of the following events:

        i.        <u>Denial of Approval of this Agreement</u>.  The Bankruptcy Court enters an order denying approval of this Agreement;

        ii.        <u>Failure to Obtain Timely Order of the Bankruptcy Court</u>.  The Bankruptcy Court has not entered by October 31, 2014, an order confirming the Plan, or the Bankruptcy Court has not entered, by December 15, 2014, an order awarding to the Shustak Firm an Allowed Administrative Claim for its unpaid fees and costs in an amount not less than $100,000.

-4-

iii.      <u>Mutual Consent</u>.  The Shustak Firm and such Assignee give their mutual consent.

b.      <u>Effect of Termination of This Agreement</u>.

i.      <u>Termination by The Shustak Firm</u>.  In the event of any termination of this Agreement by the Shustak Firm as permitted by paragraph 9(a) hereof, all provisions of this Agreement shall forthwith become void, and no Party shall have any liability or further obligation to any other Party under or by reason of this Agreement, except for any breach of this Agreement occurring prior to or as a result of a termination of this Agreement, and except that Winthrop Couchot shall return to Assignees the Acquisition Deposit.

ii.      <u>Termination by an Assignee</u>.  In the event that an Assignee terminates his participation as a Party to this Agreement as permitted by paragraph 9(a) hereof, all provisions of this Agreement as to such Assignee shall forthwith become void, and such Assignee shall have no liability or further obligation to any other Party under or by reason of this Agreement, except for any breach of this Agreement occurring prior to or as a result of a termination of this Agreement.  Upon any such termination of an Assignee's participation as a Party to this Agreement, Winthrop Couchot shall return to such Assignee such Assignee's pro rata share of the Acquisition Deposit.  In the event that an Assignee terminates his participation as a Party to this Agreement pursuant to the provisions of paragraph 9(a) hereof, the Shustak Firm and other Assignees may elect not to terminate this Agreement and to continue to perform their respective obligations pursuant to the terms and conditions of this Agreement.

c.      <u>Notice of Termination</u>.  In the event that the Shustak Firm terminates this Agreement, or an Assignee terminates his participation as a Party to this Agreement, pursuant to the provisions of paragraph 9(a) hereof, such Party shall give immediate written notice of such termination to the other Parties at the addresses to which notices must be provided pursuant to paragraph 12(j) hereof.

**10.      Disposition of Acquisition Deposit.**  Winthrop Couchot shall maintain the Acquisition Deposit in Winthrop Couchot's client trust account until the earlier to occur of the following events:  the Closing of the Transaction; or a termination of an Assignee's participation as a Party to this Agreement pursuant to the provisions of paragraph 9(a) hereof.

a.      <u>Release of Acquisition Deposit at the Closing</u>.  Upon the satisfaction of the conditions set forth in paragraph 8(b) hereof, the Acquisition Deposit shall be released, irrevocably and unconditionally, to the Shustak Firm in accordance with the terms and conditions of this Agreement.

b.      <u>Return of Acquisition Deposit Upon Termination of Agreement</u>.  Upon an Assignee's termination of his participation as a Party to this Agreement in accordance with the provisions of paragraph 9(a) hereof, Winthrop Couchot shall return as soon as practicable to such Assignee his pro rata interest in the Acquisition Deposit.

**11.      Notice of Transfer of Claim.**  The Assignees shall be solely responsible for filing any required notice of the transfer of the Allowed Administrative Claim to the Assignees, in accordance with the provisions of Rule 3001(e) of the Federal Rules of Bankruptcy Procedure.

## 12.    <u>Miscellaneous</u>.

a.    <u>Modification</u>.  This Agreement may not be modified or amended, except by an instrument in writing signed by each of the Parties.

b.    <u>Waiver</u>.  Acceptance by a Party of any performance less than required hereunder shall not be deemed to be a waiver of the rights of such Party to enforce all of the terms and conditions hereof. No waiver of any such right hereunder shall be binding unless reduced to writing and signed by the Party to be charged therewith.

c.    <u>Counterparts; Facsimile or Electronic Signature</u>. This Agreement may be signed in any number of counterparts with the same effect as if the signatures appeared on the same instrument, and all signed counterparts shall be deemed to be an original. Facsimile or electronic transmission of any signed original document, and retransmission of any signed facsimile or electronic transmission, shall be the same as delivery of an original.

d.    <u>Authorized Execution</u>. Each individual executing this Agreement on behalf of a Party represents and warrants that (i) he is authorized to execute this Agreement for such Party, and (ii) such Party shall be bound in all respects hereby.

e.    <u>Attorneys' Fees and Costs</u>.  Each Party shall bear his own attorneys' fees and costs arising from or related to the negotiation and execution of this Agreement. In the event of any action or proceeding to enforce, modify, interpret, construe, invalidate, rescind, or set aside any term or provision of this Agreement, however, the prevailing Party shall be entitled to an award of his costs and expenses, including reasonable attorneys' fees and costs, incurred as a result of such claim, action, or lawsuit, including any appeals resulting therefrom.

f.    <u>Governing Law; Choice of Forum</u>.  This Agreement shall be construed and enforced according to the laws of the State of California, without reference to conflicts of law principles. Any action or proceeding brought to enforce, modify, interpret, construe, invalidate, rescind or set aside any of the terms or provisions of this Agreement may be brought only in the Bankruptcy Court (subject only to the right of appeal). Each of the Parties hereby consents to the exclusive jurisdiction of the Bankruptcy Court to enforce the provisions of this Agreement and for all such matters, and hereby waives any objection that he may have to such jurisdiction.  Notwithstanding the foregoing, in the event that Imagenetix's bankruptcy case should be closed or dismissed, any action or proceeding to enforce, modify, interpret, construe, invalidate, rescind or set aside any of the terms or provisions of this Agreement shall be brought only in the state or federal courts of California sitting in San Diego, California.

g.    <u>No Construction against any Party; Headings for Convenience Only</u>.  The Parties have cooperated in the drafting and preparation of this Agreement. In any construction of this Agreement, or of any of its terms and provisions, the same shall not be construed against any Party. All headings in this Agreement are inserted for convenience of reference only, and shall not affect the construction or interpretation hereof.

h.    <u>Reliance on Representations</u>.  Each Party hereby acknowledges that he has not relied on any statement, representation or promise of any other Party, or of any of his

-6-

agents, employees, attorneys or representatives, in executing this Agreement, except as expressly set forth herein.

       i.      <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement of the Parties with respect to the matters set forth herein, and supersedes any and all prior agreements or understandings, written or oral, between them relating to the subject matter of this Agreement.  No other promises or agreements shall be binding upon the Parties with respect to this subject matter unless contained in this Agreement or separately agreed to in writing and signed by an authorized representative of each Party.

       j.      <u>Notices</u>.  All notices, requests, demands, and other communications required by this Agreement shall be in writing and shall be delivered by facsimile, e-mail transmission, or in person, or mailed by first class registered or certified mail, as follows:

If Directed to the Shustak Firm:

Shustak & Partners, PC
401 West A Street, Suite 2330
San Diego, CA 92101
Attn: Erwin Shustak, Esq.
Tel.: (888) 748-8748 (Ext. 109)
Fax: (800) 8689350

If Directed to the Assignees:

Barbara Opperman, IRA
36837 Wax Myrtle Pl.
Murrieta, CA 92562
Tel.: (951) 445-4251
Email: oppassociates@verizon.net

James and Josephine Zolin
P.O. Box 1903
Rancho Santa Fe, CA 92067
Tel.: (858) 756-3347
Email: jzolin@pacbell.net

Victor Gabourel
11404 Cypress Woods Dr.
San Diego, CA 92131
Tel.: (858) 566-5450
Email: vgabourel@san.rr.com

George Georgeklis
4510 Executive Dr., Ste. 106
San Diego, CA 92121
Tel.: (858) 735-6688
Email: george@drgeorgedds.com

Kim Vanderlinden
PO Box 181825
Coronado, CA 92178
Tel.: (619) 319-5833
Email: drkim@gmail.com

  If delivered by facsimile, by e–mail transmission, or personally, the date on which the notice, request, demand or other communication is delivered, and a copy thereof is sent by first class mail, postage prepaid, addressed to the addresses required by this paragraph 12(j), shall be the date on which such delivery is made. If such notice, request, demand or other communication is delivered by first class mail, the date on which such notice, request, demand or other communication is received shall be the date of delivery. Any Party may designate in writing a different address to which any notice, request, demand or other communication is to be given hereunder to such Party. Telephone numbers are listed for convenience purposes only and not for the purpose of giving notice pursuant to this Agreement.

[Continued on Page 9]

[Continued From Page 8]

k.  <u>Successors and Assigns</u>.  This Agreement shall be binding upon and inure to the benefit of the respective successors and assigns of the Parties.

l.  <u>Interpretation</u>.  Wherever in this Agreement the context so requires, reference to the neuter, masculine or feminine shall be deemed to include each of the others, and reference to either the singular or the plural shall be deemed to include the other.

**IN WITNESS WHEREOF,** the Parties have executed this Agreement as of the date and year first above written.

**SHUSTAK & PARTNERS, PC**                Barbara Opperman, IRA
                                                               By:  _____
                                                               Its:  _____

By:  _____
              Erwin J. Shustak                               _____
                                                               James Zolin


                                                               _____
                                                               Josephine Zolin


                                                               _____
                                                               Victor Gabourel


                                                               _____
                                                               George Georgeklis


                                                               _____
                                                               Kim Vanderlinden

Exhibit "4" Page 135

## EXHIBIT "A"

### INVESTMENT SCHEDULE

| | |
|---|---|
| Barbara Opperman, IRA | $ 56,962 |
| James & Josephine Zolin | $ 113,924 |
| Victor Gabourel | $ 56,962 |
| George Georgeklis | $ 56,962 |
| Kim Vanderlinden | $ 15,190 |
| Total | $ 300,000 |

Exhibit "4" Page 136

## CERTIFICATE OF SERVICE

I, Jeannie Martinez, declare as follows:

I am employed in the County of Orange, State of California; I am over the age of eighteen years and am not a party to this action; and my business address is 660 Newport Center Drive, Fourth Floor, Newport Beach, California 92660, in said County and State.

On August 29, 2014, I served the following document: **DEBTOR'S THIRD AMENDED CHAPTER 11 PLAN OF REORGANIZATION** on each of the interested parties as follows:

### SEE ATTACHED SERVICE LIST

by the following means of service:

| | |
|---|---|
| ☒ | **BY ELECTRONIC SERVICE via the Court's Electronic Noticing System** |
| ☐ | **BY MAIL**: I placed a true copy in a sealed envelope addressed as indicated above, on the above-mentioned date. I am familiar with the firm's practice of collection and processing correspondence for mailing. It is deposited with the U.S. Postal Service on that same day in the ordinary course of business. Under that practice, it would be deposited with the U.S. Postal Service on that same date with postage thereon fully prepaid at Newport Beach, California in the ordinary course of business. I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit. |
| ☐ | **BY ELECTRONIC MAIL**: From Newport Beach, California, I caused each such document to be transmitted electronically to the parties at the e-mail address indicated above. To the best of my knowledge, the transmission was reported as complete, and no error was reported that the electronic transmission was not completed. A return receipt was requested at the time of the transmission of each such document and I did not receive a notice of failure of receipt of each such document. |
| ☒ | I am employed in the office of Winthrop Couchot Professional Corporation. Jeannie Kim is a member of the bar of this Court. |
| ☒ | **(FEDERAL)**     I declare under penalty of perjury that the foregoing is true and correct. |

Executed on August 29, 2014 at Newport Beach, California.

/s/ *Jeannie Martinez*
Jeannie Martinez

-73-

_____

**DEBTOR'S THIRD AMENDED CHAPTER 11 PLAN OF REORGANIZATION**

MAINDOCS-#204711-v1-Imagenetix_-_Clean_-_3rdAmendedPlan.doc

NEF SERVICE LIST

- **Bernard D. Bollinger**    bbollinger@buchalter.com, smartin@buchalter.com
- **Matthew Bouslog**    mbouslog@gibsondunn.com, pcrawford@gibsondunn.com
- **John W. Cutchin**    jcutchin@san.rr.com
- **Heather U. Guerena**    huguerena@duanemorris.com, cdarmijo@duanemorris.com;rchurch@duanemorris.com;johta@duanemorris.com;kzakarin@duanemorris.com
- **James Andrew Hinds**    jhinds@jhindslaw.com – COUNSEL TO TRI-PHARMA
- **Garrick A. Hollander**    ghollander@winthropcouchot.com, pj@winthropcouchot.com;vcorbin@winthropcouchot.com;mconour@winthropcouchot.com
- **Jeannie Kim**    jkim@winthropcouchot.com, pj@winthropcouchot.com;vcorbin@winthropcouchot.com
- **Kristin Mihelic**    Kristin.T.Mihelic@usdoj.gov
- **Walter Moore**    WMoore@WaltonLawPC.com, CInclan@waltonlawpc.com
- **Sarah D. Moyed**    moyeds@sec.gov
- **Robert E. Opera**    ropera@winthropcouchot.com, pj@winthropcouchot.com;vcorbin@winthropcouchot.com;mconour@winthropcouchot.com
- **United States Trustee**    ustp.region15@usdoj.gov
- **Dennis Winters**    winterslawfirm@cs.com – COUNSEL TO PACIFIC RAINBOW

-74-