DHEERAJ K. SINGHAL (SBN 217299)
    dksinghal@dcdmlawgroup.com
**DCDM LAW GROUP, PC**
35 N. Lake Avenue, Suite 700
Pasadena, California 91101
Telephone:  (626) 689-2407
Facsimile:  (626) 689-2205

Attorneys for Intervenor and Attorney Lienholder
DCDM LAW GROUP, PC

## UNITED STATES BANKRUPTCY COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re:<br><br>IMAGENETIX, INC., a Nevada corporation,<br><br>                              Debtor. | Case No. 12-16423 MM7<br><br>Chapter 7<br><br>**RESPONSE OF DCDM LAW GROUP, PC TO APPLICATION OF TRIPHARMA AND DAMESHEK FOR ORDER TO SHOW CAUSE RE FRAUD PERPETRATED ON THE COURT, THE TRUSTEE, TRIPHARMA AND DAMESHEK BY INTERVENORS WALTON LAW GROUP AND DCDM LAW GROUP; DECLARATION OF DHEERAJ K. SINGHAL IN SUPPORT THEREOF**<br><br>DATE:     September 6, 2018<br>TIME:     2:00 p.m.<br>PLACE:   Department 1 (Judge M. Mann)<br>             325 West "F" Street, San Diego, CA 92101 |

DCDM Law Group, PC submits this Response to the Application of TriPharma and Dameshek for Order to Show Cause RE Fraud Perpetrated on the Court, the Trustee, TriPharma and Dameshek (collectively, "T/D") by Intervenors Walton Law Group ("WLG") and DCDM Law Group ("T/D Application") filed as Document 1014.

# <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION ............................................................................................ 1

II.    THE MISSTATEMENTS AND RELEVANT PLEADINGS FILED BY T/D .................... 3

III.    THIS COURT SHOULD BE OUTRAGED AT T/D COUNSEL'S FLAGRANT
DISREGARD OF RULE 9011(A)........................................................................ 9

    A.    In Addition to Being Required to Layout the Evidentiary Basis, T/D's Counsel
Should Be Required to Set Forth the Law Supporting the T/D Application. ............. 9

    B.    Counsel for T/D Should Be Required to Show Cause Why They Should Not be
Sanctioned for the Relief Sought by the Application. .............................. 13

IV.    RESPONSE TO THE JOINDER OF JAMES ANDREW HINDS, JR. AND HINDS &
SHANKMAN, LLP ....................................................................................... 15

V.    CONCLUSION.............................................................................................. 17

RESP. OF DCDM LAW GROUP TO T/D
APPLICATION FOR OSC RE FRAUD

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*FTC v. Enforma Natural Products, Inc.*,
  362 F.3d 1204 (9th Cir. 2004) ......................................................................... 13

*In re La Sierra Fin. Servs., Inc.*,
  290 B.R. 718 (B.A.P. 9th Cir. 2002)................................................................. 10

*In re Rainbow Magazine, Inc.*,
  77 F.3d 278 (9th Cir. 1996) ............................................................................... 9

**Federal Statutes**

11 U.S.C.§ 105(a)..................................................................................................... 9

**Federal Rules**

Fed. R. Bankr. Proc. 9011 ...................................................................... 9, 10, 13, 17

Fed. R. Bankr. Proc. 2018(a) ................................................................................. 10

Fed. R. Civ. Proc. 60(b) ......................................................................................... 14

Fed. R. Evid. 502(a) ............................................................................................... 11

**Other Federal Authorities**

U.S.D.C. for Southern Dist. of CA Civil Rule 83.5 .............................................. 15

**California Statutes**

California Business & Professions Code
  Section 6148............................................................................................ 10, 11, 13

RESP. OF DCDM LAW GROUP TO T/D
APPLICATION FOR OSC RE FRAUD

## RESPONSE

I. **INTRODUCTION**

The T/D Application asks the Court for a jaw-dropping list of remedies and sanctions arising from three misstatements relating to whether Walton had signed DCDM's fee agreement with TriPharma. All three misstatements were set made in a March 2016 declaration supporting DCDM and WLG's motion to intervene and an ex parte application to shorten time for a hearing on that motion. DCDM regrets the misstatements and has explained them below. But none of these misstatements have affected the outcome of any proceeding before this Court. T/D (and Hinds) assert that the trajectory of this bankruptcy proceeding, including the OSC re Contempt proceeding, would be quite different if the Court had known about the absence of John Walton's signature on the DCDM Fee Agreement. The assertion sounds of wishful thinking from parties that have been caught with their hands in the proverbial cookie jar.

In August 2017, this Court warned T/D about further attempts to challenge the validity of the DCDM and WLG liens when it ruled on T/D's motion to estimate liens:

> This court has rejected Movants' efforts to set aside its orders regarding Walton's liens in settlements with Debtor and the Trustee twice in this case already, and it will reject this third indirect assault as well.

(Doc. 801.) Yet, the T/D Application concedes that it is nothing more than another assault on the validity of the DCDM and WLG attorneys' liens and another challenge to the Court's Order approving the DCDM and WLG motion to intervene. In their 27 pages of vitriol and slanderous statements—none of which are supported by an accompanying declaration from Dameshek or anyone else with knowledge of the convoluted narrative—T/D provides a uniquely succinct explanation of why the Court should, among other things, *dismiss the pending OSC re Contempt based upon T/D's fraud, strike the WLG and DCDM liens and report both Walton and Singhal to the State Bar for possible disbarment*:

> No fee agreement = no lien = no intervene.

T/D Application Memo. at 5:14. *See also* T/D Application at 3 (setting forth requested remedies and sanctions). Indeed, the T/D Application makes clear that it is rooted in T/D's unshakeable

RESP. OF DCDM LAW GROUP TO T/D
APPLICATION FOR OSC RE FRAUD

belief that neither DCDM nor WLG have a valid fee agreement and that, therefore, they should not have been allowed to intervene:

> Secured Creditor TriPharma LLC ("TriPharma") and Evan Dameshek ("Dameshek") (collectively "T/D") hereby submit this Application for Order to Show Cause ("AOSC") against Intervenors Walton Law Group ("WLG") and DCDM Law Group ("DCDM") for committing fraud on the Court, the Trustee, T/D and the other parties to this bankruptcy proceeding ("BK Case") in connection with WLG/DCDM's Joint Motion to Intervene ("Joint Motion") [Dkt. No. 514] and supporting Ex Parte Application for Order Shortening Time ("Ex Parte Application") [Dkt. No. 515] (including the false Declaration of Dheeraj K. Singhal and the deceptively redacted version of purported three-party bankruptcy case fee agreement between WLG, DCDM and Tripharma) **which fraudulently induced the Court to grant intervention by misrepresenting that the purported agreement had been fully executed while concealing that there was no fully executed agreement in existence.**

T/D Application at 1-2.  Later, when summarizing four pages of factual recitations that lack any evidentiary foundation, T/D reiterates that the T/D Application is nothing more than an assault on the validity of the DCDM and WLG liens:

> To put it lightly, based on the foregoing summary of facts, T/D strongly disputes that WLG or DCDM have valid liens in the BK Case because neither has a written fee contract applicable to the BK Case. And their lies to the Court (and others) regarding the WDT Agreement has caused T/D severe damage.

*Id*. at 5:6-9.  In another passage, T/D once again admits to its frustration with this Court and the OSC re Contempt proceedings, asserting that the bankruptcy case could have been resolved long ago had this Court deprived DCDM and WLG of standing to bring T/D's deceitful conduct to the attention of this Court:

> So, **WLG/DCDM misrepresented that they had a valid lien to this Court, and concealed/redacted the signature, and the fox was let in the henhouse by this unsuspecting Court.** At the time, no one – not the Court, T/D, T/D's counsel, the other attorneys, etc. – knew that allowing WLG/DCDM to intervene would allow them to perpetrate their extortion scheme. Why would they, WLG/DCDM are attorneys held to a high

-2-                    RESP. OF DCDM LAW GROUP TO T/D
                       APPLICATION FOR OSC RE FRAUD

ethical standard, right? **Unfortunately, the intervention (based on fraud) allowed for everything that has followed since. Thus, but for WLG/DCDM's fraud on the Court, there would have been no intervention, no extortion, and this BK Case would have been wrapped up long ago.**

T/D Application Memo. at 24:1-9. It bears noting that T/D is describing as "extortion" this Court's orders rejecting efforts to allow T/D to receive payments directly from the estate that would violate this Court's prior orders respecting the attorneys' liens, including those of McKennon Schindler LLP, as well as DCDM and WLG. Indeed, the purported "extortion" appears to be nothing more than T/D being forced to address the outstanding attorneys' liens securing valuable legal services that T/D bargained for and received.

As these passages from the T/D Application make self-evident, and as explained further below, the Court should deny the T/D Application because it is nothing more than another challenge to this Court's orders acknowledging the prima facie validity of the DCDM and WLG attorneys' liens.

The Court should also deny the T/D Application because, as also explained below, none of the misstatements had any material impact on these bankruptcy proceedings.

## II.    THE MISSTATEMENTS AND RELEVANT PLEADINGS FILED BY T/D

On March 11, 2016, in support of an ex parte application to shorten time on the motion to intervene (Doc. 515) filed on behalf of DCDM and Walton Law Group, PC, DCDM filed a declaration of the undersigned, Dheeraj K. Singhal, dated March 11, 2016 (the "2016 Singhal Declaration"). (Doc. 515.) For the Court's reference, a copy of the ex parte application, together with the accompanying March 11, 2016 declaration is attached as Exhibit 1.

DCDM acknowledges three misstatements made in the 2016 Singhal Declaration. Singhal Decl. ¶ 4. The chart below sets forth the original statement and explains each misstatement:

| Original Statement | Misstatement Because: |
| --- | --- |
| No. 1: At paragraph 4, Singhal stated, "On January 4, 2013, TriPharma, DCDM, and LOJRW signed and executed an engagement letter and fee agreement ("Agreement")." | Singhal does not know whether or not LOJRW signed a copy of the Agreement and, if it was signed, whether it was signed on January 4, 2013 or some other date. Singhal |

RESP. OF DCDM LAW GROUP TO T/D
APPLICATION FOR OSC RE FRAUD

| | |
|---|---|
| | has not been able to locate a copy of the Agreement containing Walton's signature. |
| No. 2.  At paragraph 5, Singhal stated, "The Agreement included an attorney lien clause, which granted DCDM and LOJRW liens against any recovery obtained by TriPharma to secure TriPharma's unpaid legal fees. A true and correct copy of the redacted Agreement is attached hereto as Exhibit A". | Singhal misstated the basis for Walton's lien.  The DCDM Fee Agreement granted a lien to DCDM only.  That agreement did not grant a lien to Walton.  Walton executed a separate fee agreement with TriPharma that grants separate lien rights to Walton. |
| No. 3.  LOJRW's signature block contained at page 8 of the Agreement was redacted. | Singhal does not know why the Walton's signature block was redacted, as there was nothing confidential about it. |

As confirmed in the accompanying declaration of Dheeraj K. Singhal, none of these misstatements were intentional.  Singhal Decl. ¶ 5.  Rather, the misstatements occurred because Singhal (and Walton) did not carefully review the 2016 Singhal Declaration that had been prepared by Singhal's staff, none of whom were intimately familiar with the TriPharma case and the various fee agreements.  *Id.*  Singhal can confirm that Walton did not draft any portion of the motion to intervene, the accompanying ex parte application to shorten time or the 2016 Singhal Declaration. Singhal should have carefully reviewed the declaration, as it was to bear his signature when it was filed.  Walton should have undertaken a careful review, as well.  But neither did.  Had Singhal closely read the 2016 Singhal Declaration, Singhal would have immediately realized that the declaration was wrong because, among other things, Singhal has always known that the DCDM Fee Agreement does not grant a lien to LOJRW.  The issue would have been that much more apparent to Walton had he reviewed the 2016 Singhal Declaration before or after its filing. *Id.*

None of the misstatements had any material impact on the proceedings for a number of reasons.  First, TriPharma and Dameshek have always had a copy of the unredacted copy of the DCDM Fee Agreement since January 4, 2013, when Dameshek received a copy by email. *Id. See also* Declaration of Reid Winthrop in Supp of T/D Application ("Winthrop Decl.") Ex. 305.  As further explained in the Singhal Declaration, none of the draft versions of the 2016 Singhal

Declaration had a redaction of the LOJRW signature block. Undoubtedly, the signature page should not have been redacted, as there was nothing confidential or privileged about it. Singhal Decl. ¶¶ 6-8.

Second, no one knows for sure whether Walton did or did not sign the DCDM Fee Agreement. Walton has testified that he cannot recall one way or the other. Winthrop Decl. Ex. B at 301:13-303:20 (Walton's deposition testimony). Regardless, Walton has acted consistent with the assumption that he had signed the DCDM fee agreement. For example, when Walton informed Singhal that WLG was terminating the lien subordination agreed to in Paragraph 6 of the DCDM Fee Agreement (Winthrop Decl. Ex. 306), Walton was working under the assumption that he had signed the DCDM Fee Agreement. *Id*. at 303:8-20 ("I did believe that it was signed and sent a notice that I was terminating my agreement with him to subordinate my lien for fee payments to his and that was pursuant to that agreement.). In addition, consistent with paragraph 3 of the DCDM Fee Agreement, LOJRW advanced the amount of a sum total of $4,700 to DCDM, an advance of $100 for each of the 47 hours that Singhal personally incurred for the benefit of TriPharma. Singhal Decl. ¶ 10. *See also* Winthrop Ex. 524 (attaching DCDM email to Dameshek and Walton that included initial billing statement reflecting 47 hours of Singhal's time). Had Walton not believed that he had agreed to the DCDM Fee Agreement, Walton is unlikely to have advanced $4,700 to DCDM without TriPharma's knowledge, consent and agreement to reimburse LOJRW.

And third, WLG removed any potential confusion about the source of WLG's lien rights when Walton filed a declaration attaching WLG's redacted fee agreement signed by Dameshek showing the contractual basis of WLG's lien. (Doc. 538 filed on April 1, 2016.) Thus, when this Court heard and granted the DCDM/WLG motion to intervene on April 5, 2016, the Court had before it the respective fee agreements of both DCDM and WLG, the terms of the attorneys' liens that TriPharma respectively granted to DCDM and WLG, and copies of Dameshek's signatures on each fee agreement. (Doc. 543 (minute order reflecting disposition to grant motion to intervene).)

Dameshek himself obliterated any possible confusion about his state of mind and his possession of the original DCDM Fee Agreement in a July 2017 declaration (Doc. 761-3 (Decl. of

RESP. OF DCDM LAW GROUP TO T/D
APPLICATION FOR OSC RE FRAUD

Evan Dameshek in Supp. of Mot. to Determine and Estimate Att'y Liens), in which he made two unretractable admissions:

1) Dameshek testified, "A true and correct copy of the DCDM Engagement Agreement is attached hereto as Exhibit D." (*Id*. at ¶ 8.)  The document attached as Exhibit D was a complete copy of the **unredacted** DCDM Fee Agreement.  Dameshek's Exhibit D did not contain Walton's signature.

2)  Dameshek further testified, "TriPharma granted DCDM a lien on all its 'receivables and monies recovered from any of its pending claims.'" (*Id*. at ¶ 9.) By confirming that TriPharma did in fact grant a lien to DCDM, Dameshek confirmed the validity and enforceability of the underlying DCDM Fee Agreement which set forth the attorneys' lien.

In short, Dameshek's unequivocal admissions left no doubt as to T/D's knowledge of the DCDM Fee Agreement or as to T/D's position on the validity and enforceability of DCDM's Fee Agreement.  In an effort to isolate WLG from DCDM, T/D's motion to estimate liens gushed to the defense of DCDM and repeatedly confirmed the enforceability of DCDM's fee agreement:

- "While DCDM holds an attorney's lien securing the claim for provision of legal services pursuant to DCDM's Engagement Agreement, the same is not the case with respect to LOJRW." Mot. to Determine and Estimate Attorneys' Liens (Doc. 761) at 1:19-21;

- "When Mr. Walton and DCDM requested to intervene in this case over a year ago, their motion was premised upon a stated fact: LOJRW and DCDM had an "economic interest in the pending bankruptcy case by virtue of their valid and enforceable liens that attached to any distributions made to TriPharma .... " That statement was true only as to DCDM and untrue as to LOJRW.  *Id*. at 2:4-9;

- "As stated above, however, there is valid lien in favor of DCDM. Copies of the bills submitted by DCDM are attached as Exhibit E to the Dameshek Declaration and establish the outside sum owed to DCDM is $192,560.50." *Id*. at 8:22-24.

RESP. OF DCDM LAW GROUP TO T/D
APPLICATION FOR OSC RE FRAUD

1   These concessions leave no doubt that T/D concedes that the DCDM Fee Agreement is

2   valid and enforceable, that DCDM has a valid lien on assets secured by TriPharma's allowed

3   secured claim, and that DCDM is owed a maximum, according to T/D, of $192,560.50.  *Id.*

4   One would expect that a party moving this Court for an order to show cause about

5   misstatements would, at the very least, make sure that the application is based upon admissible

6   facts and accurately sets forth relevant proceedings in the underlying case. The T/D Application

7   fails on both counts.  It is disturbing, to say the least, that T/D did not submit a declaration from

8   Dameshek attesting to the alleged facts contained in the T/D Application.  Not only does T/D fail

9   to submit any declaration from Dameshek containing admissible evidence, T/D's attorney, John

10   Randolph Haag, believes he is not bound by any of T/D's unequivocal admissions and positions set

11   forth in T/D's prior filings with this Court, including T/D's Motion to Determine and Estimate

12   Liens (Doc. 761) and Dameshek's supporting declaration (Doc. 761-3).  Attorney Haag has gone

13   so far as to assert—again without any supporting declaration—that Singhal "*tried to trick Haag*"

14   (emphasis in original) by providing the very same unredacted agreement that Dameshek had filed

15   with this Court with Document 761-3.  T/D Application at 25:14-25.  *See also* Singhal Decl. Ex. 2

16   (attaching copy of email sent to Haag in which Singhal forwarded both the fee agreement and the

17   signature page). How could I trick Haag (or Hinds for that matter) by providing a duplicate of the

18   documents in my possession?  That is frankly ridiculous.

19   Relying exclusively on the misstatement in paragraph 4 of the 2016 Singhal Declaration—

20   *i.e.*, that "[o]n January 4, 2013, TriPharma, DCDM, and LOJRW signed and executed an

21   engagement letter and fee agreement"—the  T/D Application lets out a shrieking cry that "fraud"

22   has been committed:

23   *We now know the quoted sentence from the Singhal*
   *Declaration was a fraud on the Court, the Trustee and the*
24   *parties to this BK Case (especially T/D) because DCDM and*
   *WLG (f.k.a. LOJRW) knew WLG did not sign the document,*
25   *and there was no fully executed copy of the document, and*
   *they concealed that fact since 2013 – including in the Joint*
26   *Motion – and thereafter.*

27

28

-7-

T/D Application at 6:23-28 (emphasis in original).  T/D similarly shrieks about the redaction of WLG's signature block:

> ***This redaction was a fraud on the Court, the Trustee, and the parties to this BK Case (especially T/D) because it concealed that there was no WLG/Walton signature on the so-called "Agreement"; and it concealed that no fully executed version of the "Agreement" was in existence; and it concealed the Singhal declaration claiming "full execution" was false; and it concealed there was no fully executed and delivered fee contract in existence to create the contractual rights to fees and liens asserted by WLG and DCDM in the BK Case.***

T/D Application at 7:7-14 (emphasis in original).

In summary, Singhal made three misstatements: 1) attesting that LORJW signed the fee agreement, when he did not know for sure whether Walton signed it; 2) attesting that LOJRW's lien was based upon the DCDM Fee Agreement, when it was based on LOJRW's own fee agreement with T/D; and 3) redacting LOJRW's signature block, when there was nothing confidential about the signature block.  These three statements constitute the sum total of the fraud on "the Court, the Trustee, and the parties to this BK case" and especially T/D who has been forced to tell the truth about money it took from this bankruptcy estate without permission.

As noted above, none of the misstatements misled the Court or any of the parties to this proceeding.  The record before the Court when it ruled on the WLG and DCDM motion to intervene included the respective fee agreements that TriPharma executed with WLG and DCDM, as well as the terms of the respective attorneys' liens that TriPharma granted to WLG and DCDM. (Docs. 515 & 538.)  Furthermore, by the time that the Court entered the order approving the WLG and DCDM motion to intervene (Doc. 787 entered on July 31, 2017), Dameshek had already submitted a duplicate of the complete unredacted DCDM Fee Agreement to the Court at Document 761-3 filed on July 6, 2017, confirming that he knew what was under the redactions in the 2016 Singhal Declaration.

Because none of the misstatements in the 2016 Singhal Declaration had any material consequence to the case at bar, the T/D Application must be denied.

-8-

**III.    THIS COURT SHOULD BE OUTRAGED AT T/D COUNSEL'S FLAGRANT DISREGARD OF RULE 9011(A).**

Federal Rule of Bankruptcy Procedure 9011(a) provides, in pertinent part, that when an attorney presents a pleading to the bankruptcy court, the attorney "is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, —"

> (2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;
>
> (3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery;

Fed. R. Bankr. Proc. 9011.  Rule 9011(c)(1)(B) grants bankruptcy courts the right to impose sanctions for violations of Rule 9011 on the court's "own initiative."  Furthermore, this Court, like all bankruptcy courts, has "the inherent power to sanction vexatious conduct presented before the court [pursuant to 11 U.S.C. § 105(a)]." *In re Rainbow Magazine, Inc.*, 77 F.3d 278, 284 (9th Cir. 1996).

Sanctions are appropriate here because, as discussed below, the T/D Application is not based upon existing law and the factual contentions lack evidentiary support.  At the outset, the T/D Application does not even attach a declaration attesting to the 25+ pages of "facts," which largely consist of Attorney Haag's conjecture and vitriol.  T/D's counsel should be required to provide the evidentiary support that supports the factual contentions made in the T/D Application. In addition, T/D and its counsel should be required to provide the legal authority that would allow this Court to grant the remedies and sanctions that T/D ask of this Court.

**A.    In Addition to Being Required to Layout the Evidentiary Basis, T/D's Counsel Should Be Required to Set Forth the Law Supporting the T/D Application.**

The dispositive issue in the T/D Application is whether the Court would have denied the DCDM and WLG motion to intervene had the Court known that DCDM did not have a copy of Walton's signature on the DCDM Fee Agreement.  That issue depends, in turn, on whether DCDM

RESP. OF DCDM LAW GROUP TO T/D
APPLICATION FOR OSC RE FRAUD

1  had a protectable economic interest in this Court which is not otherwise protected as required by

2  the Federal Rule of Bankruptcy Procedure Rule 2018(a), which governs permissive intervention.

3  *See In re La Sierra Fin. Servs., Inc.*, 290 B.R. 718, 728 (B.A.P. 9th Cir. 2002) (describing the

4  "cause" identified in Rule 2018 as "some economic or other similar interest in the pending matter"

5  which is not otherwise protected).

6      Here, DCDM's economic interest is based upon DCDM's demand to be paid for services

7  rendered to TriPharma in this bankruptcy proceeding between January 2013 and July 2014.  As

8  T/D may recall, they conceded to DCDM's right to be paid in their motion to estimate liens.  (Doc.

9  761 and 761-3.)  Before DCDM and WLG were allowed to intervene, none of the interested parties

10  had any incentive to protect the rights of TriPharma's former lawyers.  With the 2016 Singhal

11  Declaration, DCDM made prima facie showing that its Fee Agreement granted DCDM a lien over

12  any recoveries obtained by TriPharma in the Imagenetix bankruptcy proceeding.  For these

13  reasons, this Court agreed that DCDM (and WLG) had a protectible economic interest and had

14  established sufficient "cause" to be allowed to intervene under FRBP Rule 2018. (Doc. 787 (Order

15  on Jt. Mot. for Order Permitting WLG and DCDM to Intervene in Bankruptcy Proceedings).)

16      As shown by the various excerpts from the T/D Application quoted in the Introduction,

17  *supra*, the T/D Application urges the Court to find that the DCDM Fee Agreement is invalid under

18  California law.  Compliance with FRBP Rule 9011(a)(2) when they filed the T/D Application

19  required T/D's counsel to certify to this Court that existing California and federal law—or a non-

20  frivolous argument "for the extension, modification, or reversal of existing law or the

21  establishment of new law"—supports a finding that the DCDM Fee Agreement is invalid because

22  it lacks Walton's signature.  If that is the case, let's see the supporting law.

23      California Business & Professions Code ("B&P") Section 6148, which governs the

24  enforceability of non-contingent attorney-client fee agreements, states that in any case in which it

25  is "reasonably foreseeable that total expense to a client, including attorney fees, will exceed one

26  thousand dollars ($1,000), the contract for services in the case shall be in writing."  B&P § 6148

27  further requires that the "attorney shall provide a duplicate copy of the contract signed by both the

28  attorney and the client, or the client's guardian."

1    Here, DCDM has repeatedly asserted that it has a valid and enforceable fee agreement with

2    TriPharma because Dameshek signed the fee agreement on behalf of TriPharma and returned a

3    copy to DCDM.  Exhibit 305 to the Winthrop Declaration confirms that a complete copy of the

4    written DCDM Fee Agreement was emailed to Evan Dameshek on January 4, 2013.  On January 7,

5    2013, Dameshek returned a single page containing his execution of the fee agreement on behalf of

6    TriPharma.  Singhal Decl. Ex. 3.[1]  Thus, on January 7, 2013, both DCDM and TriPharma

7    possessed a duplicate copy of the fee agreement and a duplicate copy of Dameshek's signature on

8    the agreement, satisfying the signature requirement of B&P § 6148.

9    Any argument that Dameshek was confused about the terms of the DCDM Fee Agreement

10    or its enforceability without Walton's signature is belied by numerous emails that Dameshek

11    exchanged with Singhal just days after signing the fee agreement.  In the same email thread in

12    which Dameshek attached his signature page, the following exchange took place between Singhal

13    and Dameshek (Singhal Dec. Ex. 4[2]):

14    Singhal (1/8/2013 at 11:46 a.m.):    "Got it!  Thank you."

15    Dameshek (1/8/2013 at 12:10 p.m.)    "No, thank *YOU*! Now go win me some money! All
16    kidding aside, I look forward to meeting you and
17    working with you."

18    Singhal (1/8/2013 at 9:50 p.m.)    "Same here.  Hopefully we can get you the IP rights
      you need to bring in the rainfall."

19

20    Dameshek (1/9/2013 at 8:45 a.m.)    "Amen to that. Do you have any questions of me?
21    Notwithstanding not being a lawyer, I often have
      strong opinions - John doesn't always agree with

_____

[1] Pursuant to Federal Rules of Evidence 502(a), TriPharma has affected a waiver of the attorney
client privilege as to, at the very least, all communications concerning the same subject matter as
TriPharma's disclosures made as part of the T/D Application, which include the email from
Singhal to Dameshek dated January 4, 2013. Fed. R. Evid. 502(a) ("When a disclosure is made in
a federal proceeding …, the waiver extends to an undisclosed communication … only if: (1) the
waiver is intentional; (2) the disclosed and undisclosed communications or information concern the
same subject matter; and (3) they ought in fairness to be considered together.")  The January 7,
2013 email from Dameshek to Singhal replies to T/D's Exhibit 305.  The emails should, therefore,
be considered together.

[2] For the same reasoning set forth footnote 1, T/D's waiver of the attorney-client privilege should
extend to the email exchanges set forth in Exhibit 4 to the Singhal Declaration similarly should be
considered together with T/D's Exhibit 305.

RESP. OF DCDM LAW GROUP TO T/D
APPLICATION FOR OSC RE FRAUD

| | | |
|---|---|---|
| 1 | | them - particularly as it relates to the bk filing and, hopefully, getting it jettisoned. Thanks again." |
| 2 | … | … |
| 3 | Singhal (1/9/2013 at 11:55 a.m.) | "You sound like a client who has been through his share of litigation and lawyers." |
| 4 | | |
| 5 | Dameshek (1/9/2013 at 12:23 p.m.) | "Yes. Fortunately -- I guess -- I'm always the Plaintiff. Although I consider my shelf to be fairly shrewd; I find myself always getting screwed. This |
| 6 | | situation though has been the Super Bowl of all my litigation. Fortunately, John is, hands down, the best |
| 7 | | lawyer with whom I have been involved." |
| 8 | | |

9        This email exchange is particularly illustrative of Dameshek's state of mind upon signing

10   the DCDM Fee Agreement.  First off, Dameshek confirms his appreciation for Singhal's

11   willingness to represent TriPharma under the agreed upon fee structure, with no indication that

12   Dameshek was awaiting Walton's signature before DCDM would be officially retained ("No,

13   thank *YOU*! Now go win me some money! All kidding aside, I look forward to meeting you and

14   working with you.").  Dameshek then forewarns Singhal that Dameshek will have strong opinions

15   on legal issues and is intimately involved in the Imagenetix bankruptcy ("Notwithstanding not

16   being a lawyer, I often have strong opinions - John doesn't always agree with them - particularly as

17   it relates to the bk filing and, hopefully, getting it jettisoned.").  In the last email of the exchange,

18   Dameshek plays victim while boasting that he is litigious ("Fortunately -- I guess -- I'm always the

19   Plaintiff. Although I consider my shelf to be fairly shrewd; I find myself always getting screwed.")

20   And finally, Dameshek puts down on paper the praises he often sung about Walton's legal skills

21   and how adeptly Walton was handling the most complex litigation in which Dameshek has been

22   involved ("This situation though has been the Super Bowl of all my litigation. Fortunately, John is,

23   hands down, the best lawyer with whom I have been involved.")

24        Against the background of these email exchanges occurring just two days after Dameshek

25   signed the DCDM Fee Agreement, exchanges that confirmed Dameshek's enthusiasm to have

26   DCDM and WLG as TriPharma's counsel in the bankruptcy, T/D argues that they believed that

27   Walton's signature was required before DCDM's fee agreement would become effective.  T/D

28   Application Memo. at n.14. ("T/D never contemplated that WDT#3 would be effective without

RESP. OF DCDM LAW GROUP TO T/D
APPLICATION FOR OSC RE FRAUD

execution by all three parties and delivery of the fully executed agreement to T/D.")  Forging ahead, without any eye to the truth, T/D states that "Singhal expressly led T/D to believe the document would not be effective until fully executed …."  Really?  Where in that email exchange does Singhal say that Walton's signature was required.  Indeed, T/D cannot point to a single email from Singhal remotely suggesting that the DCDM Fee Agreement would not be effective without Walton's signature.  Such cowardly assertions devoid of any factual support explains why Dameshek and T/D's counsel elected to not file a supporting declaration from Dameshek; otherwise, they would be constrained by the truth and may risk consequences for false testimony.

In order to comply with Rule 9011(a)(2), T/D must show that existing case law—or the extension, reversal, modification of existing law—supports T/D's position that an attorney-client fee agreement signed by both the attorney and the client becomes unenforceable under B&P 6148 if another lawyer to the agreement performs under the agreement but may not have signed it.  If such authority existed, surely T/D would have cited to it.  They have not because they cannot.  Indeed, the undersigned has not been able to locate any such legal authority.

**B.** **Counsel for T/D Should Be Required to Show Cause Why They Should Not be Sanctioned for the Relief Sought by the Application.**

This Court should be incensed at the remedies and sanctions sought in the T/D Application.  Attorney Reid Winthrop (and ghostwriter Attorney John Randolph Haag) should be charged with providing the factual basis and the legal authority that would permit the Court to grant any of the following egregious remedies and sanctions requested by the T/D Application:

1) **"An order holding WWDS in contempt."**  Attorneys Winthrop and Haag have failed to cite to any legal authority whatsoever on the standard for contempt under the Ninth Circuit and failed to show how the conduct of DCDM and WLG rises to the level of contempt.  "In a civil contempt action, the moving party has the burden by clear and convincing evidence that the contemnors violated a specific and definite order of the court, and the burden then shifts to the contemnors to demonstrate why they were unable to comply." *FTC v. Enforma Natural Products, Inc.*, 362 F.3d 1204, 1211 (9th Cir. 2004).  Which order was violated and how?  T/D's counsel have failed to identify any specific and definite order of the Court that was violated.

RESP. OF DCDM LAW GROUP TO T/D
APPLICATION FOR OSC RE FRAUD

2) **"An order striking the previous order granting the WLG/DCDM Joint Motion to intervene."** This request is a disguised and defective request for the Court to reconsider and overrule its prior order that must be made under Federal Rule of Civil Procedure 60(b). T/D's counsel have failed to set forth any legal authority permitting this Court to grant relief from a prior order under any of the six enumerated grounds of Rule 60(b).

3) **"An order dismissing with prejudice the pending OSC initiated by WLG/DCDM."** In asking for a dismissal of the OSC re Contempt, T/D seek to equate the three misstatements to the false statements made to the Court in a stipulation that the Court approved late on a Friday evening of July 18, 2014, in which the Court 1) approved a $20,000 payment directly to TriPharma, and 2) ordered no notice or hearing was required to effectuate the stipulation. (Doc. 400.) Incensed at the lack of candor to the Court, the Court vacated the order approving the stipulation *nunc pro tunc*. (Doc. 442.)

T/D counsel must have felt particularly brave in asking the Court to dismiss the OSC re Contempt proceeding. As T/D and its counsel are well aware, while the application requesting an order to show cause was filed by WLG and DCDM, it is the Court that issued the Order to Show Cause re Contempt because the Court must "determine the consequences of the actions taken in violation of its orders." (Doc. 890 at 3 (Tentative Ruling on OSC re Contempt).) In other words, T/D and its counsel are asking the Court to forgive and forget all of T/D's violations of this Court's orders. Wow.

5) **"An order requiring WWDS to pay all attorney's fees and expenses for T/D and other parties to the extent they were incurred in addressing issues involving WWDS since the filing of the Joint Motion."** In other words, T/D and its counsel are asking the Court to order DCDM and WLG to pay for the attorneys' fees that T/D have incurred when forced to disclose the truth to this Court, to rectify their willful violations of this Court's orders, as well as for fees T/D incurred when submitting knowingly false and inconsistent testimony to this Court on multiple occasions. The audacity is unrivaled.

7) **"An order equitably striking the alleged WLG and DCDM attorney liens asserted against T/D."** What exactly does it mean to equitably strike the attorneys' liens and does this

RESP. OF DCDM LAW GROUP TO T/D
APPLICATION FOR OSC RE FRAUD

Court have legal authority to do so?  T/D fail to provide any case law supporting such a broad exercise of judicial authority.  In light of all the wrongs that T/D has engaged in during the pendency of this bankruptcy proceeding, many of which were enabled by T/D's counsel, both past and present, T/D and its counsel must explain how the facts presented support the striking the attorneys' liens as well as provide the legal authority that would permit the Court to grant this serious remedy.

8) **"An order reporting WWDS to the State Bar of California for perpetrated fraud on the Court and others so the State Bar can investigate and determine if disbarment, suspension or other remedies are appropriate."** Local Civil Rules of Practice for the United States District Court for the Southern District of California Rule 83.5, which is made applicable to the Southern District Bankruptcy Courts, provides that Courts may "refer the matter to the disciplinary body of any court before which the attorney has been admitted to practice."  Nowhere is there any authority for the bankruptcy court to make a report directly to the State Bar of California.  Not only is this request highly offensive and unprofessional, the Civil Rules do not permit such an order.  T/D and its counsel must be required to explain how the Court could possibly entertain such relief in light of the Civil Rules and the utter lack of admissible evidence presented by T/D and its counsel.

9) **"An order referring WWDS to the appropriate attorney misconduct investigation and enforcement tribunal of the United States Bankruptcy Court."**  As parties who have submitted knowingly false declarations to this Court and lied outright, it is interesting that T/D and its counsel request this relief.  If the Court would consider a referral of DCDM and WLG to the disciplinary body for the Southern District for the misstatements in the 2016 Singhal Declaration, one can only imagine the consequences to T/D, DHF and Hinds for their conduct before this Court.

## IV.   RESPONSE TO THE JOINDER OF JAMES ANDREW HINDS, JR. AND HINDS & SHANKMAN, LLP

In an eyebrow-raising joinder filed by James Andrew Hinds, Jr. and Hinds & Shankman, LLP, Hinds and H&S join the T/D Application because they have had enough of being accused of lying, making false representations to the Court and advancing arguments that defy common sense:

RESP. OF DCDM LAW GROUP TO T/D
APPLICATION FOR OSC RE FRAUD

> H&S joins with the AOSC because it has been the subject matter of outright lies and vicious innuendo from WLG and DCDM who contend that H&S acted to divert money due to TriPharma and DHF under the Debtor's Plan to third-parties in violation of this Court's Orders. H&S denies now, and has denied throughout this matter that its conduct was designed in any way to misdirect funds under the Debtor's Plan. Yet, despite there being no direct evidence of any improper acts on the part of H&S, the record is now clear that WLG and DCDM perpetrated a fraud on this Court as part of their Joint Motion.

(Doc. 1017 at 2:20-26.)  In other words, the spotlight should be shifted from them to DCDM/WLG because there is "no direct evidence of any improper acts on the part of H&S" or presumably Hinds himself.  Not quite.

The Court may recall the conflicting testimony from Hinds about an accounting of TriPharma/Dameshek/DHF/Imagenetix-related funds in the H&S Client Trust Account. In Document 741, Hinds testified that the sum of $17,969.48 was paid to his H&S on March 4, 2016 and that two wires were sent to DHF.  (Doc. 741 at ¶¶ 5-6.)  In Document 905, Hinds testified that the sum of $17,969.48 was actually sent to GFY LLC, not to his firm.  (Doc. 905 ¶ 6.)  In Document 905, Hinds also testified that the two wires that were supposedly sent to DHF according to Document 741 were actually sent to GFY LLC.  These gross factual inaccuracies are just a few instances of false testimony that Hinds has submitted to this Court.

Perhaps Hinds has also forgotten about his knowingly false statement made under penalty of perjury that "[a]s a result of the filing of the Order to Show Cause, TriPharma returned to my Clients Trust Account $20,000.00."  (Doc. 708 (Decl. of James Andrew Hinds, Jr. in Support of Opp. to Application for OSC) at ¶ 4.)  In the accompanying Dameshek Declaration, Dameshek testified, again under penalty of perjury, that "as a result of the filing of the Order to Show Cause, TriPharma has returned $20,000.00 to the Trust Account of Hinds and Shankman, LLP."  (Doc. 708 (Decl. of Evan Dameshek in Support of Opp. to Application for OSC) at ¶ 28.)  In reality, both Dameshek and Hinds were lying to the Court because TriPharma never returned $20,000 to the H&S Trust Account, as confirmed by the Hinds' accounting in Document 905.  Indeed, if such a deposit was made, perhaps Hinds and H&S can provide a copy of the deposit slip or an excerpt from the Client Trust Account monthly statement confirming the Deposit.

RESP. OF DCDM LAW GROUP TO T/D
APPLICATION FOR OSC RE FRAUD

1    Of course, one cannot forget the immemorable arguments that Hinds and H&S made to

2    oppose the OSC re Contempt.  As the Court may recall, as counsel for DHF and TriPharma, Hinds

3    and H&S argued that DHF acquired TriPharma's allowed claims without being subject to the

4    Court's Confirmation Order or the attorneys' liens of DCDM and WLG.  (Doc. 708 (Opp. and

5    Response to OSC at 3:16-27.)  The Court was troubled by the argument, but limited its response,

6    saying "The court does not understand why DHF would contend it is not bound by the Plan as a

7    successor in interest."  (Doc. 731 (Tentative Ruling) at 3.)

8    In the Conclusion section of their joinder, Hinds and H&S recite verbatim the incredible

9    remedies and sanctions requested in the T/D Application.  Should the Court deem that sanctions or

10    an order to show cause against Winthrop and Haag is appropriate, the court should add Hinds and

11    H&S to that list of offending counsel.

## V.    CONCLUSION

13    For the reasons stated above, DCDM hereby requests that this Court deny the T/D

14    Application.  DCDM further asks that T/D, T/D's counsel, Hinds and H&S should be required to

15    show cause why they should not be sanctioned for the showstopping remedies and sanctions that

16    they each seek for three misstatements that had no impact on these legal proceedings.  And finally,

17    DCDM requests that T/D and T/D's counsel (including both Winthrop and Haag) be required to

18    show cause why they should not be sanctioned for willful violations of Rule 9011(a)(2) and (a)(3).

Dated: August 7, 2018          DCDM LAW GROUP, PC

By    /s/ Dheeraj K. Singhal
                DHEERAJ K. SINGHAL
                Attorneys for Intervenor
                DCDM LAW GROUP, PC

## **DECLARATION OF DHEERAJ K. SINGHAL**

I, Dheeraj K. Singhal, hereby declare and state as follows:

1.      I am the principal of the DCDM Law Group, PC ("DCDM") and an attorney at law licensed to practice and practicing before this Court and the Courts of the State of California.  The facts set forth in this declaration are personally known to me to be true and correct and if called upon to do so, I could and would testify competently thereto.

2.      This declaration is submitted in support of the Response of DCDM Law Group, PC to the Application of TriPharma and Dameshek for Order to Show Cause RE Fraud Perpetrated on the Court, the Trustee, TriPharma and Dameshek (collectively, "T/D") by Intervenors Walton Law Group ("WLG") and DCDM Law Group ("T/D Application").

3.      On March 11, 2016, in support of an ex parte application to shorten time on the motion to intervene (Doc. 515) filed on behalf of DCDM and Walton Law Group, PC, DCDM filed a declaration of the undersigned dated March 11, 2016 (the "2016 Singhal Declaration"). (Doc. 515.)  For the Court's reference, a copy of the ex parte application, together with the accompanying March 11, 2016 declaration is attached as Exhibit 1.

4.      DCDM acknowledges three misstatements made in the 2016 Singhal Declaration. The chart below sets forth the original statement and identifies each specific misstatement:

| Original Statement | Misstatement Because: |
|---|---|
| No. 1:  At paragraph 4, I stated, "On January 4, 2013, TriPharma, DCDM, and LOJRW signed and executed an engagement letter and fee agreement ("Agreement")." | I do not know whether or not LOJRW signed a copy of the Agreement and, if it was signed, whether it was signed on January 4, 2013 or some other date. I have not been able to locate a copy of the Agreement containing Walton's signature. |
| No. 2:  At paragraph 5, I stated, "The Agreement included an attorney lien clause, which granted DCDM and LOJRW liens against any recovery obtained by TriPharma to secure TriPharma's unpaid legal fees. A true and | I misstated the basis for Walton's lien.  The DCDM Fee Agreement granted a lien to DCDM only.  That agreement did not grant a lien to Walton.  Walton executed a separate fee agreement with TriPharma that grants separate lien rights to Walton. |

RESP. OF DCDM LAW GROUP TO T/D
APPLICATION FOR OSC RE FRAUD

| | |
|---|---|
| correct copy of the redacted Agreement is attached hereto as Exhibit A". | |
| No. 3.  LOJRW's signature block contained at page 8 of the Agreement was redacted. | I do not know why the Walton's signature block was redacted, as there was nothing confidential about it. |

5.     None of these misstatements were intentional.  Rather, the misstatements occurred because I (and John Walton) did not carefully review the 2016 Singhal Declaration that had been prepared by my staff, none of whom were intimately familiar with the TriPharma case and the various fee agreements.  I can confirm that Walton did not draft any portion of the motion to intervene, the accompanying ex parte application to shorten time or the 2016 Singhal Declaration. I should have carefully reviewed the declaration, as it was to bear my signature when it was filed. Walton should have undertaken a careful review, as well.  But neither of us did.  Had I closely read the 2016 Singhal Declaration, I would have immediately realized that the declaration was wrong because, among other things, I have always known that the DCDM Fee Agreement does not grant a lien to LOJRW.  The issue would have been that much more apparent to Walton had he reviewed the 2016 Singhal Declaration before or after its filing.

6.     As to the redaction, I recall asking a DCDM staff member to redact the confidential portions of the DCDM Fee Agreement to make sure that DCDM was complying with its duties to preserve the attorney-client privilege with its former client, TriPharma.  I have emails with my staff evidencing an exchange about the redactions and confirming that I did not want them to redact anything that was not confidential. I would be happy to provide them to the Court for an *in camera* review. None of the redacted versions of the DCDM Fee Agreement I exchanged with my staff contained a redaction of the LOJRW signature block.  Undoubtedly, the signature page should not have been redacted, as there was nothing confidential or privileged about it.

7.     I have no recollection as to why the LOJRW signature block was redacted.  Based upon my review of the electronic files of DCDM, which are kept in the normal course, I found a file named "2016-3-11 Declaration of DKS & Exhibits – Final" that was last edited at 3:53 p.m. on Friday, March 11, 2016.  The ex parte application was filed as Document 515 at 4:14 that same

RESP. OF DCDM LAW GROUP TO T/D
APPLICATION FOR OSC RE FRAUD

afternoon.  That file contained all the redactions set forth in the 2016 Singhal Declaration but did not redact the signature block of LOJRW.

8.      Just four minutes later, at 3:57 p.m. on the afternoon of March 11, 2016, there is another file containing my declaration, with this file named "2016-3-11 Declaration of DKS & Exhibits – Final_Redacted." The only difference between the two files is the redaction of the LOJRW signature block.  It makes no sense to me why the signature block would have been redacted at the last minute.  I know for sure that I did not redact the signature block myself.  My conversations with my former associate, Ryan Stubbe, did not bring forth any recollection for either of us.  I was unable to reach the two other staff members who were involved with preparing and filing the ex parte application and the 2016 Singhal Declaration.

9.      No one knows for sure whether Walton did or did not sign the DCDM Fee Agreement.  To the best of my recollection, I never gave a second thought to Walton's signature until some point in 2016 or 2017.  Even then, I did not think it was significant.  In my mind, I treated the DCDM Fee Agreement just as I did any other client fee agreement, in that the key issues were whether the client had signed it and whether the client had a duplicate of the executed agreement.  Here, Dameshek had signed the DCDM Fee Agreement and he had a copy.  Check and check.

10.      My actions and those of Walton were consistent with Walton having agreed to and signed the DCDM Fee Agreement.  For example, as my email to Dameshek and Walton of March 6, 2013 shows, I submitted a billing statement to them showing that I had incurred 47 hours of billable time on behalf of TriPharma. Exhibit 524 to the Winthrop Declaration is a copy of that March 6, 2013 email and billing statement.  In response, LOJRW wrote a check to DCDM Law Group, PC in the amount of $4,700 dated on or about March 13, 2013, to advance $100 for each of the 47 hours that I personally incurred for the benefit of TriPharma. Had Walton not believed that LOJRW had agreed to the DCDM Fee Agreement, Walton is unlikely to have advanced $4,700 to DCDM without TriPharma's knowledge, consent and agreement to reimburse LOJRW.

11.      On  September 18, 2017, in response to Attorney John Randolph Haag's request for a signed copy of the DCDM Fee agreement, I forwarded him a copy of the final version of the fee

RESP. OF DCDM LAW GROUP TO T/D
APPLICATION FOR OSC RE FRAUD

agreement that I had forwarded to Dameshek on January 4, 2013 and a copy of Dameshek's signature page that he returned to me on January 7, 2013.

12.    Attached as Exhibit 2 hereto is a duplicate of the September 2017 email to Haag, along with the accompanying attachments.

13.    Attached as Exhibit 3 is a duplicate of Dameshek's January 7, 2013 email to me including his signature page.

14.    Attached as Exhibit 4 is a duplicate of an email exchange that I had with Dameshek between January 8-9, 2013 in the same email thread in which Dameshek attached his signature page.

I declare, under penalty of perjury that the foregoing is true and correct, and that this declaration was executed on the 7th day of August, 2018 at Westlake Village, California.

/s/ Dheeraj K. Singhal
DHEERAJ K. SINGHAL

RESP. OF DCDM LAW GROUP TO T/D
APPLICATION FOR OSC RE FRAUD